LINDABURY, MCCORMICK, ESTABROOK & COOPER
A Professional Corporation
53 Cardinal Drive
P.O. Box 2369
Westfield, N.J. 07091
(908) 233-6800
Attorneys For Defendant Nissan Motor Acceptance Corporation
 Improperly plead as Nissan-Infiniti LT

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

|  |  |  |
|---|---|---|
| ANDREW RITZ and MICHAEL RITZ | : | Civil Action No. 3:20-cv-13509 |
|  | : |  |
| Plaintiffs, | : |  |
|  | : |  |
| vs. | : |  |
|  | : |  |
| NISSAN-INFINITI LT; TRANS UNION, LLC, | : |  |
| EQUIFAX INFORMATION SERVICES, LLC; and | : |  |
| EXPERIAN INFORMATION SOLUTIONS, INC. | : |  |
|  | : |  |
| Defendants. | : |  |
|  | : |  |
|  | : |  |

**DEFENDANT NISSAN MOTOR ACCEPTANCE CORPORATION'S (improperly plead
as Nissan-Infiniti LT.) BRIEF IN SUPPORT OF MOTION FOR SUMMARY
JUDGMENT.**

On the Brief:

      Steven L. Fox, Esq.

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .......................................................................................................... ii

PRELIMINARY STATEMENT .................................................................................................... 1

STATEMENT OF FACTS ............................................................................................................. 2

    1.   Procedural History ............................................................................................................... 2

    2.   Origination of Lease and Relevant Terms ........................................................................... 3

    3.   Procedure for Returning Leased Vehicle and Ritz Failure to Comply ................................. 3

    4.   Ritz Did not Sustain Provable Damages ............................................................................... 7

LEGAL ARGUMENT .................................................................................................................. 10

POINT I ....................................................................................................................................... 10

THE SUMMARY JUDGMENT STANDARD ............................................................................ 10

POINT II ...................................................................................................................................... 11

PLAINTIFFS' CLAIM FAILS BECAUSE NMAC'S REPORTING IS ACCURATE AS A
MATTER OF LAW ...................................................................................................................... 11

POINT III ..................................................................................................................................... 14

RITZ'S CLAIM FAILS BECAUSE EVEN IF THE REPORTING WAS INACCURATE,
WHICH IT IS NOT, RITZ'S DISPUTE CONCERNS A LEGAL ISSUE RATHER THAN AN
ALLEGED FACTUAL INACCURACY. ..................................................................................... 14

POINT IV ..................................................................................................................................... 18

ALTERNATIVELY, NMAC MUST BE GRANTED SUMMARY JUDGMENT DISMISSING
PLAINTIFFS' CLAIM FOR STATUTORY AND PUNITIVE DAMAGES UNDER 15 U.S.C.
1681(N) BECAUSE NMAC DID NOT WILLFULLY VIOLATE THE FCRA .......................... 18

POINT V ....................................................................................................................................... 20

ALTERNATIVELY, NMAC MUST BE GRANTED SUMMARY JUDGMENT BECAUSE
PLAINTIFFS HAVE NOT SUFFERED DAMAGES ................................................................. 20

CONCLUSION ............................................................................................................................. 22

## TABLE OF AUTHORITIES

**Cases**

Bell Atl. Corp. v. Twombly
550 U.S. 554 (2007)......................................................................................................................21

Berkery v. Equifax Info. Servs. LLC
No. CV 18-3417, 2019 U.S. Dist. LEXIS 73906, 2019 WL 1958567(E.D. Pa. 2019) .................14

Birmingham v. Experian Info. Sols., Inc.
633 F.3d 1006 (10th Cir. 2011) ...................................................................................................18

Carruthers v. Am. Honda Fin. Corp.
717 F. Supp. 2d 1251 (N.D. Fla. 2010) ........................................................................................11

Celotex Corp. v. Catrett
477 U.S. 317(1986)...............................................................................................................10, 11

Chiang v. Verizon New England Inc.
595 F.3d 26 (1st Cir. 2010)...................................................................................................12, 15

Chijioke-Uche v. Equifax Info. Services, LLC
No. CV 19-4006, 2021 WL 2005499 (E.D. Pa. May 20, 2021) .....................................................15

Cohen v. Mercantile Adjustment Bureau, LLC
No. 21-16977 (KM) (JSA), 2022 U.S. Dist. LEXIS 89326 (D.N.J. 2022)......................................15

Cosmas v. Am. Exp. Centurion Bank
757 F. Supp. 2d 489 (D.N.J. 2010)...............................................................................................11

Doe v. Abington Friends Sch.
480 F.3d 252 (3d Cir. 2007) .........................................................................................................11

Esperance v. Resorts
No. 1:18-cv-10248, 2022 U.S. Dist. LEXIS 95453 (D.N.J. 2022)...........12, 13, 14, 15, 16, 19, 20,

Felts v. Wells Fargo Bank, Nat'l Ass'n
893 F.3d 1305 (11th Cir. 2018) ....................................................................................................12

Fireman's Ins. Co. v. DuFresne
676 F.2d 965 (3d Cir.1982) ..........................................................................................................11

Fuges v. Sw. Fin. Servs., Ltd.
707 F.3d 241 (3d Cir. 2012) .........................................................................................................18

Gatanas v. Am. Honda Fin. Corp.
No. 20-7788, 2020 WL 7137854 (D.N.J. Dec. 7, 2020) .................................................................12

Holland v. Trans Union, LLC
574 F. Supp. 3d 292 (E.D. Pa. 2021)...........................................................................................12

Hopkins v. I.C. Sys.
No. 18-2063, 2020 U.S. Dist. LEXIS 88905 (E.D. Pa. 2020).......................................................14

Kelly v. RealPage, Inc.
539 F. Supp. 3d 374 (E.D. Pa. 2021)...........................................................................................11

Ostrander v. Trans Union LLC
No. 20-5227, 2021 U.S. Dist. LEXIS 142220 (E.D. Pa. 2021).......................................................12

Pittman v. Experian Info. Sols., Inc.
901 F.3d 619 (6th Cir. 2018) .......................................................................................................12

Rosenberg v. Frontline Asset Strategies, LLC
556 F. Supp. 3d 157 (E.D.N.Y. 2021).........................................................................................15

Ruffin–Thompkins v. Experian Info. Solutions, Inc.
422 F.3d 603 (7th Cir.2005) .......................................................................................................21

Safeco Ins. Co. of America v. Burr
551 U.S. 47 (2007).......................................................................................................................18

Salvador v. Fedloan Servicing
No. CV 20-20568, 2021 WL 5422292 (D.N.J. Oct. 28, 2021).......................................................12

Scaife v. Nat'l Credit Sys., Inc.
No. 1:20-cv-00379-CLM, 2021 U.S. Dist. LEXIS 79472 (N.D. Ala. 2021)...................................15

Shannon v. Equifax Info. Servs., LLC
764 F. Supp. 2d 714 (E.D. Pa. 2011)...........................................................................................11

Slack v. Suburban Propane Partners, LP
No. 10-cv-2548, 2010 WL 3810870 (D.N.J., Sept. 21, 2010)..................................................20, 21

Van Veen v. Equifax Info.
844 F. Supp. 2d 599 (E.D. Pa. 2012).........................................................................10, 14, 17, 18,

Wadley v. Ford Motor Credit Co.
397 F. Supp. 2d 781 (E.D. Va. 2005) ...........................................................................................13

Young v. Harbor Motor Works, Inc.
No. 07–31, 2009 WL 187793 (N.D. Ind. Jan.27, 2009) ...............................................................21

**Statutes**

15 U.S.C. § 1681s-2(b) .................................................................................................................2

15 U.S.C. §1681(n) ...............................................................................................................2, 20

15 U.S.C. §1681(o) .......................................................................................................................2

49 CFR §580.7...................................................................................................................17, 19

**Rules**

Rule 56(a) ....................................................................................................................................10

## **PRELIMINARY STATEMENT.**

The ultimate issues on this motion are as follows: (1) whether lessees Andrew Ritz and Michael Ritz were 30 days past due on their payment due in August 2019; or (2) is the determination of whether the lessees owed the payment due in August 2019 a legal dispute. If either are in the affirmative, then NMAC is not liable under the FCRA as a matter of law and summary judgment should be granted. Both issues should be decided in NMAC's favor. Moreover, even if there was a viable claim for liability, which there is not, Ritz did not sustain any damages as a result of the alleged violation, and therefore the claim fails as a matter of law. Lastly, even if the Court found an outstanding issue of fact on any of these issues, partially summary judgment should be granted in NMAC's favor insofar as there is no evidence of a willful violation.

As explained below, the fundamental facts are not in dispute. On the final day of the term, without notice or a scheduled appointment, Andrew and Michael Ritz brought the vehicle to a dealership (dealerships are independent entities from NMAC) that told them it would not accept the vehicle because, among other reasons, they had failed to make the required appointment. Andrew and Michael Ritz left without signing any documents related to disposition of the vehicle, most notably the federally required odometer statement. The non-party dealership did not accept possession of the vehicle and, accordingly, did not notify NMAC that the vehicle was in its possession. Pursuant to the terms of the subject lease agreement, if a customer keeps possession of the vehicle past the end of the lease term, NMAC is expressly permitted to continue charging monthly payments.

Neither Andrew nor Michael Ritz returned to the dealership until over a month later at which point the required documents were signed and the dealership accepted possession of the vehicle. NMAC was notified by the dealership that the vehicle had been "grounded," and therefore

1

no further monthly payments were charged. By the time the vehicle was "grounded," one payment had already come due and went unpaid, resulting in NMAC reporting Andrew and Michael Ritz as 30 days delinquent on the account. Andrew Ritz disputed this delinquency notation on his credit report, but NMAC investigated and confirmed he failed to make the August 2019 monthly payment. There is no dispute that neither Andrew nor Michael Ritz did not make this payment, the only dispute is whether they were legally required to make the payment under the terms of the lease agreement.

## STATEMENT OF FACTS.

**1.    Procedural History**

On September 29, 2020, plaintiffs Andrew Ritz and Michael Ritz[1] (hereinafter referred to collectively as "**Ritz**" unless otherwise designated) commenced this action against NMAC; TransUnion, LLC; Equifax Information Services, LLC; and Experian Information Solutions, Inc. (See Complaint attached to the accompanying Certification of Steven L. Fox, Esq., dated August 31, 2022, **Exhibit "A".**) NMAC filed an Answer. (See Fox Cert., **Exhibit "B".**) Subsequently, Ritz dismissed their claims against TransUnion, LLC; Equifax Information Services, LLC; and Experian Information Solutions, Inc., leaving NMAC as the remaining defendant. (See Fox Cert., **Exhibit "C".**)

In this action, Ritz allege that NMAC willfully or negligently violated the Fair Credit Reporting Act ("**FCRA**"), 15 U.S.C. § 1681s-2(b), 15 U.S.C. § 1681(n), and 15 U.S.C. §1681(o), by reporting inaccurate or incomplete information to the Credit Reporting Agencies related to an

---

[1]    Andrew Ritz is the son of Michael Ritz.  At the time of their depositions, they resided at the same address.

automobile lease, failing to investigate Ritz's request for reinvestigations and failing to respond to Ritz's requests for reinvestigation.  (See Fox Cert., **Exhibit "A"**.)

**2.      Origination of Lease and Relevant Terms**

The following pertinent facts are to be considered.  On or about May 10, 2017, Ritz leased a 2017 Nissan Sentra from non-party DCH Freehold Nissan.  DCH Freehold Nissan then assigned the lease to Nissan-Infiniti LT for which NMAC acts as servicer. The lease provided for twenty-four monthly payments, with the lease maturity date of May 9, 2019. (See Fox Cert., Exhibit "D".) On or about April 17, 2019, Ritz requested a three (3) month end of lease extension, which was approved by NMAC.  (See Fox Cert., **Exhibit "E"**.)

In addition, the lease provides that "When your Lease terminates . . . you will return the Vehicle to a Nissan dealer or other location we specify. You will complete a statement of this Vehicle's mileage at termination as required by federal law. **If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments** . . ." (See Fox Cert., **Exhibit "D", paragraph 12**) [emphasis added]. Ritz was aware that keeping the vehicle beyond August 9, 2019, would result in the need "to make another lease payment of $181.51." (See Fox Cert., **Exhibit "K",** Responses to Nissan's First Set of Interrogatories, Andrew Ritz, interrogatory number 11, relevant portion at the beginning of page 18 to first paragraph on page 19.)

**3.      Procedure for Returning Leased Vehicle and Ritz Failure to Comply**

Prior to the expiration of the lease term, as extended, NMAC provided Ritz with information for the procedure for turning in the leased vehicle and terminating the lease.  This process requires an inspection of the leased vehicle and instructs Ritz in all bold letters to **"[s]chedule your complimentary, but required, vehicle inspection,"** and that he is "required to

complete a Federal Odometer/Lease Termination Statement." (See Fox Cert., **Exhibit "F"**.)[2]  At his deposition, Ritz testified that he "may have looked at probably" the lease end information. (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 15, line 11 to page 16, line 18.) Despite clear statements requiring an appointment to be scheduled to turn in the vehicle,[3] Ritz stated he did not think a lease return appointment was required.  (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 14, lines 10 to 14.)

On August 9, 2019, without scheduling an appointment or inspection necessary to terminate the lease, Ritz appeared unannounced at DCH Freehold Nissan (a non-party in this action and not a related entity to NMAC) to turn in the leased vehicle. (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 13, line 7 to page 14, line 14.)  An employee of the dealership informed Ritz that an appointment was necessary and therefore the dealership would not be returning the car for Ritz. (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 16, line 22 to page 18, line 9.) In fact, demonstrating the dealerships unwillingness to take possession of the vehicle from Ritz without following the proper procedure, Andrew Ritz testified that the employee told him that the vehicle would be towed back to his house because the dealership could not keep the vehicle on its lot. (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 19, line 23 to page 20, line 5.)

Without the appointment, the dealership was unable to meet with Ritz to inspect the leased vehicle and to complete legally required documents and forms. (Id.) An appointment is necessary when turning in a leased vehicle to inspect the leased vehicle and to sign legally required documentation and forms and specifically, an odometer statement.  (See Fox Cert., **Exhibit "H"**,

---

[2] Ritz produced Exhibit F in discovery.
[3] The End of Lease instructions provide three options at the end of the lease. Two of the options includes the same initial bold heading of "**1 - Schedule your complimentary, but required, vehicle inspection.**" The third option involves the customer keeping the vehicle.

Deborah Donley's deposition transcript, page 88, line 23 to page 92, line 25.)  Ritz's contractual obligation to sign the odometer statement is expressly stated in the Lease Agreement which Ritz signed. (See Fox Cert., **Exhibit "D"**, page 3, section 12.)  In fact, Federal law requires an odometer statement to be executed when a lease terminates. (See Fox Cert., **Exhibit "U"**, 49 CFR § 580.7.)

While at the dealership on August 9, 2019, a verbal altercation ensued between Ritz and the dealership representative, not NMAC, regarding Ritz not having an appointment and the dealership's inability to inspect the vehicle, meet with Ritz to sign the documents and terminate a/k/a "ground" the vehicle. (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 16, line 22 to page 18, line 9.)  At that time, Ritz tossed the leased vehicle's keys on a desk and abruptly walked out without the vehicle being inspected and without signing the contractually and legally required documents and forms including the odometer statement. (See Fox Cert., **Exhibit "G"**, Andrew Ritz's deposition transcript, page 19, line 18 to page 20, line 15.)

As a result of Ritz's own actions, the required documents to terminate the lease were not signed.  The vehicle was abandoned, it was not properly grounded or turned in; the lease was not terminated. (See Fox Cert., **Exhibit "H"**, Deborah Donley's deposition transcript, page 88, line 23 to page 92, line 25; and **Exhibit "I"**, NMAC's amended answers to plaintiffs' first set of interrogatories, interrogatory number 1.)  Although Ritz may no longer have been in physical possession of the vehicle (as would be the case if they left it in a supermarket parking lot), since the dealership refused to take possession Ritz was never relieved of possession of the vehicle.

Further, when a leased vehicle is turned in, it needs to be grounded by the dealership to be taken back into inventory and for the lease to be terminated. (See Fox Cert., **Exhibit "H"**, Deborah Donley's deposition transcript, page 107, line 11 to page 108, line 4.)  In order for the leased vehicle to be grounded (and lease terminated), the lessee, such as Ritz, is required to sign an

odometer statement.  (See Fox Cert., **Exhibit "H"**, Deborah Donley's deposition transcript, page 108, line 5 to page 109, line 9.)

Ritz did not sign the odometer statement on August 9, 2019.  (See Fox Cert., **Exhibit "H"**, Deborah Donley's deposition transcript, page 109, lines 10 to 13.)  Instead, Ritz returned to the dealership on September 20, 2019, to complete the documents and forms required to terminate the lease, to complete the lease return, including the odometer statement. (See Fox Cert., **Exhibit "I"**, NMAC's amended answers to plaintiffs' first set of interrogatories, interrogatory number 1; **Exhibit "K"**, Responses to Nissan's First Set of Interrogatories, Andrew Ritz, interrogatory number 11, relevant portion page 21, third paragraph to page 22, first paragraph.)  On or about September 27, 2019, NMAC received notice from the dealership that the vehicle was grounded for purposes of the lease and Ritz's contractual obligations terminated.  (See Fox Cert., **Exhibit "I"**, NMAC's amended answers to plaintiffs' first set of interrogatories, interrogatory number 1.)

Based on information received by NMAC from the dealership that the lease termination was completed on September 20, 2019, Ritz turned in the leased vehicle late. (Id.)  Due to failing to relinquish possession of the vehicle prior to the end of the lease term, an additional monthly payment was due August 9, 2019, pursuant to the terms of the lease agreement. (See Fox Cert., **Exhibit "D"** at Paragraph 12; **Exhibit "W"**, Ritz 000354). Ritz failed to make the $181.51 monthly payment, and on August 19, 2019, Ritz was sent a billing statement noting that there was $181.51 past due and an additional $181.51 due on September 9, 2019. (See Fox. Cert., **Exhibit "W"**, Ritz 000379; Deposition of Tanya Messmer, Page 34, Line 19 to Page 35, Line 2).[4]

---

[4] Ritz was also ultimately charged a $395.00 vehicle disposition fee upon surrendering the vehicle, as well as a disposition fee tax of $26.17. (Id.)  The disposition fee and disposition fee tax are charges unrelated to Ritz's untimely return of the leased vehicle as they are charges assessed upon the return and termination of a leased vehicle.  (See Fox Cert., **Exhibit "F"**, End of Lease document bate stamped Ritz 000169 to Ritz 000176, pages 3, 5 and 6.)

Ritz subsequently disputed the reporting of the account based upon his contention that he was never 30 days late on any payment. **(Fox Cert., Exhibit "K",** Responses to Nissan's First Set of Interrogatories, Andrew Ritz, interrogatory number 7, relevant portion pages 4 to 5; Fox Cert., **Exhibit "W"**, Ritz 238.). Ritz's disputes were predicated upon his contention that he did not owe further monthly payments under the terms of the lease agreement because he left the vehicle at the dealership as described above. [Fox Cert., **Exhibit "W"**, Ritz 000190, 000228-000229]. NMAC undertook good faith investigations regarding Ritz's complaints, including engaging in communications with the dealership and Andrew Ritz, and concluded that the reporting was accurate. (See Fox Cert., **Exhibit "I"**, NMAC's amended answers to plaintiffs' first set of interrogatories, interrogatory number 1.) Specifically, NMAC concluded that a payment was owed and unpaid based upon the untimely grounding of the vehicle. (Fox Cert., **Exhibit "W"**, Ritz 000227 and 230.).

Nonetheless, despite the reporting being accurate, after a series of disputes and discussions with the dealership and Andrew Ritz, on January 6, 2020, NMAC elected to submit an AUD to the Credit Reporting Agencies to remove the late payment entry from Ritz's credit reports. (See Fox Cert., **Exhibit "V"**, page age 22, line 22 to page 23, line 7.) This was roughly four months from NMAC responding to the first dispute and confirming the thirty-day delinquency notation. (See Fox Cert., **Exhibit "H"**, Deborah Donley's deposition transcript, page 50, line7 to page 52, line 11.)

**4.     Ritz Did not Sustain Provable Damages.**

This action was then commenced. During discovery, Andrew Ritz signed interrogatories which were notarized stating that he sustained pecuniary damages of $100,000.00 and non-pecuniary damages of $100,000.00. (See Fox Cert., **Exhibit "K"**, Ritz deposition transcript, page

19, lines 1 to 17.)   Michael Ritz signed interrogatories which were notarized stating that he sustained pecuniary damages of $26,000.00 and non-pecuniary damages of $100,000.00. (See Fox Cert., **Exhibit "L"**, Ritz deposition transcript, page 19, lines 1 to 17.)

The depositions of Andrew and Michael Ritz reveals a different story.  Andrew Ritz was able to purchase another vehicle without any credit issue.  Ritz purchased another car for cash in or about April or May of 2019, prior to the incident forming the subject matter of this lawsuit. (See Fox Cert., **Exhibit "G"**, Ritz deposition transcript, page 19, lines 1 to 17.)

As a result of this incident, Andrew Ritz was never denied any credit card.  (Id. at page 27, lines 16 to 20.)  Andrew Ritz applied for and received a USAA American Express credit card after the incident.  (Id. at page 29, lines 23 to page 30, line 9.)  Andrew Ritz has about 9 or 10 credit cards.  (Id. at page 30, lines 10 to 13.)  He had applied and received a Chase Amazon credit card as well.  (Id. at page 30, lines 14 to line 25.)

Andrew Ritz never applied, nor was denied any loan or mortgage after August 2019.  (Id. at page 31, lines 1 to 3.)  He was not denied any insurance benefits because of the subject credit reporting.  (Id. at page 31, lines 12 to 21.)  Andrew Ritz is unaware of any adverse employment action as a result of any credit reporting by NMAC. (Id. at page 31, lines 4 to 11.)  Andrew Ritz testified he did not suffer quantifiable losses or expenses as a result of the action in August 2019. (Id. at page 33, lines 21 to 24.)

With respect to alleged non-pecuniary damages such as lost sleep, nervousness, frustration, mental anguish, injury to reputation, Andrew Ritz testified he did not seek any type of medical treatment.  (Id. at page 34, lines 2 to 11.)  Andrew Ritz never took time off from work because of any alleged emotional distress, nor did he lose any work opportunities.  (Id. at page 34, lines 12 to

17.) Andrew Ritz did not seek medical attention, counseling or therapy for mental distress. (Id. at page 34, lines 18 to 22.)

Regarding loss of reputation, Andrew Ritz testified that at Staples copies were made regarding correspondence with defendants. Andrew Ritz believes (speculates) the machines at Staples record the documents copied. Ritz speculates that Staples' personnel making the copies may have noticed the subject matter of the documents Andrew Ritz arranged for copying.[5] However, no one at Staples ever commented to Andrew Ritz about any issue raised in this action. (Id. at page 35, lines 3 to 21.)

Andrew Ritz was not prescribed any medication for any injuries allegedly suffered as a result of NMAC's alleged action. (Id. page 35, line 22 to page 36, line 1.)

Michael Ritz's approximate credit score on September 9, 2021 (the date of his deposition date) was 738-740. (See Fox Cert., **Exhibit "J"**, Michael Ritz's deposition transcript, page 18, line 23 to page 19, line 3.) Michael Ritz was never denied any application for credit since August 2019. (Id. at page 20, lines 2 to 8.) Michael Ritz was able to refinance his home in 2019 and then again in 2021. (Id. at page 20, line 9 to page 21, line 1.) Since August of 2019, he has never sought any sort of employment. (Id. at page 21, lines 2 to 5.) Since August of 2019, Michael Ritz was not denied any sort of credit opportunities he wanted to pursue. (Id. at page 21, lines 6 to 9.) Since August of 2019, he has not sustained any financial loss as a result of the allegations in this action. (Id. at page 22, line 25 to page 23, line 3.)

Michael Ritz did not seek any sort of medical attention for non-pecuniary damages such as loss of sleep, nervousness, frustration. (Id. at page 23, lines 4 to 11.) Michael Ritz did not seek

---

[5] Ritz, not NMAC, was the one disclosing the information which he believes *may have* impacted his reputation.

any type of counseling or therapy for non-pecuniary losses. (Id. at page 23, lines 12 to 14.)  Michael Ritz did not seek any sort of medical attention for loss of sleep or psychiatric assistance for non-pecuniary losses. (Id. at page 23, lines 15 to 18.)  He did not take any medication, nor was placed on any medication, to resolve the alleged non-pecuniary issues. (Id. at page 23, lines 19 to 23.)

At his deposition, Michael Ritz did not articulate any damage to reputation. (Id. at page 24, lines 1 to 9.)  Nor did he articulate any damage to family work and well-being. (Id. at page 24, line 10 to page 25, line 4.)  Michael Ritz did not articulate any basis for future damages. (Id. at page 25, lines 5 to 17.)

Simply stated, Andrew nor Michael Ritz sustained damages.

## LEGAL ARGUMENT

### POINT I

### THE SUMMARY JUDGMENT STANDARD

"Under Rule 56(a), [the Court] must grant summary judgment if the moving party 'shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Van Veen v. Equifax Info., 844 F. Supp. 2d 599, 604 (E.D. Pa. 2012) (quoting Fed.R.Civ.P. 56(a)). "Summary judgment must be entered against 'a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" Id. (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23(1986) (internal quotations omitted).

"In ruling on a summary judgment motion, a court must view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary

judgment motion." Kelly v. RealPage, Inc., 539 F. Supp. 3d 374, 377 (E.D. Pa. 2021) (internal quotations omitted). "However, '[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead, he must show where in the record there exists a genuine dispute over a material fact.'" Id. (quoting Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007). "The nonmoving party cannot rely upon 'bare assertions, conclusory allegations or suspicions' to support its claim. Shannon v. Equifax Info. Servs., LLC, 764 F. Supp. 2d 714, 718 (E.D. Pa. 2011) (quoting Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir.1982). "Rather, the party opposing summary judgment must go beyond the pleadings and present evidence, through affidavits, depositions, or admissions on file, to show that there is a genuine issue for trial." Id. (citing Celotex, 477 U.S. at 324).

Based upon the record and the facts herein, there is no genuine issue of a material fact to deny NMAC summary judgment.

## POINT II

## PLAINTIFFS' CLAIM FAILS BECAUSE NMAC'S REPORTING IS ACCURATE AS A MATTER OF LAW.

"[N]o private right of action exists to establish civil liability under § 1681s–2(a), including any regulations issued thereunder." See Cosmas v. Am. Exp. Centurion Bank, 757 F. Supp. 2d 489, 500 (D.N.J. 2010). Rather, "Subsection (b) creates a private right of action, but the subsection applies by its plain terms only when the furnisher receives notice of a dispute from a consumer-reporting agency." Carruthers v. Am. Honda Fin. Corp., 717 F. Supp. 2d 1251, 1253 (N.D. Fla. 2010). "To state a claim under § 1681s-2(b), a plaintiff must allege that: (1) [they] sent notice of disputed information to a CRA, (2) the CRA then notified the defendant furnisher of the dispute, and (3) the furnisher failed to investigate and modify the inaccurate information." See

Salvador v. Fedloan Servicing, No. CV 20-20568, 2021 WL 5422292, at *3 (D.N.J. Oct. 28, 2021) (internal quotations omitted).

Critically, in order to state a claim against a furnisher, "there must be some threshold showing of inaccuracy . . ." *Holland v. Trans Union, LLC*, 574 F. Supp. 3d 292, 302 (E.D. Pa. 2021). *See also Esperance v. Resorts*, No. 1:18-cv-10248, 2022 U.S. Dist. LEXIS 95453, at *12 (D.N.J. 2022) (finding courts have "explicitly held that a showing of inaccuracy is essential to a [Section § 1681s-2(b) claim.") (citing *Gatanas v. Am. Honda Fin. Corp.*, No. 20-7788, 2020 WL 7137854, at *3 n.3 (D.N.J. Dec. 7, 2020)).*See also Ostrander v. Trans Union LLC*, No. 20-5227, 2021 U.S. Dist. LEXIS 142220, at *34 (E.D. Pa. 2021) (holding a plaintiff's claim under § 1681s-2(b) fails because he failed to meet the "threshold of inaccuracy of incompleteness…").

This showing must be made "[r]egardless of the investigation a furnisher conducted…" *Felts v. Wells Fargo Bank, Nat'l Ass'n*, 893 F.3d 1305, 1313 (11th Cir. 2018). When a credit report contains no inaccurate information, a claim against a furnisher under § 1681s-2 fails as a matter of law. *Id*. "This is because, absent an inaccuracy, the consumer cannot satisfy the statutory requirement of actual damages or Article III's requirement of actual damages or concrete harm." *Esperance v. Resorts*, No. 1:18-cv-10248, 2022 U.S. Dist. LEXIS 95453, at *12 (D.N.J. 2022).

Courts in other circuits agree that a plaintiff suing a furnisher under section 1681s-2 must show that the furnisher reported inaccurate or incomplete information. *See, e.g.*, *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 629 (6th Cir. 2018) ("[w]e agree that a threshold showing of inaccuracy or incompleteness is necessary in order to succeed on a claim under § 1681s-2(b)"); *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 40-41 (1st Cir. 2010) (affirming summary judgment as to 1681s-2(b) claim, in part, because plaintiff failed to provide evidence showing that any of his disputes with furnisher's reporting involved actual, factual inaccuracies in his billing

that a reasonable investigation could have detected); *Wadley v. Ford Motor Credit Co.*, 397 F. Supp. 2d 781, 784 (E.D. Va. 2005) ("FCRA does not provide a cause of action to collaterally attack an accurate credit report").

Absent an inaccuracy, the Plaintiffs cannot satisfy the statutory requirement of actual damages or Article III's requirement of actual damages or concrete harm." *Esperance*, at \*5 (internal quotations and citations omitted). Moreover, "unless the reported information is technically incorrect or materially misleading, the furnisher cannot be liable for [its] failure to investigate or for an inadequate investigation." Id. at \*5 (internal quotations omitted).

Here, although NMAC did conduct a reasonable investigation into the disputes, that is ultimately immaterial because the information reported was accurate. Ritz failed to comply with the termination process by scheduling a lease end appointment. (See NMAC Undisputed Statement of Facts, § 7-16.) Ritz failed to comply with their contractual obligations to signing documents in including the legally required odometer statement. (See NMAC Undisputed Statement of Facts, § 13-14.) Due to Ritz's own actions, NMAC was permitted to charge, and Ritz was obligated to pay, an additional monthly payment pursuant to Paragraph 12 of the Lease Agreement which states, in relevant part, "if [Plaintiffs] keep possession of this Vehicle past the end of the lease term, [Plaintiffs] will continue to pay the monthly payments... [Plaintiffs] will pay [NMAC] for any damages [NMAC] suffer[s] because [Plaintiffs] failed to return this Vehicle..." [See Fox Cert., Exhibit "D", page 3 of lease agreement, paragraph 12.) Ritz did not make the payment due August 9, 2019 and therefore by September 8, 2019 he had become 30-days delinquent and reporting this delinquency was factually accurate.[6] This alone is fatal to Ritz's claim.

---

[6] It is of no moment that NMAC subsequently decided to remove the delinquency notation as a courtesy.

## POINT III

## RITZ'S CLAIM FAILS BECAUSE EVEN IF THE REPORTING WAS INACCURATE, WHICH IT IS NOT, RITZ'S DISPUTE CONCERNS A LEGAL ISSUE RATHER THAN AN ALLEGED FACTUAL INACCURACY.

As explained in Point II above, NMAC reported accurate information which is fatal to Ritz's claim. However, even if Ritz were able to cast doubt on the accuracy of the reporting, which they cannot, their argument would necessarily turn on a legal dispute as to the accuracy of the reporting, not a factual dispute. This too is fatal to Ritz's claim.

A Plaintiff must point to a factual inaccuracy in the furnisher's credit reporting in order to state a claim under § 1681s-2; a legal question as to the validity of the debt is insufficient as a matter of law. *Esperance v. Diamond Resorts*, No. 1:18-CV-10237, 2022 WL 1718039 (D.N.J. May 27, 2022) (holding a legal dispute cannot form the basis of a claim under the FCRA because a furnisher is not qualified or obligated to resolve matters that turn on questions that can only be resolved by a court of law); *Hopkins v. I.C. Sys.*, No. 18-2063, 2020 U.S. Dist. LEXIS 88905, at *16-17 (E.D. Pa. 2020) ("As a threshold issue, the Court must determine whether the information at issue stems from a factual inaccuracy, and not a legal one."); *see also Berkery v. Equifax Info. Servs. LLC,* No. CV 18-3417, 2019 U.S. Dist. LEXIS 73906, 2019 WL 1958567, at *3 (E.D. Pa. 2019) (holding furnishers "are only liable for patent, factual inaccuracies contained in credit reports"); Van Veen v. Equifax Info., 844 F. Supp. 2d 599, 605 (E.D. Pa. 2012) ("Significantly, [the Plaintiffs'] required showing is factual inaccuracy rather than the existence of disputed legal questions, such as whether a plaintiff was legally billed for the services he disputes."); *Chijioke-Uche v. Equifax Info. Services, LLC*, No. CV 19-4006, 2021 WL 2005499, at *9 n.4 (E.D. Pa. May

20, 2021) (noting a plaintiff is precluded from establishing a violation of the FCRA "where the plaintiff challenges a legal inaccuracy, rather than a factual inaccuracy, in a credit report").

"Whether someone owes a debt to someone else is ultimately a question of law." *Rosenberg v. Frontline Asset Strategies, LLC*, 556 F. Supp. 3d 157, 161 (E.D.N.Y. 2021). *See also Cohen v. Mercantile Adjustment Bureau, LLC*, No. 21-16977 (KM) (JSA), 2022 U.S. Dist. LEXIS 89326, at *11 (D.N.J. 2022) (holding "The question of whether a person is indebted to another is ultimately one of law, concerning the legal obligation of one party to another."). In other words, when an "allegation of a factual inaccurate debt is tethered to a legal dispute between the parties, it cannot form the basis of a Section 1681s-2(b) violation." *Id.; see also Scaife v. Nat'l Credit Sys., Inc.*, No. 1:20-cv-00379-CLM, 2021 U.S. Dist. LEXIS 79472, at *14-15 (N.D. Ala. 2021) (dismissing claims under § 1681s-2(b) with prejudice where plaintiffs' argument that they do not owe the debt was a legal question, not a factual one.); *Van Veen*, 844. F. Supp. 2d at 605 quoting Chiang v. Verizon New England, Inc., 595 F.3d 26, 38 (1st Cir.2010) ("[F]urnishers are neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law.")

The case of Esperance v. Diamond Resorts, 2022 WL 1718039 (D.N.J. May 27, 2022) is particularly on point with the present action. In Esperance, a FCRA plaintiff asserted that it was factually inaccurate for the defendant Diamond Resorts to report plaintiffs' account balance as open because the plaintiffs' timeshare had been transferred back to Diamond Resorts pursuant to a Deed-in-Lieu. Esperance, 2022 WL 1718039, at *6. In turn, Diamond Resorts argued that "any alleged inaccuracy with respect to the acceptance or rejection of the Deed-in-Lieu involves a legal dispute outside the scope of a furnisher's investigatory responsibilities under § 1681s–2(b)." Id. In granting Diamond Resorts summary judgment, the court held that the "question of whether

[p]laintiffs' submission of the Deed-in-Lieu is sufficient to vitiate the mortgage documents and timeshare interest is a threshold question that can only be resolved by a court of law" and that "furnishers are neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law." Id.

Here, like in Esperance, Ritz's dispute turns on a matter of contract interpretation (as well as the legal requirements under the Code of Federal Regulation, Title 49, Part 580, Odometer Disclosure Requirements [attached to the accompanying Cert. of Fox, **Exhibit "U"**]).  The legal nature of the purportedly inaccurate information is best exemplified in the words of Ritz' counsel: "the question – the issue is, did Nissan have the contractual right to charge the Ritzes after August 9th, 2019, right?" (See Fox Cert. **Exhibit "E",** Donley Dep. Transcript., p. 60, lines 8-10.)  In fact, the legal issue is so at the heart of Ritz' contention that it repeatedly manifests in Ritz's discovery. For example, the issue pervades more than a sampling of the deposition of Deborah Donley, a NMAC supervisor for its Credit Bureau Management Team:

> "Q     Does it say anywhere in this lease that Nissan may charge the Ritzes any amount, including a monthly amount, if they do not complete a statement of the vehicle's mileage at termination?"  (See Fox Cert. **Exhibit "H",** Donley Dep. Transcript page 30, lines 8-11.)

> "Q     . . . [D]o you see anywhere in this lease where it allows Nissan - - where there's a term that allows Nissan to charge the Ritzes any amount of money if they don't complete a statement of the vehicle's mileage at termination?" (Id. at page 30, line 22 to page 31, line 2.)

> "Q     . . . did Nissan have the contractual right to charge the Ritzes after August 9, 2019?" (Id. at page 61, lines 18-19.)

> "Q     . . . what is Nissan's contractual right to charge the Ritzes after August 9th?" (Id. at page 65, lines 13-14.)

The information Ritz's dispute is not, for example, whether Ritz followed the required procedures and signed all the necessary paperwork to ground the vehicle, but due to a data entry

error the wrong date of surrender was recorded. Instead, Ritz's dispute turns on questions of contract law, lease interpretation, and federal regulations. The issue is not what date Ritz brought the vehicle to the dealership, the issue is whether the activities of that day were legally sufficient to cause the vehicle to be grounded and terminate Ritz's monthly payment obligation. Specifically, the issue is whether Nissan's charge was valid considering Ritz's failure to appropriately turn in the leased vehicle and execute legal documents including an odometer statement as required under the lease agreement itself and by 49 CFR §580.7.

To elaborate on the dispute, if Ritz parked the vehicle on the side of the road and then went home, Ritz would no longer be in physical possession of the vehicle, but no reasonable interpretation of the lease agreement would suggest Ritz could no longer be charged monthly payments for failing to surrender possession of the vehicle. Similarly, if Ritz left the vehicle in a garage and never returned, no reasonable interpretation of the lease agreement would suggest the monthly obligation is eliminated. Here, Ritz left the vehicle on the lot of the dealership and therefore no longer physically possessed the vehicle, the dealership made abundantly clear that it was not accepting possession of the vehicle and the vehicle was instead being abandoned on its lot. Whether, pursuant to the terms of the contract and relevant laws, Ritz's conduct was legally sufficient to terminate the monthly payment obligation is for a court to decide. The FCRA does not require NMAC to predict a future Court's interpretation of this legal issue and resolve it in connection with a credit reporting dispute. See e.g., Van Veen, 844 F. Supp. 2d at 605.

The sole issue this Court need consider is whether Ritz paid the August 9, 2019 monthly payment, which Ritz indisputably did not. Whether the legal validity of that monthly payment can be challenged is of no moment since "courts have routinely held that furnishers are not required to investigate the legal validity of the underlying debts they report." Esperance, 2022 WL 1718039

at *6.  Therefore, there is no FCRA violation.  Ritz are unable to prove the threshold element that

NMAC furnished inaccurate information to the CRAs.  It is therefore respectfully submitted that

summary judgment be entered in favor of NMAC on this basis alone.

## POINT IV

### ALTERNATIVELY, NMAC MUST BE GRANTED SUMMARY JUDGMENT DISMISSING PLAINTIFFS' CLAIM FOR STATUTORY AND PUNITIVE DAMAGES UNDER 15 U.S.C. 1681(N) BECAUSE NMAC DID NOT WILLFULLY VIOLATE THE FCRA.

Ritz must be able to prove that NMAC willfully violated the FCRA to be entitled to

statutory and punitive damages. Fuges v. Sw. Fin. Servs., Ltd., 707 F.3d 241, 248 (3d Cir. 2012).

Willful violations of the FCRA can be based on either a "knowing" or "reckless" basis. Van Veen

v. Equifax Info., 844 F. Supp. 2d 599, 610 (E.D. Pa. 2012) (quoting Safeco Ins. Co. of America v.

Burr, 551 U.S. 47, 56–60 (2007)).  "A company subject to FCRA acts with reckless disregard if

(1) the action is a violation under a reasonable reading of the statute's terms; and (2) "the company

ran a risk of violating the law substantially greater than the risk associated with a reading that was

merely careless." Id.  A defendant's conduct is reckless only if it was "objectively unreasonable"

in light of "legal rules that were 'clearly established' at the time." Fuges, 707 F.3d at 249.

Summary judgment may be granted on this issue if there is an absence of evidence of intentional

or reckless conduct. Birmingham v. Experian Info. Sols., Inc., 633 F.3d 1006, 1009 (10th Cir.

2011).

NMAC is entitled to summary judgment because the reasonableness of NMAC's conduct

is beyond question and cannot be disputed in good faith. See Van Veen, 844 F. Supp. 2d at 605.

"Once a CRA, such as Experian, notifies a credit furnisher, such as [NMAC], of a dispute, the

credit furnisher must: 1) conduct an investigation with respect to the disputed information; 2)

review all relevant information received from the CRA; 3) report the results of the investigation to

the CRA; and 4) if the information is found to be inaccurate or incomplete, report the results to all CRAs to which it originally provided the erroneous information." Esperance, 2022 WL 1718039, at *5. There is no evidence NMAC failed to investigate the disputes raised in the ACDVs sent by the CRAs. (See Fox Cert., **Exhibit "I"**, answers to interrogatory numbers 1 with subparts and 4.) Ritz has no proof to negate NMAC's position. Rather, Ritz's allegations of willful conduct again rest on the question of whether NMAC's reporting was legally valid, not whether it was factually inaccurate.

NMAC took all reasonable procedures to ensure that Ritz's credit information was furnished accurately. (See Fox Cert. **Exhib5it "I"**, NMAC's Amended Interrogatory Responses, interrogatory numbers 1 with subparts and 4.) NMAC requires its Credit Bureau Management team members to take bi-annual Consumer Date Industry Association training. (See Fox Cert. **Exhibit "H"**, Donley Dep. Transcript, page 58, lines 2-4.) NMAC representatives repeatedly communicated with Ritz by telephone and by letter to address his dispute, as well as with the co-defendant credit agencies. (See Fox Cert. **Exhibit "I"**, NMAC's Amended Interrogatory Responses, page 5.) NMAC's CBM team investigated Ritz' dispute and confirmed that Ritz's vehicle was not "grounded", the lease terminated, until September 20, 2019.

Since the parties disagree on Ritz's contractual lease obligations with respect to terminating the lease, i.e., making a dealer appointment and executing legal documents including the federal odometer statement as required by 49 CFR §580.7, NMAC's Credit Bureau Management team was faced with the legal question of whether Ritz's charges where legally valid following Ritz's improper surrender and abandonment of the vehicle. Compare, Donley Dep. Transcript, pages 90-96 with Esperance, 2022 WL 1718039, at *6 ("in response to . . . ACDVs that expressly identified the Deed-in-Lieu as a basis of dispute, Diamond Resorts' credit reporting coordinators were faced

with the legal question of whether [p]laintiffs' balance was legally valid with respect to Plaintiffs' purported transfer of legal title back to Diamond Resorts.")

While NMAC argues its charges were valid in light of Ritz's own conduct, for purposes of liability under the FCRA NMAC is "neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law." See Esperance, 2022 WL 1718039, at *6. Accordingly, it cannot be said that NMAC's investigation resulted in a willful violation of the FCRA.  NMAC's conduct was objectively reasonable as a matter of law.[7]  NMAC is entitled to summary judgment on the issue of statutory and punitive damages.  The claims under 15 U.S.C. §1681(n) should be dismissed.

## POINT V

## ALTERNATIVELY, NMAC MUST BE GRANTED SUMMARY JUDGMENT BECAUSE PLAINTIFFS HAVE NOT SUFFERED DAMAGES

Assuming, *arguendo*, there were errors committed by NMAC, the errors did not result in significant damages.  In answers to interrogatories Andrew Ritz alleges he sustained pecuniary damages of $100,000, non-pecuniary damages of $100,000, and punitive damages of $5 million and attorney fees.  (See Fox Cert., **Exhibit "K"**.)  Likewise, Michael Ritz sustained pecuniary damages of $26,000, non-pecuniary damages of $100,000, and punitive damages of $5 million and attorney fees.  (See Fox Cert. **Exhibit "L".**)

NMAC respectfully submits this matter is analogous to Slack v. Suburban Propane Partners, LP, a case in the District of New Jersey holding that a plaintiff who alleged a reduction in his credit score, without any other harm, "failed to raise the possibility of relief above the

---

[7] Whether NMAC elected to reverse its reporting as a matter of courtesy is irrelevant to this issue and is not an admission.

speculative level." Slack v. Suburban Propane Partners, LP, No. 10-cv-2548, 2010 WL 3810870, at *8 (D.N.J., Sept. 21, 2010) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 554, 555 (2007)).

In Slack, one day after the filing of plaintiffs' original Complaint, defendant, Suburban Propane, requested and obtained a consumer report relating to the plaintiff without his authorization or knowledge. According to plaintiffs, Suburban Propane did not obtain Slack's consumer report for a purpose authorized by the FCRA and that, as a result of defendants' unauthorized request for his consumer report, Slack suffered a reduction in his credit score. The District Court found that plaintiffs provided no facts that Slack suffered actual damages as a result of defendants' alleged FCRA violation, alleging merely a reduction in his credit score. The Court determined that Slack did "not allege [] any actual damages that he suffered as a consumer flowing from the alleged decrease in credit score such as that he was denied credit, lost credit, had his credit limits lowered, or was required to pay a higher interest rate for credit." Young v. Harbor Motor Works, Inc., No. 07–31, 2009 WL 187793, at *5 (N.D. Ind. Jan.27, 2009). Absent such factual content, the FCRA claims were dismissed. See also, Ruffin–Thompkins v. Experian Info. Solutions, Inc., 422 F.3d 603, 610 (7th Cir.2005) (dismissing FCRA claim where plaintiff had not demonstrated "actual damages" and noting that "[t]he FCRA does not presume damages; instead, as discussed above, the consumer must affirmatively prove that she [or he] is entitled to damages").

Ritz have not satisfied their burden of proving actual damages. Ritz' damages are not to be simply presumed. Without sufficient proof of damages, summary judgment should be granted in favor of NMAC dismissing the claims against NMAC with prejudice.

## CONCLUSION

For the foregoing reasons, NMAC respectfully requests that its motion for summary judgment be granted and Ritz's claims against NMAC in this action be dismissed with prejudice.

Respectfully submitted,
**LINDABURY, MCCORMICK,
ESTABROOK & COOPER, P.C.**
Attorneys for Nissan Motor Acceptance Corporation

By:

STEVEN L. FOX, ESQ.
Partner

Dated:  August 31, 2022

22