# Exhibit G

Page 1

```
1                         UNITED STATES DISTRICT
                          COURT FOR THE DISTRICT OF
2                         NEW JERSEY
                          CIVIL ACTION3:20-cv-13509
3
4
     ANDREW RITZ AND MICHAEL RITZ,
5
            Plaintiffs,
6                                        Deposition of:
                                          ANDREW RITZ
7           -vs-
8
     NISSAN-INFINITI LT, TRANS
9    UNION, LLC, EQUIFAX
     INFORMATION SERVICES, AND
10   EXPERIAN INFORMATION
     SOLUTIONS, INC.,
11
            Defendant.
12
     -------------------------
13
14
15      B E F O R E:  LISA R. GENTEMPO, a Certified
16   Court Reporter of the State of New Jersey, at the
17   offices of VERITEXT VIRTUAL, on SEPTEMBER 9, 2021
18   commencing at 10:00 a.m.  pursuant to Notice.
19
20
21
22
23
24
25
```

Page 12

1    -- an additional amount of wear and tear.  It

2    originally was 500, and went up to $7,500 which

3    which we purchased, I remember that, and that we

4    received a copy of the lease.

5         Q.    Okay. Do you recall what the original

6    end date of that lease was?

7         A.    It was 24 months from the point that we

8    signed the lease.  At the time I did not know

9    exactly what that day was, but I know it was only

10   a 2-year lease.

11        Q.    Did you request an extension of the

12   lease term?

13        A.    Yes.

14        Q.    Were you granted an extension?

15        A.    Yes.

16        Q.    Do you recall at which date that

17   extension was supposed to end?

18        A.    That was 90 days, as far as the lease

19   agreement itself, the lease extension agreement

20   was 90 days from the maturity date.  But, I mean I

21   had a few chats on the NMAC website confirming

22   certain vehicles up to the actual return of the

23   car.  And they did a couple different times, they

24   confirmed that the hard date to return the car was

25   August 9, 2019.

1        Q.     Okay.

2        A.     That was date certain to return the

3   car. The lease extension agreement had in it that

4   we can return the car at any point up to that

5   date, but that was the definitive last day to

6   return that car.

7        Q.     Okay. Did you return the vehicle to DCH

8   Freehold on August 9, 2019?

9        A.     Yes, we did.

10       Q.     Did you make an appointment prior to

11  that time to?

12       A.     No, we did not.  With the dealership to

13  return the car?

14       Q.     Yes, with DCH or any other dealer?

15       A.     We made an appointment with a dealer to

16  discuss -- this was Toms River dealership, we made

17  an appointment to possibly discuss purchasing the

18  car, but the amount, the purchase amount that was

19  outlined in the lease agreement I could not agree

20  too, with the lease payments.  The total of the

21  lease payments and the amount to purchase the car

22  that was outlined in the lease agreement, that

23  would have been over the sticker price, I could

24  not in good conscience agree to a price like that.

25  So, I reached out to the head dealership, the

Page 14

1    person I talked to was going on vacation, so I had

2    to make an appointment with him.  And once I

3    returned from vacation to talk about that, when I

4    sat down to talk about it, that was a number that

5    could not be negotiated, that number to purchase

6    the car that was in the lease agreement could not

7    be negotiated.  But he did help us reach out to

8    NMAC to discuss an extension lease agreement, and

9    that is where that came from.

10       Q.    Okay. But for purposes of returning the

11   vehicle, returning the vehicle at the end of the

12   lease term, you had to make an appointment is that

13   correct?

14       A.    I did not think one was required.

15       Q.    Okay. I'm going to try and share the

16   screen with you.  I would like to show just one

17   exhibit if I may. You produced this as part of

18   your discovery. Can you see the document I'm

19   showing you?  If you look at the top of the page

20   it says, "end of lease", it's by Nissan. You

21   produced this as part of your discovery packet,

22   and I'm scrolling down to page 000170.

23

24

25                 (A brief recess was taken.)

Page 15

```
 1

 2        Q.    We were discussing the document that

 3   I'm showing you Bates stamped Ritz 000170. This

 4   was produced by you during discovery exchange.

 5   Does this document look at all familiar to you?

 6        A.    I'm not familiar with it.  I mean there

 7   were a lot of documents, there are a stack of

 8   payments like this that I submitted to my

 9   attorney, I'm not as familiar with it as I am with

10   other documents in that pile of documents.

11        Q.    This document, if you can just take a

12   look at what it states, it discusses the lease

13   return, and then on paragraph three, you will see

14   a section on the bottom 000170, paragraph three,

15   make a vehicle return appointment with your Nissan

16   dealership. Did you make that appointment as per

17   these instructions?

18        GUERINO CENTO:  Objection, compound, calls

19   for a legal conclusion.

20        Q.    You can go ahead and answer please, to

21   the best of your knowledge, it's a yes or no.

22        A. Well, to me it's not really -- I don't

23   know when I might have looked at the stuff, either

24   before the return of the car or after. I do know

25   that I referred to the lease agreement several
```

Page 16

1    times before returning the car because it had

2    important information. It said I needed to return

3    the car to the Nissan dealership or other

4    specified location.

5         Q.    I just --

6          A.    An appointment was not required, it

7    also had other information that what items could

8    be considered under the wear and tear.  What were

9    considered, maintenance, I referred to that more

10   than several times before.

11        Q.    Understood.

12        A.    This document, I may have looked at

13   probably, but I don't remember.

14        Q.    Thank you. It was produced in your

15   discovery packet, I wanted to see if you had

16   referred to this document at all before, thank you

17   for that. We will Mark this I guess for purpose of

18   the deposition as D-1.

19

20        (Exhibit marked D-1 for identification.)

21

22        Q.    In your complaint, in your Answers to

23   Interrogatories you mention that you had a dispute

24   at the dealership when you returned the vehicle.

25   Can you just give me some background facts as to

```
 1    what occurred there?  What's your version of the
 2    events that occurred at DCH when you tried to
 3    return the vehicle August 9th?
 4         A.    Well, my father and I got there in the
 5    morning, with the car.  When we got there I took
 6    the plates off the car, and my father followed me
 7    in our new car, which was an older Toyota. Put the
 8    plates in the car.  Because I wanted those plates,
 9    it was the last day to return the car, I wanted
10    the plates returned to motor vehicle by myself. I
11    did not want them forgotten on somebody's desk and
12    returned later.  The insurance was due to come off
13    the car at midnight that day, and I did not want
14    any problems with lapse or anything else. When --
15    went in, you know, let people know we were there,
16    and waited for the sales manager to become
17    available. When he did he said, "you don't have an
18    appointment to return the car, I'm not returning
19    the car for you.  You can go to any dealership in
20    the State of New Jersey, nobody is going to return
21    this car for you. I showed him the lease extension
22    agreement and said that this is Nissan's property
23    and they want it back. They want this car back
24    today. They are the owner of the car, not me. I'm
25    here to return the car. I'm going to leave this
```

Page 18

1    car here in your lot. I placed the keys on his

2    desk, he did not say anything, he sat in the

3    chair. I walked by my father out to the parking

4    lot. Got in the car, my father came out a short

5    while later.  Got in the car.  As we were leaving

6    he came out of the side door, the sales center,

7    and walked out to where the 2017 Nissan was and

8    yelled across the parking lot, "you will never get

9    another car". And that was it.

10        Q.    Do you recall the name of the service

11   manager that you spoke with, that you communicated

12   with during this time?

13        A.    I did not even get his name. I found

14   out days later, but I did not even -- the name was

15   not offered or anything else. Nothing was offered

16   other than, you know, I'm not going to return this

17   car for you.

18        Q.    And you stated that you went back and

19   into the car that you purchased, you said it was

20   an older Toyota?

21        A.    No, no, no -- --

22        Q.    You can't speak with other people

23   during the deposition, I'm just asking for your

24   personal knowledge please?

25        A.    I understand.

1    Q.    When did you -- what is the older

2    Toyota that you purchased, when did you purchase

3    that vehicle?

4    A.    I purchased that car.

5    Q.    Okay.

6    A.    Cash, and I believe it was in April or

7    May of 2019, a couple of months before the return

8    of the car, so we had that car.

9    Q.    Okay. I want to make sure I'm accurate.

10   Again, this is to the best of your recollection,

11   that is all. And the Toyota, what model is it,

12   year and model?

13   A.    I believe it's a 2003 Toyota Echo, I'm

14   sure it's a Toyota Echo, not sure of the year.

15   Q.    Did you purchase any other car after

16   you returned in the Nissan Sentra?

17   A.    No.

18   Q.    You testified that you left the car at

19   the dealership with the keys on the service

20   manager's desk, you did not come back with the

21   Sentra, just for purpose of clarification, it

22   remained at DCH --

23   A.    --  I placed two sets, both keys on the

24   corner of his desk and left. And he said if you

25   leave this car here, I'm going to have it towed to

Page 20

1    your house, I'm only allowed to have so many cars

2    on the lot. I needed to, I showed him that

3    document and said Nissan wants their property

4    back.  If I hold onto this car until tomorrow, I

5    have this car without the owner's permission.

6         Q.    Did you sign any documents at the

7    dealership when you left the keys on the service

8    manager's desk?

9         A.    No, none were offered.

10        Q.    Did you sign any end of lease

11   documents?

12         A.   None were offered.

13        Q.    Did you sign any odometer disclosure

14   statement?

15         A.   None were offered.

16        Q.    Did you ever contact the finance

17   company Nissan Motor Acceptance Company to advise

18   that the vehicle had been left at the dealership

19   on August 9, 2019?

20         A.    Yes, immediately after leaving the

21   dealership I went to New Jersey Motor Vehicle

22   which is a short drive away.  Returned the plates,

23   got home, got on the computer, got on NMAC website

24   and started the chat.  I told the person that I

25   was chatting with from NMAC, exactly what occurred

1    at the dealership, and that their car was there.

2    That I returned it, the condition I returned it

3    in.  I washed and vacuumed that car before I

4    returned it.  When I initially got in the car, I

5    had gotten seat covers, I had taken those seat

6    covers off, the car smelled brand new. I let them

7    know that the condition of the car, and, you know,

8    what more can you do?  The car is there, it was in

9    good  condition.

10        Q.    Do you recall the names of any other

11   individuals at the dealership with whom you may

12   have communicated with when you turned in the

13   vehicle?

14        A.    There might have been 1 or 2 other

15   employees of DCH Freehold, I don't remember their

16   names, to let them know that we were there and

17   wanted to speak to someone about returning the

18   car.

19        Q.    So you left the dealership without any

20   vehicle keys?

21        A.    Right.

22        Q.    To the Sentra?

23        A.    Right, no keys whatsoever to that car.

24        Q.    In your complaint, and in your answers

25   to Interrogatories you testified that you stated

```
 1   stood over me, you can't write that -- anyway,
 2   that is exactly what happened.
 3        Q.   Okay. Before the Nissan Sentra, the
 4   2017 Nissan Sentra, have you ever leased a vehicle
 5   before?
 6        A.   No.
 7        Q.   So this was the first lease experience
 8   that you had of a new vehicle?
 9        A.   Yes.
10        Q.   Are you still driving the 2003 Toyota?
11        A.   Yes, knock on wood. The car has over
12   200,000 miles on it. It's held together by rubber
13   bands, but we are in it. We are getting places.
14        Q.   That is a good thing.
15        A.   Yes, it is.
16        Q.   As a result of your experience with DCH
17   Freehold, you state that you're credit was
18   effected. Were you ever denied a credit card
19   following this incident at the DCH?
20         A.   No.  And I have to tell you what went
21   through my mind, I have on one of my credit cards
22   there's a benefit feature that I can see my credit
23   score through Transunion. I looked at that and my
24   credit, my fico score dropped 100 points over
25   night.
```

```
 1        Q.    Was what was it before and what was it
 2    after, if you can recall?
 3        A.    It was definitely over eight hundred
 4    and it was 100 points lower.
 5        Q.    In the sevens?
 6        A.    Yes, definitely, absolutely definitely.
 7    And I'm just the kind of person why make a bad
 8    situation worse. You know, sometimes just leave
 9    things alone until they get fixed. You know, my
10    first thought with seeing my fico score like that,
11    I can't apply for anything until this gets fixed.
12    So there is not a slew of inquiries without credit
13    granting, things like that. Just leave it alone
14    until it gets fixed.  I tried to fix it myself
15    until I reached the end of what I can do and then
16    I contacted Mr. Cento.
17        Q.    Okay. Do you know what your current
18    credit score is as of today?
19        A.    I think it's 822 to be exact.
20        Q.    How often do you check your credit
21    score?
22        A.    I believe three of my credit cards
23    have the opportunity to at least look at the score
24    plus look at my report on an ongoing basis.  I
25    look at it frequently to see where I'm at, to see
```

1    what's being recorded, do the balances look right.

2    I don't do a reconciliation or anything like that.

3    But I do check for, you know, for accuracy.

4         Q.    I would like to share the screen again.

5    Mr. Ritz, can you see the shared screen?

6         A.    Yes, I can.

7         Q.    I'm going to take you to the beginning

8    of the document so that you can see what it is. It

9    is titled in the center of the page the responses

10   of Nissan's first set of interrogatories by

11   Andrew Ritz. Do you recall seeing this document at

12   all?

13        A.    Yes.

14        Q.    Do you recall providing answers to

15   these questions?

16        A.    Yes, I do.

17        Q.    I would like to refer you to page 23. I

18   will scroll down to it.

19        A.    I have a copy of it in front of me.

20        Q.    Whatever is easier for you to reference

21   that is fine. Let me know when you're there?

22        A.    All right I'm there.

23        Q.    At the bottom of page 23 you mentioned

24   USAA American express credit card that you wanted

25   to apply for. Did you apply for that credit card

Page 30

1    after this incident with NMAC and DCH Freehold?

2        A.    Yes, I did, but months after I

3    initially looked at it.

4        Q.    Were you denied this credit card?

5        A.    No, I was accepted, I waited for after

6    NMAC posted a letter to that website saying that

7    they reversed the late.

8        Q.    Do you presently use this credit card?

9        A.    Yes, I do, it has five percent off gas.

10       Q.    How many credit cards do you have in

11   your name, if you can recall?

12       A.    9 or 10.  They each fit a specific

13   purpose.

14       Q.    From August of 2019 when you were --

15   when you say you turned in the vehicle at DCH

16   until the present, have you ever been denied a

17   credit card?

18       A.    No, I have not applied. The first time

19   I applied for a credit card after August was in

20   January or February of 2020.

21       Q.    And, were you granted that credit card,

22   you were not denied?

23       A.    I was granted the USAA, I had to wait a

24   couple days for the Chase Amazon.  It was not

25   instant.  I had to wait.

Page 31

1          Q.    Were you ever denied a loan or mortgage

2     application after August 2019?

3          A.    I did not apply.

4          Q.    Okay. Did this incident, after

5     August 2019, at the all affect your employment at

6     Target?

7          GUERINO CENTO:  Objection, vague.

8          Q.    Your employment status? Did you

9     continue to work.

10         A.    I don't know what they are able to

11    access, so I'm totally unaware.

12         Q.    Were you ever denied any insurance

13    benefits as a result of the incident from

14    August 2019 to the present?

15         A.    I would say it's very possible because

16    I applied to USAA insurance, and I was given a

17    very high quote.  I'm aware that insurance

18    companies access credit reports in their rating.

19    It may or may not have.

20         Q.    But you were not denied coverage?

21         A.    No.

22         Q.    I would like to take you to page 18 of

23    your Answers to Interrogatories.  I will just

24    scroll up there. At the top of the page you

25    provide some background as to your financial

1   communications, and so forth.  Do you recall the

2   total amount of money that you spent there as a

3   result of this action?

4          A.    About the last time that I disputed

5   this with NMAC by letter by certified mail, I had

6   put an amount from receipts, that it was over

7   $100.00 at that point.  In photo copying, postage,

8   mailing supplies, mileage to Staples and Post

9   Office, and it came out to over $100.00.  But

10  after that point I stopped keeping track.

11         Q.    Do you recall whether you suffered any

12  other financial losses after August 2019 as a

13  result of this action?

14         A.    I don't know how you quantify it, but I

15  know there's, to anyone that access's a credit

16  report in granting credit, a hiring decision,

17  binding it as an insurance policy, or rating an

18  insurance policy, while this was on there, there's

19  no doubt in my mind that that could have affected

20  me in a very negative way.

21         Q.    But you suffered no quantifiable loss,

22  no expense that you can point to as a result of

23  this action in August of 2019 to the present?

24         A.    Only opportunity loss.

25         Q.    How do you quantify?

1      A.    --

2      Q.    I would like to take you to page 26,

3    there is a table there that you titled

4    non-pecuniary damages.

5      A.    Yes, I see that.

6      Q.    And, you know various forms of damage,

7    including loss of sleep, nervousness, frustration,

8    mental anguish, injury to reputation.  Did you

9    ever seek any type of medical treatment for any of

10   these issues?

11      A.    No, I did not.

12      Q.    Did you ever take any time off of work

13   because of any of these issues?

14      A.    No.

15      Q.    Did you lose any work opportunities as

16   a result of any of these issues?

17      A.    No.

18      Q.    You mention mental distress here as

19   well.  Did you ever seek any type of medical

20   attention for stress, counseling or therapy?

21      A.    No, and that is not to say any of this

22   was not going on, it was.

23      Q.    That's okay.

24      A.    That is truthful, it's a percentage of

25   what I experienced in that $100,000.  That is the

1    magnitude of what I experienced in each of those

2    categories.

3        Q.    You mention injury to reputation, can

4    you elaborate how your reputation was injured?

5        A.    I had to -- the amount of photocopying

6    I had to do could not be done on my printer, I

7    would be going through cartridges -- I had to go

8    to Staples.  Obviously that stuff that you put

9    through Staples is recorded somewhere.  And, you

10   know, there are probably people watching what

11   people are doing.  They can put a name to a face

12   to what somebody is doing.  That's little bit of

13   an embarrassment.

14       Q.    That is based on your own personal

15   speculation, correct?  You don't know that this

16   occurred?

17       A.    There's no actual incident of somebody

18   saying you are less of a human because of this.

19   But, you know, that is what goes through my mind

20   when I'm doing this. Making photo copies at

21   Staples that goes through my mind anyway.

22       Q.    So you were not prescribed any sort of

23   medications for any of these issues that you

24   outlined?

25       A.    No, I did not feel it necessary to go

Page 36

1    to a doctor for this.

2        Q.    Okay.

3        A.    And again, not to say that I was not

4    experiencing these things, but I did not thik it

5    was at a level where I had to seek medical

6    attention.

7        Q.    You mention also injury to family work

8    in that table, can you elaborate what you mean by

9    that?

10       A.    Sure.

11       Q.    Well being and injury to family work?

12       A.    Sure, obviously the Well being, you

13   know, it injured my credit rating, my availability

14   to get credit, I'm 55, my father is my only living

15   relative. You know, I want my father to live until

16   he is over 100, but, you know, at some point

17   everybody goes. And when he goes, I'm by myself.

18       Q.    Okay. I understand.

19       A.    I have to have these things in place

20   for when that happens. I have to have good credit.

21   I have have a savings, I have to have all these

22   things in place. And when this happened, I helped

23   my father with his side of it, just because it's a

24   duplication. You know, I did mine, and his is

25   exactly the same, so I helped him with his. But,