# Exhibit H

```
 1                UNITED STATES DISTRICT COURT
                    DISTRICT OF NEW JERSEY
 2                     TRENTON DIVISION

 3

 4    ANDREW RITZ and              )
      MICHAEL RITZ,                )
 5                                 )
                 Plaintiffs,       )
 6                                 )   Case No.
            -v-                    )   3:20-cv-13509-FLW-DEA
 7                                 )
      NISSAN-INFINITI LT; TRANS    )
 8    UNION, LLC; EQUIFAX          )
      INFORMATION SERVICES, LLC;   )
 9    and EXPERIAN INFORMATION     )
      SOLUTIONS, INC.,             )
10                                 )
                 Defendants.       )
11

12            The 30(b)(6) videoconference deposition upon

13    oral examination of DEBORAH DONLEY, a witness produced

14    and sworn remotely before me, Sherry D. Lenn, RPR, and

15    Notary Public in and for the County of Warrick, State

16    of Indiana, taken on behalf of the Plaintiffs,

17    remotely via Zoom videoconference on January 28, 2022,

18    at 9:59 a.m. EST, pursuant to the Federal Rules of

19    Civil Procedure.

20

21

22

23
                    STEWART RICHARDSON & ASSOCIATES
24                  Registered Professional Reporters
                            (800)869-0873
25
```

30(b)(6)

```
 1        the fourth page of the lease agreement, Bates
 2        No. 36.  We looked at, under vehicle return, the
 3        term that says, "You will complete a statement of
 4        this Vehicle's mileage at termination as required
 5        by federal law."  Do you remember we looked at that
 6        a moment ago?
 7   A    Yes.
 8   Q    Okay.  Does it say anywhere in this lease that
 9        Nissan may charge the Ritzes any amount, including
10        a monthly amount, if they do not complete a
11        statement of the vehicle's mileage at termination?
12             MR. FOX:  Objection to form.  Do you need to
13        look at the document again?
14             THE WITNESS:  Yes, please.
15             MR. CENTO:  Yeah, take your time.
16             MR. FOX:  Yeah.  It begins on Bates stamp --
17        was it 35?
18   Q    The provision I'm referring to is on Bates stamp
19        36, under Section 12.  It's the -- again, it's the
20        provision that says, "You will complete a statement
21        of this vehicle's mileage at termination as
22        required by federal law."  And my question is, do
23        you see anywhere in this lease where it allows
24        Nissan -- where there's a term that allows Nissan
25        to charge the Ritzes any amount of money if they
```

30(b)(6)

```
 1        don't complete a statement of the vehicle's mileage
 2        at termination?
 3    A   No.
 4    Q   All right.  Now, you understand that this case is
 5        about Nissan having charged the Ritzes after -- for
 6        a monthly charge -- a monthly lease charge after
 7        they turned the car in to the dealership on
 8        August 9th and the reporting of that payment as
 9        late to the consumer reporting agencies.  Do you
10        understand that much about this case?
11    A   Yes.
12            MR. FOX:  Objection.
13            THE WITNESS:  Oops.
14            MR. FOX:  That's okay.
15    Q   All right.  And so other than the terms we've
16        looked at related to returning the vehicle and the
17        circumstances under which Nissan can charge, is
18        there anything else in this lease, any other terms
19        in the lease or in the extension agreement that you
20        think relate to that issue that I have not included
21        in the chart on the first page of this document?
22            MR. FOX:  Objection.  You can answer it if you
23        can.
24    A   Don't know.
25    Q   Okay.  Why don't you know?
```

30(b)(6)

```
 1    A   Correct.
 2    Q   All right.  Now, let's go -- we're going to look
 3        again at the account notes, which I'll go down to
 4        page -- it's page 14 of the document, Bates
 5        No. 141.  Let me know when you're there.
 6    A   Okay.
 7    Q   All right.  The entry I want you to look at is
 8        dated September 28th at 9:52 a.m.  Do you see that?
 9    A   Yes.
10    Q   This is an entry related to an ACDV investigation,
11        right?
12    A   Yes.
13    Q   And in the notes it says that the response to the
14        ACDV was update with CRB, 11 open CRNT
15        1X30(08/09/19), right?
16    A   Yes.
17    Q   And then below that it tells us that the response
18        to the ACDV was verified, right?
19            MR. FOX:  Objection to form.
20    A   That's incorrect.
21    Q   What is incorrect about it?
22    A   Verified is pertaining to something else.
23    Q   Okay.  What was the response to this ACDV?
24    A   Exactly what you have highlighted in green above.
25    Q   All right.  Let's go down to the -- let's see.
```

30(b)(6)

```
 1        This is page 25 of the document.  It is Bates
 2        numbered Nissan 140.  Let me know when you're
 3        there.
 4    A   Okay.
 5    Q   Okay.  The top is just a -- the top box is just a
 6        cut and paste of what we were -- of the account --
 7        from the account notes, and the bottom part of this
 8        is the ACDV itself, right?
 9    A   Correct.
10    Q   Okay.  And what was the consumer's dispute on this
11        ACDV?
12    A   Dispute Code 106 that's stated in dispute code,
13        Section 1 of the ACDV.
14    Q   And what is Dispute Code 106?
15    A   Disputes present/previous account status/payment
16        rating/account history.
17    Q   Okay.  And it asks -- and by this dispute code,
18        Experian is asking Nissan to verify the account
19        status, the payment rating and the account history,
20        correct?
21    A   Correct.
22    Q   And at the time this dispute was made -- or when
23        Nissan responded to this dispute -- and this is on
24        the next page, Bates No. 141, Nissan's response to
25        the ACDV was to provide a Code 1 for -- in the
```

30(b)(6)

```
 1        payment history grid for the date September 2019,
 2        right?
 3    A   Correct.
 4    Q   And Code 1 means 30 days late, right?
 5    A   Correct.
 6    Q   Okay.  All right.  If we could go back to my chart,
 7        page 8, you'll see that the last entry is an entry
 8        for 9-28-19 ACDV investigation:  Verified 30-day
 9        late payment as accurate.  Do I have that correct?
10            MR. FOX:  Objection.
11    A   Yes.
12    Q   All right.  What is -- does Nissan have a working
13        definition of the term accuracy?
14            MR. FOX:  Objection to form.  You can answer
15        that if you can.
16    A   It's to report accurate.
17    Q   And what does that mean?
18    A   Accurate.
19    Q   Sure.  What does accurate mean?
20            MR. FOX:  Objection to form.
21    A   I stated it was to report accurate.
22    Q   And I'm asking you if Nissan has a working
23        definition of the term accurate.
24            MR. FOX:  Objection.  If you understand what
25        he's asking, answer it.
```

30(b)(6)

```
 1        arises.
 2   Q    Did you have any involvement in the Ritzes' case
 3        while it was -- while the SRs were coming in and
 4        while the ACDVs were being processed?  Did you,
 5        yourself -- were you involved in any of that?
 6   A    I was not involved in this case.
 7   Q    Okay.  Do you -- are you familiar with -- or are
 8        you -- as part of your job, are you responsible for
 9        ensuring that CVM is in compliance with the
10        Fair Credit Reporting Act?
11   A    Yes, I am.
12   Q    All right.  You're familiar with that statute?
13   A    Yes, I am.
14   Q    Are you familiar with the furnisher's
15        responsibilities under Section 1681s-2(B)?
16   A    I'm familiar with it.
17   Q    And if I reference 1681s-2(B), you know what I'm
18        talking about?
19   A    Yes, I'm familiar with it, like I said.
20   Q    What kind of training have you received on
21        compliance with the FCRA?
22   A    I'm CDIA certified.
23   Q    Did you receive training from and through the CDIA?
24   A    Yes.
25   Q    Okay.  What kind of training did you get from the
```

30(b)(6)

```
 1      CDIA?
 2   A  We have a two-year, two-day training course that we
 3      have to mandate for every CBM team member that we
 4      have to take every two years.
 5   Q  Okay.  When was the last time you took it?
 6   A  I took it in January of 2020.
 7   Q  Okay.  And then two years before that, I take it?
 8   A  Yep.
 9   Q  Okay.  All right.  Do you -- are you familiar with
10      the FTC furnisher rules?
11   A  Yes, I am familiar with the rules.
12   Q  Are you familiar with the definition of the term
13      accuracy contained within those rules?
14   A  I am familiar with that.
15   Q  All right.  What is that definition?
16   A  I can't quote it.
17   Q  Oh, you can't quote it?
18   A  I can't quote it.
19   Q  All right.  Could you look at Document 13 and let
20      me know when you have it?
21   A  Okay.
22   Q  Okay.  This is a printout of the FTC's furnisher
23      rule, the duties of furnishers of information to
24      consumer reporting agencies.  You've looked at this
25      before?
```

30(b)(6)

```
 1            MR. FOX:  Objection.  You can answer it if you
 2      can.
 3   A  Correct.
 4   Q  What's at issue in this case are the terms of the
 5      Ritzes' account, right?
 6            MR. FOX:  Objection.
 7   A  Correct.
 8   Q  All right.  The question -- the issue is, did
 9      Nissan have the contractual right to charge the
10      Ritzes after August 9th, 2019, right?
11            MR. FOX:  Objection.
12   A  Correct.
13   Q  And in order to report accurately, as is defined by
14      the furnisher rules, Nissan is obligated to report
15      information that reflects the terms of a consumer's
16      account, right?
17            MR. FOX:  Objection to the extent it calls for
18      a legal conclusion.  You can answer that if you
19      can.
20   A  Correct.
21   Q  All right.  So with that definition in mind, let's
22      look again at Document 12.  And let me know when
23      you're there.
24   A  Okay.
25   Q  All right.  The terms that pertain to whether or
```

30(b)(6)

```
 1        not Nissan could or could not charge the Ritzes
 2        after August 9th are the terms we looked at that
 3        time earlier this morning that are summarized on
 4        page 1 of Document 12, right?
 5             MR. FOX:  Objection.
 6   A    Correct.
 7   Q    Under these terms, did Nissan have the contractual
 8        right to charge the Ritzes after August 9th?
 9             MR. FOX:  Well, objection to form.  "Under
10        these terms" meaning your summary or under the
11        terms of the lease?
12   Q    Do you understand my question?
13   A    I understand your question.
14             MR. FOX:  I'm sorry, Ms. Donley.  I object,
15        but you can answer that if you can.
16   A    Repeat the question again, as I'm reading the
17        contract, Section 12 again.
18   Q    Under the -- did Nissan have the contractual right
19        to charge the Ritzes after August 9th, 2019?
20   A    I can't answer that question.
21   Q    Why not?
22   A    I'm not a lease end of term expert.
23   Q    No.  You work for the CBM department, which is
24        responsible for reporting consumer credit data and
25        responding to consumer disputes about that data,
```

30(b)(6)

```
 1        for each month the vehicle is not returned.  Did
 2        the Ritzes fail to return the vehicle to the Nissan
 3        dealer at the end of the lease term?
 4   A    No.
 5   Q    All right.  If these are the only two provisions
 6        that would give Nissan a contractual right to
 7        charge the Ritzes after August 9th, then wouldn't
 8        you agree that Nissan did not have a contractual
 9        right to charge the Ritzes after August 9th?
10             MR. FOX:  Objection to form.  You can answer
11        that.
12   A    I disagree with that.
13   Q    Okay.  What is Nissan's contractual right to charge
14        the Ritzes after August 9th?
15   A    The Ritzes failed to follow the proper grounding
16        procedure.
17   Q    Where is the -- where is the term in the lease or
18        the lease extension agreement related to proper
19        grounding procedures?
20   A    The Ritzes should have received notification of
21        proper grounding procedures.
22   Q    Can you show me where in the lease or the lease
23        extension agreement it mentions grounding?
24   A    I'm not a leasing expert, as I stated.  I cannot
25        provide you that information.
```

30(b)(6)

```
 1    Q   Well, it's what -- this says that Nissan Freehold
 2        was late in grounding the vehicle; do you agree?
 3    A   I wasn't at the dealership.  I don't know if they
 4        were late in grounding the vehicle or not.
 5    Q   Well, you know that the Ritzes returned it on the
 6        9th, right?
 7            MR. FOX:  Objection to form.
 8    A   That's correct.
 9            MR. FOX:  You can answer that.
10    Q   That's correct, right?
11    A   Correct.
12    Q   So you say they didn't ground it until the 20th of
13        September, right?
14    A   Correct, but this is stating something different
15        than what you're saying.
16    Q   So if they didn't ground it until the 20th of
17        September, they weren't late in grounding the
18        vehicle that was returned on the 9th, right?
19            MR. FOX:  Objection to form.
20    A   And the reason it was late in grounding was because
21        the dealership -- the customer did not follow the
22        proper grounding procedure.
23    Q   When the Ritzes arrived at the dealership, are you
24        aware that the first thing they were told was that
25        they needed an appointment?
```

30(b)(6)

```
 1   A   I was not at the dealership.

 2   Q   No, but you've seen the account notes, right?

 3   A   I did see the account notes.

 4   Q   Did you see in the account notes where they were

 5       told they needed an appointment?

 6   A   I did see the account notes on 5-19 where he was

 7       told he needed an appointment.

 8   Q   Okay.  But the Ritzes didn't need an appointment to

 9       return their vehicle, did they?

10           MR. FOX:  Objection to form.  You can answer

11       that if you can.

12   A   He did need an appointment.  He was -- he was told

13       he needed an appointment.

14   Q   He was told that, but he didn't actually need one,

15       right?

16           MR. FOX:  Objection to form.

17   A   I'm not sure what you're trying to get at.

18   Q   We agree that the notes say -- reflect that when

19       the Ritzes tried to return the car they were told

20       by the manager at Freehold Nissan that they -- that

21       he would not accept the car because they needed an

22       appointment to return the car, right?

23   A   Correct.

24   Q   But that wasn't true?  They didn't actually need an

25       appointment, right?
```

30(b)(6)

```
 1            MR. FOX:   Objection to form.
 2   A   No, that's incorrect.   He needed an appointment.
 3   Q   According to what?
 4   A   According to what he was told on 5-19.
 5   Q   Well, he was told he needed one.   Do you still have
 6       -- go back to Document 12.   First page.   Let me
 7       know when you're there.
 8   A   I'm there.
 9   Q   Okay.   Reminding you again that this first page is
10       what we identified as the lease terms and the
11       extended lease terms that apply to returning the
12       vehicle.   Do you recall that in the extension
13       agreement it says -- this is the second entry on
14       this chart from the bottom -- quote, you may return
15       your vehicle at any time during the extension
16       period?   Right?
17   A   That is correct.
18   Q   So if they can return it at any time, why would
19       they need an appointment?
20   A   Because the unit has to be grounded.
21   Q   They're not responsible for grounding?   We went
22       over that, too, remember?   There's nothing in the
23       lease agreement, nothing in the extension agreement
24       about them being responsible for grounding, right?
25            MR. FOX:   Objection to form.
```

30(b)(6)

```
 1   A   Right?
 2           MR. FOX:   Objection.
 3   A   That's correct.
 4   Q   Then why do you keep bringing up grounding?
 5       Grounding is not a condition, a term, of your
 6       agreement -- of Nissan's agreement with the Ritzes.
 7       It's got nothing to do with their agreement with
 8       you, right?
 9           MR. FOX:   Objection.
10   A   Okay.  Can we move forward?
11   Q   Can you answer my last question?
12   A   I thought I just did prior to that last question
13       you just had.
14   Q   No.  My question was why do you keep bringing up
15       grounding after we've agreed there's nothing in the
16       lease or the extended lease terms that have
17       anything to do with grounding?
18   A   And I stated before, you have to ground the vehicle
19       in order for it to be terminated.  This is a lease
20       con- -- lease.
21   Q   Well, you have to ground the vehicle.  Nissan might
22       have to and the dealer might have to, but that's
23       between you two, right?  That's got nothing to do
24       with the consumer, right?
25           MR. FOX:   Objection.  Objection to form.
```

30(b)(6)

```
 1    Q   Right?
 2    A   When you lease a vehicle and you turn it in, the
 3        grounding generates an odometer statement for the
 4        customer to sign which relinquishes them of the
 5        liability of that vehicle.  Without that odometer
 6        statement, the vehicle is not deemed terminated.
 7    Q   And that grounding procedure that you're talking
 8        about, that's between you and the dealership,
 9        right?  It's got nothing to do with the consumer
10        whose only obligation under the terms of their
11        agreement with Nissan, as we went over this
12        morning, is to return the vehicle?
13             MR. FOX:  Objection to form.
14    Q   Right?
15             MR. FOX:  Objection.
16    Q   That's their part; they have to get you the
17        vehicle?  The rest of it is between you and the
18        dealership, right?
19             MR. FOX:  Objection.
20    A   But the lease contract also states you will
21        complete a statement of vehicle's mileage at
22        termination required by federal law.  A grounding
23        of the vehicle generates that odometer statement,
24        which is the complete statement of this vehicle's
25        mileage at termination.
```

30(b)(6)

```
 1        override.  Do you remember being asked that?
 2   A    Yes.
 3   Q    Okay.  Are you aware as to whether Ms. Messmer was
 4        deposed already in this matter?
 5   A    No.
 6   Q    Okay.  Well, if I told you Ms. Messmer was deposed
 7        already, are you aware of any prohibition for
 8        Mr. Cento to ask Ms. Messmer herself whether she
 9        received a reprimand or a corrective action?
10   A    No.
11   Q    Okay.  I believe there's been a lot of language
12        used in this case, industry language.  Okay.  For
13        example, grounding has been used numerous times.
14        Okay.  Can you tell me what do you mean -- or
15        what's the process?  Can you tell me what the
16        process is for grounding?
17   A    So when a -- a lease is -- a leased vehicle is
18        turned in, it has to be properly grounded with the
19        dealership in order for it to be taken back into
20        inventory.  And when that happens, then the unit is
21        terminated.  It gets a term type associated to the
22        account so that it stops any initial invoices from
23        continuing to occur on the consumer's account.  And
24        then that indicates it rolls into our vehicle
25        remarketing system.  So then we are aware that we
```

30(b)(6)

```
 1      have a unit at a dealership that we need to pick up
 2      so that we can go ahead and take it to the auction
 3      to sell it if the dealership did not purchase it
 4      for their inventory.
 5   Q  Okay.  All right.  Now, in order for a vehicle to
 6      be grounded, is it necessary for an odometer's
 7      statement to be signed by the lessee?
 8   A  Yes, it is.  It's a federal document that we have
 9      to have on file.
10   Q  Oh, it's required by federal law?
11   A  Uh-huh.
12   Q  I'm sorry.  Yes?  You have to say yes.
13   A  Yes.  Sorry.  Yes.
14   Q  Okay.  All right.  So it's a federal law that an
15      odometer statement is signed by the lessee in order
16      for it to be grounded?
17   A  That is correct.
18   Q  Okay.  All right.  Grounding -- grounded or
19      grounding, is that a term or a word used within the
20      industry?
21   A  Yes.
22   Q  Okay.  Now, in order for a car to be returned, does
23      it have to be grounded?
24   A  It has to be -- a leased vehicle has to be
25      grounded.
```

30(b)(6)

```
 1   Q   A leased vehicle has to be grounded in order for
 2       the lease to be terminated; is that correct?
 3   A   That is correct.
 4   Q   And in order to ground the vehicle, an odometer
 5       statement has to be signed by the lessee; is that
 6       correct?
 7   A   That is correct.
 8   Q   And that's under federal law, right?
 9   A   Yes.
10   Q   And based on your review of this file on
11       August 9th, did the Ritzes sign an odometer
12       statement?
13   A   No, they did not.
14   Q   Okay.  So therefore Nissan could not ground the
15       vehicle, right?
16   A   Correct.
17   Q   And therefore the vehicle was not, as we use the
18       word loosely, returned?
19   A   Correct.
20   Q   Is that fair?
21           Okay.  Now you were asked also, the Ritzes, as
22       the lessee in this matter -- the Ritzes'
23       obligation, okay, under this lease.  And you
24       testified earlier that the only obligation they had
25       was to return this vehicle.  Do you remember saying
```

30(b)(6)

```
 1      that?
 2    A  Yes.
 3    Q  Okay.  Can you look at Document No. 12, and it's
 4      the lease, and the paragraph 12 that we've referred
 5      to numerous times?
 6    A  Okay.
 7    Q  Okay.  And can you read the second sentence of
 8      paragraph 12 -- well, you know what, read the first
 9      and second sentence.
10    A  "When your Lease terminates, whether early or
11      scheduled, you will return the Vehicle to a Nissan
12      dealer or other location we specify.  You will
13      complete a statement of this Vehicle's mileage at
14      termination as required by federal law."
15    Q  Okay.  Now, that statement itself, does it say you
16      may complete or does it -- do you read it as you
17      will complete?
18    A  You will complete.
19    Q  Okay.  Is your understanding that's mandatory as
20      opposed to discretionary?
21    A  Correct.
22    Q  And to complete a statement of the mileage, it says
23      by -- required by federal law.  Is that -- to your
24      knowledge, is that really required by federal law?
25    A  Yes, it is.
```