| | |
|---|---|
| Jacob M. Polakoff, Bar No. 035832006<br>BERGER MONTAGUE PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103<br>Tel.: (215) 875-3000<br>Fax: (215) 875-4604<br>Email: jpolakoff@bm.net | Guerino Cento<br>CENTO LAW<br>5666 Carrollton Avenue<br>Indianapolis, Indiana 46220<br>(317) 908-0678<br>cento@centolaw.com |

United States District Court
District of New Jersey
Trenton Division

| | |
|---|---|
| **Andrew Ritz** and **Michael Ritz**,<br><br>       Plaintiffs,<br><br>  v.<br><br>**Nissan-Infiniti LT**; **Trans Union, LLC**; **Equifax Information Services, LLC**; and **Experian Information Solutions, Inc.**,<br><br>       Defendants. | Case No. 3:20-cv-13509-FLW-DEA |

## <u>Plaintiffs' Brief in Opposition to Defendant's Motion for Summary Judgment</u>

Respectfully submitted,

| | |
|---|---|
| <u>/s/Jacob M. Polakoff</u><br>Jacob M. Polakoff, Bar No. 035832006<br>BERGER MONTAGUE PC<br>1818 Market Street, Suite 3600<br>Philadelphia, PA 19103<br>Tel.: (215) 875-3000<br>Fax: (215) 875-4604<br>Email: jpolakoff@bm.net | <u>/s/Guerino Cento</u><br>Guerino Cento<br>CENTO LAW<br>5666 Carrollton Avenue<br>Indianapolis, Indiana 46220<br>(317) 908-0678<br>cento@centolaw.com |

# Table of Contents

Table of Authorities ……………………………………………………….. ii

Introduction ………………………………………………………….. 1

Facts …………………………………………………………………….. 2

   I. Vehicle Return, Credit Reporting and Plaintiffs' Disputes …………..…… 2

   II. Lease Terms ……………………………………………………..……. 9

Summary Judgment Standard ……………………………………….…….. 10

Argument ……………………………………………………….………. 11

   I. Nissan's Reporting Was Not Accurate Because Plaintiffs' Did NOT Keep "Possession" of the Vehicle. Plaintiffs' Returned and Surrendered "Possession" on Time on August 9th. ………………….……… 11

   II. Plaintiffs' Dispute is Factual - Not Legal. And Even if it Was Legal, the Collateral Attack Defense Does Not and Should Not Apply to Furnishers. ……………………………………………………..…….. 17

      A. Even if the Court Accepts that the Collateral Attack Defense Applies In This Case, Plaintiffs' Disputes Were Factual; Not Legal…….. 17

      B. The Collateral Attack Defense Should Not Apply to Furnishers. ……. 22

   III. Plaintiffs Have More Than Enough Evidence to Support a Willful Violation. ……………………………………………………….……… 34

   IV. Nissan's Reckless Disregard for its FCRA Duties and Misreporting of Plaintiffs' Auto Loan Caused Plaintiffs Damages, Including Emotional Distress. ………………………………………………………….……… 37

# Table of Authorities

## Cases

*Alston v. Branch Banking & Trust Co.*,
2016 WL 4521651 (D. Md. Aug. 26, 2016) …………………………………….. 27

*Auer v. Robbins*,
519 U.S. 452 (1997). …………………………………………………………… 29

*Barrientos v. 1801–1825 Morton L.L.C.*,
583 F.3d 1197 (9th Cir. 2009) …………………………………………………29

*Beaudry v. TeleCheck Serv., Inc.*,
579 F.3d 702 (6th Cir. 2009) ………………………………………………… 38

*Boggio v. USAA Federal Savings Bank*,
696 F.3d 611 (6th Cir. 2012) ……………………………………………….. 25, 30

*Burke v. Experian Info. Serv.*,
2011 WL 1085874 (E.D. Va. Mar. 18, 2011) ………………………………… 28

*Carvalho v. Equifax Info. Serv., L.L.C.*,
629 F.3d 876 (9th Cir. 2010) ………………………………… 23, 24, 25, 27, 28

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ………………………………………………………….. 10

*Chiang v. Verizon New England Inc.*,
595 F.3d 26 (1st Cir. 2010) ………………………………………………… 26, 30

*Chiang v. Verizon New England Inc.*,
2009 WL 102707 (D. Mass. Jan. 13, 2009) ………………………………   26

*Chiang v. MBNA*,
620 F.3d 30 (1st Cir. 2010) …………………………………………………   32

*Chijioke-Uche v. Equifax Info. Servs., L.L.C.*,
2021 WL 2005499 (E.D. Pa. May 20, 2021) ………………………………… 24

*Chuluunbat v. Experian Info. Sols., Inc.*,
4 F.4th 562 (7th Cir. 2021) ……………………………………………….. 24

*Curley v. Klem*,
298 F.3d 271 (3d Cir. 2002) …………………………………………… 10

*DeAndrade v. Trans Union L.L.C.*,
523 F.3d 61 (1st Cir. 2008) …………………………………………… 30

*Denan v. Trans Union L.L.C.*,
959 F.3d 290 (7th Cir. 2020) …………………………………………… 24

*Drew v. Equifax Info. Serv., L.L.C.*,
690 F.3d 1100 (9th Cir. 2012) ……………………………………….. 33

*Edwards v. Med-Trans Corp.*,
2021 WL 1087228 (N.D. Ala. Mar. 22, 2021) ………………………… 26

*Enwonwu v. TransUnion, L.L.C.*,
164 Fed. Appx. 914 (11th Cir. 2006) ………………………………… 37

*Gross v. CitiMortgage, Inc.*,
33 F.4th 1246 (9th Cir. 2022) ……………………………… 22, 23, 24, 29

*Fischl v. GMAC*,
708 F.2d 143 (5th Cir. 1983) …………………………………………… 38

*Hinkle v. Midland Credit Mgmt., Inc.*,
827 F.3d 1295 (11th Cir. 2016) ……………………………………….. 31, 35

*Holland v. Chase Bank*,
475 F. Supp. 3d 272 (S.D.N.Y. 2020) ……………………………….. 26

*Hopkinson v. Equifax Info. Servs., L.L.C.*,
2021 WL 664040 (D. Mass. Feb. 19, 2021) ………………………… 28

*Horsch v. Wells Fargo Home Mortg.*,
94 F. Supp. 3d 665 (E.D. Pa. 2015) ………………………………….. 27

*Hukic v. Aurora Loan Serv.*,
588 F.3d 420 (7th Cir. 2009) ……………………………………………… 30

*Hunt v. JPMorgan Chase Bank*,
770 Fed. Appx. 452 (11th Cir. 2019) …………………………………… 26

*Hrebal v. Seterus*, Inc.,
598 B.R. 252 (Bankr. D. Minn. 2019) ………………………………….. 28

*Hrebal v. Nationstar Mortg. L.L.C.*,
385 F. Supp. 3d 849 (D. Minn. 2019) …………………………………… 28, 33

*Johnson v. MBNA Am. Bank*,
357 F.3d 426 (4th Cir. 2004) …………………………………………. 30, 31

*Johnson v. Trans Union, L.L.C.*,
2012 WL 983793 (N.D. Ill. Mar. 22, 2012) …………………………… 27

*Lawrence v. TransUnion, L.L.C.*,
296 F. Supp. 2d 582 (E.D. Pa. 2003) …………………………………… 38

*Lewis v. Experian Info. Sols., Inc.*,
2018 WL 1989449 (C.D. Cal. Mar. 20, 2018) ………………………… 27

*Littlejohn v. Vivint Solar*,
2020 WL 2521276 (D.N.J. May 18, 2020) ……………………………….. 38

*Markosyan v. Hunter Warfield, Inc.*,
2018 WL 2718089 (C.D. Cal. May 11, 2018) ……………………… 24, 27

*Mason v. Chase Home Fin.*,
2014 WL 37219 (D.N.J. Jan. 6, 2014) …………………………………        27

*Murphy v. Ocwen Loan Servicing, L.L.C.*,
2014 WL 2875635 (E.D. Cal. June 24, 2014) ………………………        27

*Rhodes v. Marix Servicing, LLC*,
302 F. Supp. 3d 656 (D.N.J. 2018) ……………………………………        10

*Robinson v. Equifax,*
560 F.3d 235 (4th Cir. 2009) ……………………………………………… 38

*Safeco Insurance Co. of America v. Burr,*
551 U.S. 47 (2007) ……………………………………………………… 34

*Saunders v. Branch Banking & Trust Co. of Va.,*
526 F.3d 142 (4th Cir. 2008) ……………………………… 25, 27, 28, 35

*Scaife v. Nat'l Credit Sys., Inc.,*
2021 WL 1610620 (N.D. Ala. Apr. 26, 2021) ………………………… 26

*Sheffer v. Experian Info. Sols., Inc.,*
2003 WL 21710573 (E.D. Pa. July 24, 2003) ………………………… 38

*Sloane v. Equifax Info. Servs., L.L.C.,*
510 F.3d 495 (4th Cir. 2007) ………………………………………… 38

*Smith v. Aegon Companies Pension Plan,*
769 F.3d 922 (6th Cir. 2014) ………………………………………… 29

*Smith v. LexisNexis Screening Sols., Inc.,*
837 F.3d 604 (6th Cir. 2016) ………………………………………… 38

*Sullivan v. Experian Info. Sols., Inc.,*
2021 WL 24579 (D. Mass. Jan. 4, 2021) ……………………………… 28

*Thompson v. San Antonio Retail Merchants Ass'n,*
682 F.2d 509 (5th Cir. 1982) ………………………………………… 38

*Thompson v. Transunion Data Sols., L.L.C.,*
2021 WL 1923409 (N.D. Ill. May 13, 2021) ………………………… 25

*White v. Imperial Adjustment Corp.,*
2002 WL 1809084 (E.D. La. Aug. 6, 2002) …………………………… 38

*Wilson v. SunTrust Bank, Inc.,*
533 F. Supp. 3d 1363 (S.D. Ga. 2021) ……………………………… 26

**Statutes**

15 U.S.C. 1681i …………………………………………….. 23, 25, 30, 33

15 U.S.C. 1681i(a)(3) ……………………………………………. 32

15 U.S.C. 1681i(a)(5)(A) ……………………………………… 30

15 U.S.C. 1681n(a)(1) …………………………………..……….. 34, 37

1681o(a)(1) …………………………………………………. 37

15 U.S.C. 1681s-2(a) ……………………………………….. 32

15 U.S.C. 1681s-2(a)(8)(F) …………………………………….. 32

15 U.S.C. 1681s-2(b) ……………………………… 17, 22, 23, 24, 25, 26, 30, 32, 37

15 U.S.C. 1681s-2(b)(1) ……………………………………….. 32, 33

15 U.S.C. 1681s-2(b)(1)(C) …………………………………….. 32

15 U.S.C. 1681s-2(b)(1)(E) …………………………………… 30, 31

**Rules**

Fed. R. Civ. P. 56(a) …………………………………………….. 10

**Other**

CFPB, Credit Reporting Companies and
Furnishers Have Obligations to Assure
Accuracy in Consumer Reports (May 6, 2022)
(statement of Seth Frotman, CFPB General Counsel) ……………………… 23, 29

CFPB, Supervisory Highlights,
Issue 26 (May 2, 2022),
available at https://www.consumerfinance.gov. …………………………… 32

*Gross v. CitiMortgage, Inc*.,
No. 2017160 (9th Cir. 2021)

(brief of amicus curiae CFPB),
available at https://files.consumerfinance.gov. ………………………… 22, 23, 29

140 Cong. Rec. S4075 (May 2, 1994)
(statement of Senator Bryan) …………………………………………… 32

## Introduction

Plaintiffs Andrew Ritz and Michael Ritz, (collectively, "**Plaintiffs**") commenced this action for violations of the Fair Credit Reporting Act, 15 U.S.C. 1681 *et seq.* (The "**FCRA**")[1] after Defendant Nissan-Infinity LT, ("**Nissan**") failed to reasonably investigate and correct its inaccurate and misleading reporting of Plaintiffs' auto loan account. Nissan moved for Summary Judgment, asserting four main arguments: (i) that Nissan's reporting was accurate; (ii) that Plaintiffs' disputes raise a question of law and, therefore, constitute an impermissible collateral attack; (iii) that Nissan's actions were not willful; and (iv) that Plaintiffs did not actually suffer damages caused by Nissan's negative reporting. However, as explained in detail below, Nissan's reporting was inaccurate, Plaintiffs disputes do raise a question fact, not of law, the collateral attack defense should not apply to furnishers and Nissan's failure to correct its inaccurate reporting was a violation of the FCRA. Moreover, Nissan's inaccurate reporting was knowing and deliberate and the apparent result of company-wide infighting and company wide policies, meaning Nissan's actions were willful. As a result of these actions, Plaintiffs suffered considerable damages including credit denial and emotional distress. Accordingly, Nissan's motion should be denied.

---

[1] Unless otherwise stated, all "**Section**" references are to the FCRA.

## Facts

### I.  Vehicle Return, Credit Reporting and Plaintiffs' Disputes

The facts and events material to Plaintiffs' claims against Nissan have been summarized, collected and presented in three demonstrative timeline exhibits: the "Ritz - Experian Timeline"; the "Ritz - Trans Union Timeline"; and the "Ritz - Equifax Timeline". (*See* Cento Cert., **Exhibit 1**; **Exhibit 2**; and **Exhibit 3**, respectively). A consolidated version of all three timelines in spreadsheet format has also been provided. (*See* Cento Cert., **Exhibit 4**).

Nissan's recitation of the facts through August 9, 2019 is for the most part correct and will not be repeated here except where necessary. Any disagreement regarding those facts is identified and explained in Plaintiffs' Responsive Statement of Material Facts. Accordingly, Plaintiffs' recitation of material facts begins immediately after Plaintiffs' left the Freehold Nissan dealership on August 9, 2019.

After leaving the dealership on August 9, 2019 at 11:35 AM, Plaintiffs' submitted a chat message to Nissan's Complaints Management Department. (Cento Cert., **Exhibit 5**). In that message, the full text of which is in Nissan's account notes, Plaintiffs' informed Nissan that they had returned the leased vehicle that day to the Freehold Nissan dealership. (*Id*.) Based on these account notes, the head of Nissan's Complaints Management Department, Tanya Messmer, testified as

follows: "Q. Do you have any reason to think that what the Ritzes told Nissan at 11:35 was untrue? A. No." (Cento, Cert., **Exhibit 6**, at 33:07-09).

After Plaintiffs' received the invoice by which Nissan billed the charges at issue in this case, Plaintiffs' again contacted Nissan's Complaints Management Department on September 20, 2019, this time by phone at 8:26 AM and 8:54 AM. (Cento Cert., **Exhibit 7**). During these calls, Plaintiffs again informed Nissan that the leased vehicle had been returned to the Freehold Nissan dealership on August 9th. (*Id*.) After concluding the second call with Plaintiffs, Nissan's agent called the Freehold Nissan dealership. (*Id*.) A dealership representative returned that agent's call the same day at 10:56 AM. (Cento Cert., **Exhibit 8**). By this call, Nissan received another confirmation that Plaintiffs returned the leased vehicle on August 9th. (*Id*.) A short time later that same day, Nissan then received another call from Freehold Nissan's manager during which Freehold Nissan confirmed again that Plaintiffs had returned the vehicle on August 9th. (Cento Cert., **Exhibit 9**). This final call on September 20th also informed Nissan that Freehold Nissan's manager refused to "backdate" the vehicle return because Plaintiffs' were "RUDE". (*Id.*) Regarding September 20th, the head of Nissan's Complaint's Management Department, Ms. Messmer, testified as follows: "Q. Would you agree that as of September 20th, 2019, it seemed likely that the Ritzes returned the car to the dealership on August 9th? A. Yes." (*See* Exhibit 6, at 82:15-18).

On September 24, 2019, the Freehold Nissan dealership sent a letter to Nissan which stated in pertinent part: "This vehicle was dropped off to our dealership on 8.9.19. The Customer wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the Vehicle at 4041 RT 9 in Freehold NJ. The odometer was 32,500 miles at the time the car was left." (Cento Cert., **Exhibit 10** (the "**September 24th Letter**")). The September 24th Letter also referenced the vehicle identification number (the "**VIN**") as "X**9**XXXXXXXXXXXXXXX" which was VIN number for Plaintiffs' vehicle except that it contained a typographical error in the second digit of the number which was written as a "9" but was in fact an "N". (*See* Exhibit 10 and Cento Cert., **Exhibit 11**).

On September 26, 2019 at 7:39 AM, Plaintiffs submitted another chat message to Nissan's Complaints Management Department. (Cento Cert., **Exhibit 12**). Again Plaintiffs informed Nissan that the leased vehicle had been returned on August 9th and expressed concern about how Nissan's reporting of the auto loan was negatively impacting their credit. (*Id.*)

On that same day, September 26th, at 9:13 AM, Nissan's customer service department submitted a "Service Request" to Nissan's Credit Bureau Management Team, the department responsible for Nissan's credit reporting (the "**CBM Team**"). (Cento Cert., **Exhibit 13**) (the "**First Service Request**")). By this First Service Request, customer service department informed the CBM Team that Plaintiffs'

4

leased vehicle was returned on August 9th and that the "dealer grounded late",
provided the CBM Team with a copy of the September 24th Letter and instructed
the CBM Team to remove the "August delinquency" from Plaintiffs' credit files.
(Id.) However, Nissan's CBM Team cancelled, i.e., did not process, the First
Service Request "because there was a typo in the second digit of the VIN number."
(Cento Cert., **Exhibit 14**, at 85:25-86:02 and 93:07-94:20; and **Exhibit 28**, at
48:03-52:05).

Regarding Plaintiffs' account at this time, Ms. Messmer testified as follows
regarding the vehicle return and Nissan's reporting of Plaintiffs' account as
delinquent: "Q. As likely, as we just agreed, that the car was returned on August
9th, it is unlikely that the charge Nissan placed on the account was correct; right?
A. Yes. Q. It is unlikely that the charge was correct, it's unlikely that the late
payment reported was correct; right? A. Yes." (*See* Exhibit 6, at 84:11-19).

Between September 28, 2019 (a few days after the CBM Team cancelled the
First Service Request instructing them to stop furnishing Plaintiffs' auto loan as
delinquent) and October 4, 2019, the CBM Team received and processed **seven**
Automated Consumer Dispute Verifications ("ACDVs") it had received from
Experian, Equifax and Trans Union by which Plaintiffs were disputing Plaintiffs'
account information, including the account status, payment rating and account
history of Plaintiffs' auto loan account and informing Nissan that the leased vehicle
had been returned on August 9th, the last day of the lease term. (Cento Cert.,

**Exhibit 15**; and **Exhibit 16**, at Nissan 000136-Nissan 000149). At the time these ACDVs were processed, Nissan was inaccurately furnishing the account as 30-days late with an incorrect balance (which should have been zero) and a derogatory payment rating and account status. (*Id*.)

On October 8, 2019, Plaintiffs again called Nissan's customer service department and disputed the derogatory credit reporting. (Cento Cert., **Exhibit 17**). As a result of this call, Nissan's Complaints Management Department sent a second service request directing the CBM Team to delete and stop reporting the derogatory payment history, status and rating and again providing the dealership's September 24th Letter along with other relevant documents. (Cento Cert., Exhibit 17 ("submitted SR, with letter attach from dlrs"); and **Exhibit 18** (the "**Second Service Request**"). Specifically, the CBM Team was told: "Please remove August delinquency. Vehicle was returned 8/9/2019 but dealer grounded late. Please see attachments for letter from dealer. Thank you. [sic]customer is stating that Experian shows x 30 days as of 8-29-19." (*See* Exhibit 18 (*emphasis added*)). However, Nissan's CBM Team cancelled the Second Service Request "because there was a typo in the second digit of the VIN number." (*See* Exhibit 14, at 85:25-86:02; 87:19-88:22; and 93:07-94:20). As Ms. Messmer testified regarding the First Service Request and the Second Service Request: "It doesn't make sense to me why he denied it." (Exhibit 14, at 97:10-98:17).

Between October 8, 2019 and November 14, 2019, Nissan received and processed **seven more** ACDVs it received from Experian, Equifax and Trans Union by which Plaintiffs were disputing Plaintiffs' account information, including the account status, payment rating and account history of Plaintiffs' auto loan account and informing Nissan that the leased vehicle had been returned on August 9th, the last day of the lease term. (Cento Cert., **Exhibit 19**; and Exhibit 16, at Nissan 000150-Nissan 000163). At the time these ACDVs were processed, Nissan continued to furnish the Plaintiffs' auto loan as 30-days late with a balance, and a derogatory payment rating and account status. (*Id*.)

Plaintiff again disputed the derogatory reporting on December 19, 2019; this time through the Consumer Financial Protection Bureau (the "**CFPB**"). (Cento Cert., **Exhibit 20**). On January 2, 2020 at 11:05 AM, Ms. Messmer submitted a third service request to Nissan's CBM Team instructing the CBR Team as follows: "I approve removal of 1x30 delinquency due to the previous Service Request shows letter from dealer....vin# is only 1 digit off due to type by dealer….tm" (*See* Exhibit 20; **Exhibit 21** (the "**Third Service Request**"); Exhibit 14, at 85:06-102:17). On January 3, 2020 at 7:43 AM, Nissan's CBM Team attempted to cancel the Third Service Request. (*See* Exhibit 20). Ms. Messner then overrode the CBM Team's attempted cancellation of the Third Service Request forcing the CBM Team to issue an Automated Universal Data ("**UDF**") form to Experian, Trans

Union and Equifax removing the derogatory credit data from Plaintiffs' credit files. (Exhibit 16, at Nissan 000164-000165).

On January 6, 2020, the same day the CBM Team transmitted the UDF to the consumer reporting agencies, Nissan responded to Plaintiffs' CFPB complaint by letter. (Cento Cert., **Exhibit 22**). By that letter, Nissan told the CFPB that: "NMAC's records show that it received a letter from Freehold Nissan stating that the vehicle was returned on August 9, 2019, and they were late in grounding the vehicle" and "On January 6, 2019 NMAC submitted an update to the credit bureaus to remove the 1x30 for the September 2019 payment." (*Id*.) (*emphasis added*).

Nissan received and processed one additional ADCV after sending the AUD correction. (*See* Exhibit 20). On January 17, 2022, Nissan responded to the ACDV it received from Trans Union and in that response removed the negative account status, payment rating, balance and late payment history. (*See* Exhibit 16, at Nissan 000166-000167).

Before the CBM Team responded to any ACDVs, it had in its possession all of the following information: (1) account records showing that Plaintiffs returned the car on time on August 9th, including confirmation from the Freehold Nissan dealership (*See e.g.*,  Exhibits 5, 6, 7, 8, and 9); and (2) the First Service Request, which included a copy of the September 24th Letter which, according to the head

8

of Nissan's Complaints Management Department, contained an "obvious typo on the VIN number." (Cento Cert., **Exhibit 23**).

## II.   Lease Terms

The Motor Vehicle Lease Agreement (the "**Lease**") contains only two provisions which grant Nissan the contractual right to continue to charge monthly payments beyond the expiration of the Lease term, including any extended term. (*See generally*, Cento Cert., **Exhibit 24**; and Exhibit 28, at 56:08-72:14). Section 12 of the Lease (captioned "Vehicle Return") provides in pertinent part that:

> If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments.

(Exhibit 24, at Nissan 000036). Section 12 of the Lease further states that:

> You will pay us for any damages we suffer because you failed to return this Vehicle to a Nissan dealer… or because you failed to return this Vehicle at the end of the lease term. We may determine our damages in one of the following two ways…by charging you the Total Monthly Payment for each month the Vehicle is not returned….

(Exhibit 24, at Nissan 000036). The Lease does not provide Nissan with the contractual right to charge Plaintiffs for additional monthly payments for not signing an odometer statement. (*See generally*, Cento Cert., Exhibit 24). The Lease does not provide Nissan with the contractual right to charge Plaintiffs for additional monthly payments for not grounding the vehicle. (*See generally*, Exhibit 24; and Exhibit 28, at 65:13-68:14; and 85:02-86:13).

The Lease provides that: "When your lease terminates…you will return the Vehicle to a Nissan dealer…." (Exhibit 24, Lease at Section 12). The Lease extension agreement provides that: "You may return your vehicle any time during the extension period" (Exhibit 24, Lease extension agreement, at Nissan 000040). There is nothing in the Lease or the Lease extension agreement which required Plaintiffs to make an appointment to return the vehicle. (*See generally*, Exhibit 24; and Exhibit 28, at 90:18-94:16). There is nothing in the Lease or the Lease extension agreement which gives Nissan the contractual right to charge Plaintiffs for additional monthly payments for not making an appointment. (*See generally*, Exhibit 24; and Exhibit 28, at 90:18-94:16).

## Summary Judgment Standard

Summary judgment is proper only "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party moving for summary judgment bears the initial burden of identifying the parts of the record that show the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). "In determining whether a dispute regarding a material fact exists, the Court must consider all facts and their logical inferences in the light most favorable to the nonmoving party." *Rhodes v. Marix Servicing, LLC*, 302 F. Supp. 3d 656, 661 (D.N.J. 2018) (*citing Curley v. Klem*, 298 F.3d 271, 276–77 (3d Cir. 2002)).

# Argument

## I.    Nissan's Reporting Was Inaccurate Because Plaintiffs' Did NOT Keep "Possession" of the Vehicle. Plaintiffs' Returned and Surrendered "Possession" on Time on August 9th.

Nissan argues that Plaintiffs' claims fail because Nissan accurately reported the auto loan as 30-days delinquent. According to Nissan, "…NMAC was permitted to charge, and Ritz was obligated to pay, an additional monthly payment pursuant to Paragraph 12 of the Lease…" because: (1) "Ritz failed to comply with the termination process by scheduling a lease end appointment"; and (2) "Ritz failed to comply with their contractual obligations to signing documents in including the legally required odometer statement." (Nissan's Brief, at 13). This argument is nothing more than wishful thinking on Nissan's part.

The first fatal and obvious error in this argument is that Paragraph 12 of the Lease does not give Nissan the contractual or legal right to charge an additional monthly payment for failing to schedule a lease end appointment or for failing to sign the odometer statement. Paragraph 12 creates the contractual right to charge an additional monthly payment only "if [Plaintiffs] keep possession" or "because [Plaintiffs] failed to return" the vehicle. It is undisputed that Plaintiffs returned the vehicle on time on August 9th. It is undisputed that Nissan knew at all times that Plaintiffs returned the vehicle on August 9th and that Nissan acknowledged this return internally. (*See e.g.*, Exhibit 28, at 69:08-12).

Even Nissan does not believe the argument being put forth by its attorneys. Plaintiffs were ultimately not charged and the derogatory credit reporting was deleted precisely because Plaintiffs returned the vehicle on August 9th. This is confirmed many times over by Nissan's own records and the testimony of its own witnesses. Nissan's Loss Recovery Collateral Department supervisor, Allison Edmond, testified as follows: "Q. My question is, you stopped reporting that late payment because it turned out to be true that the Ritzes returned the car on August 9th, just as they told you on August 9th? … A. Right. (Cento Cert., **Exhibit 25**, at 80:18-23; see also Exhibit 25, at 79:06-82:21; 84:15-85:25; and 90:19-91:05 and Exhibit 28, at 64:14-17) ("In retrospect, after all of the information is confirmed by the dealership, them taking responsibility, it needed to be corrected.")

Nissan's accuracy argument is so utterly disingenuous that Nissan does not even mention Plaintiffs' return or alleged "possession" of the vehicle on August 9th in the entirety of its accuracy argument. (*See* Nissan's Brief, at 11-13). Instead Nissan plays fast and loose with the term "possession" in its recitation of the facts where it attempts to hide its convoluted argument from scrutiny; relying on no authority of any kind in so doing. According to Nissan, Plaintiffs kept "possession" because the "[t]he non-party dealership did not accept possession of the vehicle and, accordingly, did not notify NMAC that the vehicle was in its possession" (*see* Nissan's Brief, at 1) and because "[a]lthough Ritz may no longer have been in physical possession of the vehicle (as would be the case if they left it in a

supermarket parking lot), since the dealership refused to take possession Ritz was never relieved of possession of the vehicle." (*See* Nissan's Brief, at 5). This argument is flawed for many reasons.

First, neither the Lease nor the Lease extension agreement make return or possession subject in any way whatsoever to whether the dealership (a third party over which Plaintiffs have no control whatsoever) "did not accept" or "refused to take" possession. Even Nissan's own corporate witness Ms. Edmond does not believe Plaintiffs kept "possession" of the vehicle after August 9th. Ms. Edmond testified at length on this subject and ultimately reached this conclusion: "Q. Which means that the Ritzes did not keep possession of the vehicle past the end of the lease term. Do you agree. A. I agree." (Exhibit 25, at 58:20-23 (*emphasis added*); *see also* Exhibit 25, at 57:03-59:16; 81:03-82:21).

Moreover, Plaintiffs' were contractually obligated to return and relinquish possession of the vehicle by August 9th. That is exactly what Plaintiffs did. Plaintiffs returned and surrendered possession on time. Plaintiffs notified Nissan that they had returned the vehicle. Nissan confirmed that the vehicle was returned by communicating directly with the dealership. Nissan was told that the dealership was refusing to date the return August 9th because, according to the dealership's manager, Plaintiffs were "rude" to him. Nissan internally accepted that the vehicle was returned on August 9th when it removed the charges from Plaintiffs' account. Nissan internally accepted that the vehicle was returned on August 9th when it

attempted to correct its own inaccurate reporting of the account as delinquent before it ever received any ACDVs from the consumer reporting agencies; an effort which failed solely because Nissan's CBM Team refused to make the correction due to an obvious single digit typographical error in the September 24th Letter.

In addition, Nissan admitted all of this to the CFPB in its written response to Plaintiffs' complaint when it unequivocally stated that: "NMAC's records show that it received a letter from Freehold Nissan stating that the vehicle was returned on August 9, 2019, and they were late in grounding the vehicle." (*See* Exhibit 22). There is simply no factual, contractual or legal support for the argument that Plaintiffs' did not turn over "possession" of the vehicle on August 9th.

Second, there is nothing in the Lease or the Lease extension agreement which required Plaintiffs to make an appointment to return the vehicle. (*See e.g.*, Exhibit 28, at 90:18-94:16) The "End of Lease" instructions upon which Nissan relies for this are not part of the Lease or the Lease extension agreement. In other words, these instructions are not contractual. And even if they were contractual, Nissan's argument would still fail because there is nothing in the Lease which gives Nissan the contractual right to charge an additional monthly payment for failure to make an appointment.

Third, the odometer statement argument is a red herring. The Lease requires Plaintiffs to sign an odometer statement. That requirement may even be in the law, as Nissan suggests, but there is simply nothing in the Lease or the Lease extension

agreement that gives Nissan the contractual right to charge Plaintiffs an additional monthly payment for failing to sign an odometer statement. Nor is there any connection in the Lease between signing an odometer statement and possession. Nowhere does the Lease or any law regarding odometer statements state, suggest or even imply that failing to sign an odometer statement would give Nissan the contractual right to charge Plaintiffs an additional monthly payment.

Fourth, Nissan's assertion that the "Ritz's vehicle was not "grounded", the lease terminated, until September 20, 2019" (Nissan's Brief, at 19) is contradicted not only by its own records but also by the testimony of its Loss Recovery Collateral Department supervisor, Allison Edmond, who testified as follows: "Q. So the odometer statement actually says September 20th; right? A. Yes. But that's not the grounding date, is it? … A. Based on Freehold's second letter, you are right. Q. I'm not really concerned what it's based on. I don't think it matters. The grounding date is August 9th; right? A. Based on the dealership's second letter, yes. Q. For whatever reason, the grounding date is August 9. … Q. Right? A .Yes." (Exhibit 25, at 48:18-49:08). Therefore, Nissan cannot use September 20th as a date from which they can attempt to justify the additional monthly charge which lead to the derogatory reporting. September 20th is the date of the odometer statement and it is only that date because Nissan's dealer believed Plaintiffs were "rude" when they returned the vehicle and so refused to back date the statement to August 9th.

15

In addition, Plaintiffs have no contractually responsibility and no duty of any kind concerning whether or not the dealership "grounds" the vehicle once it is returned. (*See* Exhibit 24 and Exhibit 25, at 72:17-73:1). Grounding is an issue between Nissan and its dealership and has nothing to do with Plaintiffs. (Exhibit 28, at 29:22-24). There are no terms related to grounding in the Lease. (*Id*.) In fact, the term "grounding" is not in the Lease at all. Therefore, it cannot be that Nissan could charge Plaintiffs an additional monthly payment because the dealership did not ground the vehicle.

Finally, Nissan's entire argument regarding accuracy ignores completely virtually every relevant fact about the return of the vehicle. Nissan ignores the acknowledgments and admissions of its own representatives. It ignores its own internal documents which admit Nissan could not make the charge. It ignores the efforts of Nissan's consumer service representatives, including and especially Ms. Messmer, to correct the inaccurately reported late payment by instructing the CBM Team to remove it. Nissan ignores the unreasonable refusal of the CBM Team to make the correction over an obvious typographical error. Nissan ignores its admissions to the CFPB that this all happened to Plaintiffs because the dealership mistakenly grounded the car "late."

This idea that Plaintiffs failed to relinquish possession of the vehicle on any day other than August 9th (the day they left the vehicle and the keys to that vehicle in the hands of the dealership) is simply invented out of thin air by Nissan. It

16

contradicts the undisputed fact that Plaintiffs returned the vehicle on August 9th, Nissan's own admissions regarding return of the vehicle, the testimony of its own witnesses, its internal records and has no support in the Lease or any law.

Plaintiffs returned and relinquished the vehicle on time on August 9th. Accordingly, Nissan had no contactual right to charge an additional monthly payment. No payment was actually due. Plaintiffs could not have been and were not delinquent; but for Nissan's admitted internal mistakes, the late grounding of the vehicle by the dealership and complete mishandling of the vehicle return. Therefore, Nissan's reporting of Plaintiffs' account as past due, delinquent, with a balance owing and in a derogatory payment status was factually and legally inaccurate satisfying all the requirements of a claim under Section 1681s-2(b).

## II. Plaintiffs' Dispute is Factual - Not Legal. And Even if it Was Legal, the Collateral Attack Defense Does Not and Should Not Apply to Furnishers.

### A. Even if the Court Accepts that the Collateral Attack Defense Applies In This Case, Plaintiffs' Disputes Were Factual; Not Legal.

Nissan's argument that Plaintiffs' disputes raise legal rather than factual issues hits in no way other than farcical. The Lease gives Nissan the contractual right to charge an additional monthly payment IF and ONLY IF, Plaintiffs failed to "return" the vehicle or if Plaintiffs kept "possession" of the vehicle beyond the end of the Lease term. (Exhibit 28, at 32:16-33:15 and 34:19-35:10). There is no legal dispute here. There is no contractual interpretation problem to be resolved. Both

sides agree on how the contract should be interpreted. If Plaintiffs **did not** return the vehicle, they could be charged. If Plaintiffs **did** return the vehicle, they cannot be charged.

This was made perfectly clear through the testimony of Nissan's own witnesses as Nissan itself points out. (*See* Nissan's Brief, at 16). Frankly, Nissan is attempting to make a rather odd argument by repeating the questions asked in that deposition without repeating the answers. The answers which Nissan conveniently does not quote in its brief effectively end Nissan's own argument. For example, Nissan cites to the question asked on Page 30, lines 8-11 of the deposition transcript: "Does it say anywhere in this lease that Nissan may charge the Ritzes any amount, including a monthly amount, if they do not complete a statement of the vehicle's mileage at termination.?" Here is how that question was ultimately answered by Nissan's own witness:

> Q. The provision I'm referring to is on Bates stamp 36, under Section 12. It's the -- again, it's the provision that says, "You will complete a statement of this vehicle's mileage at termination as required by federal law." And my question is, **do you see anywhere in this lease where it allows Nissan -- where there's a term that allows Nissan to charge the Ritzes any amount of money if they don't complete a statement of the vehicle's mileage at termination**?
>
> A. **No**.

(*See* Nissan's Exhibit H, at 30:18-31:03) (*emphasis added*). The same is true of the witnesses answers to all the other questions quoted in Nissan's Brief. Taking one other example, Nissan's Brief highlights the question: "Q. …did Nissan have the

contractual right to charge the Ritzes after August 9, 2019?" Here is how Nissan's

witness ultimately answered that question:

> Q. **Where is the -- where is the term in the lease or the lease extension agreement related to proper grounding procedures?**
>
> A. The Ritzes should have received notification of proper grounding procedures.
>
> Q. **Can you show me where in the lease or the lease extension agreement it mentions grounding?**
>
> A. I'm not a leasing expert, as I stated. I cannot provide you that information.

(*See* Nissan's Exhibit H, at 61:18-65:25) (*emphasis added*). Nissan's own

representative responsible for credit reporting could not identify any term in the

Lease which would have allowed Nissan to make the additional monthly charge.

And Nissan's Brief does no better.

Nowhere in Nissan's collateral attack argument does Nissan identify any

provision of the Lease which would have allowed Nissan to make the additional

monthly charge. The only argument Nissan could come up with is a contrived issue

about "grounding" and "termination". (*See* Nissan's Brief, at 17). There is nothing

in the Lease about "grounding". So there cannot possibly be a legal or contractual

interpretation issue regarding "grounding." There is nothing in the Lease obligating

Plaintiffs to do anything about "terminating" the Lease. So there cannot possible be

a legal or contractual interpretation issue regarding termination.

19

The only question to be resolved is whether or not Plaintiffs returned the vehicle on August 9th. The undisputed facts show *not only* that Plaintiffs returned the vehicle on August 9th, *not only* that Nissan knew Plaintiffs returned the vehicle on August 9th, *not only* that the dealership knew Plaintiffs returned the vehicle on August 9th, *not only* that Nissan itself accepted this fact and tried to stop its own credit reporting team from inaccurately reporting the account, *but also* that that Nissan only continued to report the account as delinquent because of a vindictive dealership manager and a stubborn credit reporting department refused to make the correction over an obvious typographical error. These are the facts and none of them are in dispute. Nissan's attempt to create a legal question where none exists is utterly without merit.

In addition, Nissan's vague references to the Code of Federal Regulations, Odometer Disclosure Requirements and the like are yet another red herring. Nothing in those regulations or requirements give Nissan the contractual right to charge an additional monthly payment. That is all that matters here. It may well be that Plaintiffs were required by law to sign an odometer statement. It is undeniably true that the Lease required them to complete a statement of the vehicle's mileage. But neither those laws or the Lease gave Nissan the right to charge Plaintiffs for not doing so. Finally, not that this should matter either way, but the undisputed facts prove that Plaintiffs did not sign an odometer statement because the

dealership's manager refused to provide one - not because Plaintiffs refused to do it.

Even if Nissan wants to continue to torture the facts to fit its narrative at trial, Nissan will ultimately be arguing about whether or not the vehicle was returned on August 9th. It has no choice but to argue that because it is indisputable that the Lease only permits additional charges for failure to return. Nissan's wishful thinking about odometer statements, scheduling return times[2] and regulations never create any legal issue about the only question which matters; was the vehicle returned on August 9th? All the evidence proves that it was.

Finally, Nissan's farcical argument is glaringly revealed when we recall the simple fact that Nissan's representative, Ms. Messmer, resolved the reporting problem by forcing Nissan's CBM Team to remove and stop furnishing the delinquency based on one fact and one fact alone - that Plaintiffs returned the vehicle on August 9th. No one at Nissan, including Ms. Messmer, arrived at that conclusion by any sort of tangled, complicated or convoluted legal contractual interpretation. That is not what happened. Nissan corrected its erroneous reporting because it determined no additional charge could be supported because the vehicle

---

[2] Note that there is no provision in the Lease or the extension agreement requiring Plaintiffs to make an appointment with the dealership. Nissan's reliance on Exhibit F, the end of lease email, is pointless. That email is not part of the Lease or the Lease extension agreement both of which specifically provide not only that Plaintiffs were contractually obligated to return the vehicle on August 9th but, more to the point, that they "may return [their] vehicle at any time during the extension period." (*See* Exhibit 24; and Exhibit 28, at 35:16-25; and 90:18-94:16).

was returned on time. "Please remove August delinquency. Vehicle was returned 8/9/2019 but dealer grounded late. Please see attachments for letter from dealer. Thank you. [sic]customer is stating that Experian shows x 30 days as of 8-29-19." (*See* Exhibit 18; see also Cento Cert., Exhibit 25, at 80:18-23 ("Q. My question is, you stopped reporting that late payment because it turned out to be true that the Ritzes returned the car on August 9th, just as they told you on August 9th? … A. Right.); see also Exhibit 25, at 79:06-82:21; 84:15-85:25; and 90:19-91:05) ("In retrospect, after all of the information is confirmed by the dealership, them taking responsibility, it needed to be corrected."). There is no legal or contractual issue upon which to base a collateral attack defense.

## B.   The Collateral Attack Defense Should Not Apply to Furnishers.

Several circuit courts of appeals have held that consumer reporting agencies ("**CRAs**") are not equipped to arbitrate unresolved legal disputes between consumers and furnishers through the FCRA dispute process, and therefore that CRAs are not liable for their failure to investigate or correct disputes based on the legal validity of debts that only a tribunal can resolve. The rationale for this body of law establishes why the CRA exception does not apply to the duties of furnishers under section 1681s-2(b); indeed, several district courts and the leading circuit court opinions that adopt this CRA exception expressly disclaim its application to furnishers, as has the CFPB. *Gross v. CitiMortgage, Inc.*, No. 2017160 (9th Cir. 2021) (brief of amicus curiae CFPB), available at https://

22

files.consumerfinance.gov. *See also* CFPB, Credit Reporting Companies and Furnishers Have Obligations to Assure Accuracy in Consumer Reports (May 6, 2022) (statement of Seth Frotman, CFPB General Counsel: "Congress was clear that credit reporting companies and furnishers have responsibilities with respect to accuracy—with no exceptions for legal issues.") Nevertheless, furnishers like Nissan persist in arguing that the legal dispute exception also applies to them.

No federal precedential opinion that has meaningfully examined the issue has held that the putative legal dispute exception pertaining to CRAs applies to furnishers under section 1681s-2(b). Indeed, the circuit courts that have engaged in a substantive analysis of the question have agreed that the exception is inapplicable to furnishers. Most critically, the Ninth Circuit has concurred with the CFPB's formal position taken in an amicus brief, *Gross v. CitiMortgage, Inc.*, No. 2017160 (9th Cir. 2021) (brief of amicus curiae CFPB), available at https://files.consumerfinance.gov, and concluded that:

> [The] FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance. … FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct. The distinction between 'legal' and 'factual' issues is ambiguous, potentially unworkable, and could invite furnishers to 'evade their investigation obligation by construing the relevant dispute as a "legal" one'."

*Gross v. CitiMortgage, Inc.*, 33 F.4th 1246 (9th Cir. 2022). Furthermore, the Ninth Circuit's stated rationale in the *Carvalho* decision, adopting the legal dispute exception to investigations by CRAs under section 1681i, foreshadowed its ruling

in *Gross* and expressly rests on its inapplicability to furnisher investigations. *Carvalho v. Equifax Info. Serv., L.L.C.*, 629 F.3d 876 (9th Cir. 2010). The court reasoned that because CRAs have no direct relationship with the consumer or with the underlying transaction, they are ill-equipped to arbitrate the parties' legal dispute, and explicitly contrasted the CRA's inability to make such determinations with the furnisher who "stands in a far better position to make a thorough investigation of a disputed debt than the CRA does on reinvestigation." *Id.* at 892.

The Seventh Circuit similarly reaffirmed the duty of furnishers to provide CRAs with information that "correctly reflects liability for the account" and "to determine the legality of a disputed debt." *Denan v. Trans Union L.L.C.*, 959 F.3d 290, 295 (7th Cir. 2020). That court contrasted the more limited role of CRAs when it agreed with the Ninth Circuit and others that CRAs have no responsibility to resolve legal questions that require a judicial determination. *Id.*  This reasoning emphasizes the distinct role that Congress gave furnishers in the investigation process and that any judicial imposition of this putative legal dispute exception is particularly misplaced in the section 1681s-2(b) furnisher context. *See Markosyan v. Hunter Warfield, Inc.*, 2018 WL 2718089 (C.D. Cal. May 11, 2018). In fact, in a later opinion, the Seventh Circuit expressly reiterated this conclusion when it directed that legal disputes, which CRAs are supposedly ill-equipped to resolve, can and should be asserted against the furnisher. *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 569 (7th Cir. 2021); *Accord Chijioke-Uche v. Equifax Info.*

*Servs., L.L.C.*, 2021 WL 2005499 (E.D. Pa. May 20, 2021); *Thompson v. Transunion Data Sols., L.L.C.*, 2021 WL 1923409 (N.D. Ill. May 13, 2021) ("Unlike consumer reporting agencies, furnishers must resolve legal questions regarding liability when necessary to resolve disputed information.").

This distinction is also illustrated in *Boggio v. USAA Federal Savings Bank*, 696 F.3d 611 (6th Cir. 2012), where the Sixth Circuit reversed summary judgment granted to a furnisher regarding a dispute from an ex-husband who claimed he was not liable for his former wife's debt. The court remanded to allow a jury to determine the reasonableness of the furnisher's investigation of the dispute, thus in effect agreeing with the Seventh Circuit that determining the plaintiff's legal liability for the debt presents a suitable section 1681s-2(b) dispute and a justiciable jury question under circumstances the Ninth Circuit would have dismissed as "collaterally attacking the legal validity of consumer debts" if the same claim had been brought against the CRA under section 1681i. *Carvalho v. Equifax Info. Serv., L.L.C.*, 629 F.3d 876, 892 (9th Cir. 2010).

In addition to the Sixth Circuit, the Fourth Circuit expressly rejected this "collateral attack" argument—developed in cases brought against CRAs—when asserted against furnishers. *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 150 (4th Cir. 2008).

The only federal precedential opinion that has stated otherwise is *Chiang v. Verizon of New England*, but it so opined only in dicta that had no bearing on its

25

actual holding. *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010). *Chiang* presented the initial opportunity for the First Circuit to address section 1681s-2(b), acknowledging that the case "raise[d] several issues of first impression for our court." *Id*. at 29. Accordingly, the opinion naturally endeavored to provide for future guidance a comprehensive overview of perceived section 1681s-2(b) principles, including its express incorporation of the factual versus legal dispute distinction that the First Circuit had adopted earlier in the disparate CRA context. The First Circuit even explicitly acknowledged that the rule had only been applied to CRAs. *Id*. at 38. However, the *Chiang* court resolved the case before it by affirming summary judgment for the furnisher on the same basis as the district court - that the consumer had presented no inaccuracy whatsoever, <u>rendering its factual versus legal dispute distinction language purely obiter dictum</u>. *Id*. at 40, aff'g *Chiang v. Verizon New England Inc.*, 2009 WL 102707, at *9–11 (D. Mass. Jan. 13, 2009) (*emphasis added*).

A number of courts outside of the First Circuit—primarily in the Eleventh Circuit—have cited and applied without analysis *Chiang*'s legal dispute exception in the furnisher context. *Hunt v. JPMorgan Chase Bank*, 770 Fed. Appx. 452 (11th Cir. 2019); *Wilson v. SunTrust Bank, Inc.*, 533 F. Supp. 3d 1363 (S.D. Ga. 2021); *Scaife v. Nat'l Credit Sys., Inc.*, 2021 WL 1610620 (N.D. Ala. Apr. 26, 2021); *Edwards v. Med-Trans Corp.*, 2021 WL 1087228 (N.D. Ala. Mar. 22, 2021); *Holland v. Chase Bank,* 475 F. Supp. 3d 272 (S.D.N.Y. 2020). However, courts that

have examined the applicability of the CRA legal dispute exception to furnishers have explicitly rejected it. *Markosyan v. Hunter Warfield, Inc.*, 2018 WL 2718089 (C.D. Cal. May 11, 2018) (refusing to apply Carvalho to furnisher context because "its rationale . . . does not extend to a furnisher"); *Horsch v. Wells Fargo Home Mortg.*, 94 F. Supp. 3d 665 (E.D. Pa. 2015) (rejecting *Chiang*'s putative distinction between factual and legal inaccuracies as at odds with Third Circuit precedent); *Lewis v. Experian Info. Sols., Inc.*, 2018 WL 1989449, at *3 (C.D. Cal. Mar. 20, 2018) (stating that plaintiff cannot attack legal validity of debt in her claims against CRA while analyzing legal claim in holding that furnisher did not violate FCRA); *Alston v. Branch Banking & Trust Co.*, 2016 WL 4521651 (D. Md. Aug. 26, 2016) (permitting claim against furnisher for willful failure to conduct reasonable investigation, but dismissing reinvestigation claim against CRA, because it was legal dispute); *Murphy v. Ocwen Loan Servicing, L.L.C.*, 2014 WL 2875635 (E.D. Cal. June 24, 2014) (allowing claim based on failure to note lack of personal liability for post-foreclosure deficiency, even though claim relied on legal argument, because omission could be misleading; reversing prior dismissal that relied on *Chiang*); *Mason v. Chase Home Fin.*, 2014 WL 37219 (D.N.J. Jan. 6, 2014) (noting that no Third Circuit decision had approved of collateral attack rationale in furnisher case, and that such rationale makes sense for CRAs, but not furnishers; rejecting *Chiang* and quoting *Saunders*); *Johnson v. Trans Union, L.L.C.*, 2012 WL 983793 (N.D. Ill. Mar. 22, 2012) (consumer's "real dispute

concerns the legal validity of his child support obligations" and thus his dispute

was with non-defendant state child support agency that furnished information, not

CRAs, citing *Carvalho*), aff'd, 524 Fed. Appx. 268 (7th Cir. 2013); *Burke v.*

*Experian Info. Serv.*, 2011 WL 1085874, at *7 (E.D. Va. Mar. 18, 2011) (in dicta,

stating that CRA's role and legal obligations are different than those of creditor,

citing Saunders with approval); *Hrebal v. Seterus*, Inc., 598 B.R. 252, 270 (Bankr.

D. Minn. 2019), on reconsideration sub nom. *Hrebal v. Nationstar Mortg. L.L.C.*,

385 F. Supp. 3d 849 (D. Minn. 2019) (noting that *Chiang* cited only one case in

support of "legal dispute" distinction, involving investigatory duties of CRAs, and

"when it comes to a potential legal dispute over a debt, a furnisher 'stands in a far

better position to make a thorough investigation . . . than the CRA does on

reinvestigation'"; quoting *Gorman*, citing *Saunders*, and rejecting *Chiang*). *See*

*also Hopkinson v. Equifax Info. Servs.*, L.L.C., 2021 WL 664040 (D. Mass. Feb.

19, 2021) (denying dismissal of theft of identity claim by limiting *Chiang*

precedent by its terms to decisions on summary judgment), later opinion, 2022 WL

104912 (D. Mass. Jan. 11, 2022) (denying furnisher summary judgment, detailing

"irregularities on the face of the loan documents" and listing other anomalies

supporting consumer's claim as matter of disputed fact); *Sullivan v. Experian Info.*

*Sols., Inc.*, 2021 WL 24579 (D. Mass. Jan. 4, 2021) (in contrast to Chiang's ruling

involving "pure questions of law," furnisher's putative misleading reporting of the

tradeline in view of the consumer's bankruptcy presented "genuine issues of

material fact"). And, in a particularly significant development, the CFPB filed an amicus brief in the Ninth Circuit in April 2021 expressly rejecting *Chiang* and any application of the putative legal dispute exception to furnishers. *Gross v. CitiMortgage, Inc*., No. 2017160 (9th Cir. 2021) (brief of amicus curiae CFPB), available at https://files.consumerfinance.gov. *See also* CFPB, Credit Reporting Companies and Furnishers Have Obligations to Assure Accuracy in Consumer Reports (May 6, 2022) (statement of Seth Frotman, CFPB General Counsel: "[T]here is no such loophole in the law. Congress was clear that credit reporting companies and furnishers have responsibilities with respect to accuracy—with no exceptions for legal issues."). Such legal interpretations of a federal statute in an amicus brief filed by its congressionally designated regulatory agency are entitled to substantial respect, <u>if not outright deference</u>. *See Auer v. Robbins*, 519 U.S. 452, 461–462 (1997). *Compare Barrientos v. 1801–1825 Morton L.L.C*., 583 F.3d 1197, 1214 (9th Cir. 2009) ("Further, an agency's litigation position in an amicus brief is entitled to deference if there is no reason to suspect that the interpretation does not reflect the agency's fair and considered judgment on the matter."), *with Smith v. Aegon Companies Pension Plan*, 769 F.3d 922, 929 (6th Cir. 2014) (declining to give deference where DOL position was only taken once before and "not consistent with prior acquiescence").

In addition to being dicta, the reasoning in *Chiang* is seriously flawed. Instead of reviewing the statutory language, the First Circuit reached its result by

29

relying on its incorrect view that the only purpose of an FCRA investigation is "to determine whether the disputed information was inaccurate." *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 36–37 (1st Cir. 2010) (quoting similarly flawed opinion in *DeAndrade v. Trans Union L.L.C.*, 523 F.3d 61 (1st Cir. 2008), addressing same issue with regard to § 1681i CRA investigations). Congress in fact stated that the actual objective of an FCRA investigation is to determine whether "an item of information is found to be inaccurate or incomplete or cannot be verified." 15 U.S.C. 1681i(a)(5)(A). Congress repeated and reaffirmed that standard when it duplicated this language virtually verbatim in section 1681s-2(b) when it added the furnisher responsibilities in 1996. 15 U.S.C. 1681s-2(b)(1)(E) ("if an item of information disputed by the consumer is found to be inaccurate or incomplete or cannot be verified"). *See Boggio v. USAA Fed. Sav. Bank*, 696 F.3d 611, 618 (6th Cir. 2012) ("a furnisher has a duty to modify, delete, or block its original reporting if it discovers, upon investigation, that it can no longer verify the consumer information it originally supplied to a CRA"); *Hukic v. Aurora Loan Serv.*, 588 F.3d 420, 434 (7th Cir. 2009) ("If the investigation concludes that a disputed item is inaccurate or cannot be verified, the furnisher must promptly modify, delete, or block the reporting of that information."); *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 431–432 (4th Cir. 2004). As succinctly stated by the Eleventh Circuit, the FCRA "framework reflects the fact that § 1681s-2(b) is designed not only to exclude false information from credit reports, but also to prevent the

reporting of unverifiable information." *See Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1304 (11th Cir. 2016). If the furnisher truly cannot make a determination on the merits of the consumer's dispute for any reason, then it of course must inform the CRA that it cannot verify the information. *Johnson v. MBNA Am. Bank*, 357 F.3d 426, 432 (4th Cir. 2004). Yet the basis on which defendants like Nissan invoke the putative legal dispute exception essentially argues that verifying the dispute is too complicated and beyond their capabilities; thus, they are obligated to report the tradeline as unverifiable. 15 U.S.C. 1681s-2(b)(1)(E). However, consumers who are subjected to this restrictive *Chiang* dicta reasoning are burdened as a result with consumer reports containing admittedly unverifiable information precisely because it is unverifiable, the opposite of the regime that Congress intended and adopted.

This *Chiang* dicta reasoning is also the reverse of the foundational FCRA principle that places the burden on furnishers to verify the accuracy of disputed information by making deletion the default position when information cannot be verified. 15 U.S.C. 1681s-2(b)(1)(E). A lead co-sponsor of the 1996 Reform Act explained in his Senate remarks the intent and impact of amending the FCRA:

> If our legislation accomplishes nothing else, I intend that it will turn around the burden of proof so that credit bureaus and furnishers of information will be responsible for verifying the accuracy of information when an individual points out the mistake in that credit report. This is an extraordinarily important feature of this legislation, and its significance, Mr. President, cannot be underestimated.

140 Cong. Rec. S4075 (May 2, 1994) (statement of Senator Bryan). *Chiang* would eliminate that burden by enabling information to remain on consumer reports even when the furnisher is incapable of meeting its burden to verify it.

The plain language of section 1681s-2(b) focuses on whether, once the consumer initiates the CRA dispute process by claiming that the information is inaccurate or incomplete, the furnisher has complied with its five enumerated duties, not whether the basis for disputing the information raises a legal challenge. Congress authorized the CRA, as the "gatekeeper" of the consumer report, *Chiang v. MBNA*, 620 F.3d 30, 30 (1st Cir. 2010), but not the furnisher to consider the facial sufficiency of the consumer's dispute by empowering the CRA to reject without further investigation or even referral to the furnisher any dispute it deems "frivolous or irrelevant." 15 U.S.C. 1681i(a)(3); *see* CFPB, Supervisory Highlights, Issue 26 (May 2, 2022), available at https://www.consumerfinance.gov ("When disputes are forwarded to furnishers by CR[A]s, the FCRA does not provide the furnisher with discretion to deem such disputes frivolous."). The formal section 1681s-2(b) dispute mechanism contains no such role for furnishers, an omission that is further underscored by the inclusion of a similar "frivolous or irrelevant" exception in the informal direct consumer-furnisher dispute procedure in section 1681s-2(a). 15 U.S.C. 1681s-2(a)(8)(F). Under the formal dispute process, once the CRA determines that the dispute merits investigation and notifies the furnisher of the dispute, section 1681s-2(b)(1) states that the furnisher "shall"

perform its five functions without exception and irrespective of the legal validity of the tradeline.

The ability of CRAs, but not furnishers, to summarily reject "frivolous or irrelevant" disputes is a part of the "filtering mechanism" at the core of the formal dispute process that Congress adopted. This system relies on the furnisher to comply with all of its section 1681s-2(b)(1) obligations, including section 1681s-2(b)(1)(C), to "report the results of the investigation to the consumer reporting agency" whose notification triggered the furnisher's duties. *See Drew v. Equifax Info. Serv., L.L.C.*, 690 F.3d 1100 (9th Cir. 2012). Congress included this essential requirement that the furnisher report to the CRA the information that it learns in order to enable the CRA to comply with its own section 1681i duties. Accordingly, the furnisher must comply with section 1681s-2(b)(1)(C) to disclose what it has learned notwithstanding "the mere existence of a complex legal dispute in the background of a consumer credit dispute," including that the tradeline presents a bona fide or potentially meritorious legal dispute. *Hrebal v. Nationstar Mortg. L.L.C.*, 385 F. Supp. 3d 849 (D. Minn. 2019).

The growing jurisprudential consensus rejecting the *Chiang* dicta and agreeing that furnishers are obligated to investigate and correct disputes based on the legal validity of their tradeline accentuates a concern that naturally arose with the adoption of furnisher liability in the 1996 Reform Act.

This Court should reject *Chiang* and its prodigy, including the *Esperance* opinion upon which Nissan so heavily relies. *Esperance* is flawed for all the same reasons *Chiang* is flawed. The Court should join the majority of Circuit and District Courts and adopt the position of the lead federal regularity body governing credit reporting, the CFPB (to whom this Court should defer on questions of this magnitude), and find that the collateral attack defense does not apply to furnishers and, moreover, that the collateral attack defense itself (even as it is applied to CRAs) is flawed and should no longer be followed anywhere.

## III.   Plaintiffs Have More Than Enough Evidence to Support a Willful Violation.

A data furnisher can be held liable for punitive damages if it is determined that it willfully failed to comply with any portion of the FCRA. 15 U.S.C 1681n. Willfulness includes not only knowing violations, but also those which are reckless or committed with reckless disregard of the law. *Safeco Insurance Co. of America v. Burr*, 551 U.S. 47, 57 (2007). The Court established an objective standard of recklessness in civil cases generally, defining recklessness as "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'" *Safeco*, 551 U.S. 47, 68 (2007); *see also  Seamans v. Temple Univ.*, 744 F.3d 853, 869 (3d Cir. 2014); *Pinson v. JPMorgan Chase Bank*, 942 F.3d 1200, 1212 (11th Cir. 2019); *Marchisio v. Carrington Mortg. Servs.*, L.L.C., 919 F.3d 1288, 1302–1303 (11th Cir. 2019); *Daugherty v. Ocwen Loan Servicing,*

*L.L.C.*,701 Fed. Appx. 246 (4th Cir. 2017); *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1307 (11th Cir. 2016); *Jett v. Am. Home Mortg. Servicing, Inc.*, 614 Fed. Appx. 711 (5th Cir. 2015); and *Saunders v. Branch Banking & Trust Co.*, 526 F.3d 142, 151 (4th Cir. 2008); *Hopkins v. I.C. Systems, Inc.*, 2020 WL 2557134 (E.D. Pa. May 20, 2020); *Alston v. Branch Banking & Tr. Co.*, 2016 WL 4521651 (D. Md. Aug. 26, 2016); *Letren v. Wells Fargo Bank*, 2016 WL 560801 (D. Md. Feb. 12, 2016); and *Hillis v. Trans Union, L.L.C.*, 2014 WL 2581094, at *5 (E.D. Pa. June 10, 2014).

On fourteen separate occasions, Nissan's investigations were unreasonable because Nissan failed to remove the inaccurately reported late payment and other derogatory information while ignoring its own internal records and cancelling its own internal requests directing that the derogatory data should be removed. Nissan knew as of August 9th that Plaintiffs had returned the vehicle. Nissan knew that because the vehicle was returned on time on August 9th, Nissan had no contractual right to charge any additional payments. Nissan knew the manager at the Nissan dealer refused to allow Plaintiffs to sign an odometer statement (assuming for the sake of argument that signing the odometer statement has any relevance here, which it does not) and refused to backdate that odometer statement once it was signed because he thought Plaintiffs were "rude". Nissan ultimately closed the loan as if the vehicle had been "grounded" (assuming for the sake of argument that grounding has any relevance here, which it does not) on August 9th - not

35

September 20th. Nissan admitted that the charge should not have been made and that it happened as a result of the dealership's error in grounding the vehicle late when it responded to the CFPB in January. And most importantly, **Nissan's own Complaints Management Department knew Nissan's reporting of Plaintiffs' auto loan to the CRAs was inaccurate and ordered Nissan's CBM Team to correct that reporting**. Nissan knew all of these things each and every time it responded to Plaintiffs fourteen attempts to get Nissan to correct its reporting.

It is simply undeniable that Nissan's CBM Team knew Nissan's reporting was inaccurate and that it had been ordered to correct that inaccurate reporting before it responded to all fourteen ACDVs it received. To be clear and despite what Nissan is now arguing about odometer statements, federal regulations, etc., Nissan, Nissan's Complaints Management Department and even, in the end, Nissan's CBM Team removed the inaccurately reported derogatory data from Plaintiffs credit files based solely on the fact that Plaintiffs returned the vehicle on time. Nissan's own internal records confirm this fact. Nissan's own internal records show undeniably that the only reason Nissan failed to correct its reporting when it responded to the fourteen ACDVs was because the letter from the dealership, the very letter confirming that the vehicle was returned on August 9th, contained an "obvious" (according to Nissan's own witnesses) typographical error of a single digit in the vehicle's VIN number. All of this amounts to nothing less than knowing and, at a

36

minimum, reckless disregard of its Section 1681s-2(b) duties creating an unjustifiably high risk of harm that known or so obvious that it should be known.

Nissan's CBM Team displayed such utter disregard for Nissan's duties under the FCRA that it literally refused **all three service requests** ordering it to correct its reporting of Plaintiffs' account. (See, Exhibit 28, at 66:24-83:17). The only reason the Third Service Request was ultimately processed finally resulting in the correction of Nissan's reporting, was because Ms. Messmer overrode the CBM Team's stubborn refusal and forced CBM Team to correct the account. In the end, what should have been corrected after the First Service Request on September 26th, took another almost **four months** to correct during which time Plaintiffs' otherwise good credit ratings were destroyed.

## IV.   Nissan's Reckless Disregard for its FCRA Duties and Misreporting of Plaintiffs' Auto Loan Caused Plaintiffs Damages, Including Emotional Distress.

For a consumer to recover for a defendant's negligent failure to comply with the FCRA, the consumer will have to prove that actual damages resulted from the defendant's failure to comply with an FCRA requirement. These damages can be pecuniary or intangible in nature (such as emotional distress, pain and suffering or humiliation). Actual damages are also recoverable for both negligent and willful violations of the Act. 15 U.S.C. 1681n(a)(1) and 1681o(a)(1). However, although proof of actual damages is essential for any recovery for negligent noncompliance, 15 U.S.C. 1681o; *see e.g.*, *Enwonwu v. TransUnion, L.L.C.*, 164 Fed. Appx. 914

(11th Cir. 2006), it is not required for an award of statutory or punitive damages in an instance of willful noncompliance with the Act. *See e.g.*, *Beaudry v. TeleCheck Serv., Inc.*, 579 F.3d 702 (6th Cir. 2009).

In many cases, the most significant damage sustained by a consumer is the emotional distress and vexation of dealing with the repercussions of an inaccurate consumer report and the often frustrating ordeal of trying to set the record straight. FCRA cases hold that actual damages for intangible injury are recoverable under the FCRA. Examples of decisions and awards for actual damages in FCRA cases without proof of pecuniary loss include damages for:

> • **Loss of sleep, nervousness, anxiety, stress, frustration, and mental anguish over the consumer report.** *See e.g.*, *Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604, 611 (6th Cir. 2016) (upholding jury verdict where plaintiff and his wife testified that he was depressed, angry, stressed, and "down in the dumps" due to their financial woes); *Robinson v. Equifax*, 560 F.3d 235, 241 (4th Cir. 2009) (headaches, sleeplessness, skin acne, upset stomach, hair loss, and stress); *Littlejohn v. Vivint Solar,* 2020 WL 2521276, at *10 (D.N.J. May 18, 2020) (evidence of stress and anxiety sufficient to deny summary judgment);

> • **Injury to reputation, family, work, and sense of well-being.** *See e.g.*, *White v. Imperial Adjustment Corp.*, 2002 WL 1809084 (E.D. La. Aug. 6, 2002), aff'd on other grounds, 75 Fed. Appx. 972 (5th Cir. 2003) (damages for injury to reputation and creditworthiness are available, even without proof of pecuniary damages); and

> • **Humiliation, embarrassment, and mental distress.** *See e.g.*, *Sloane v. Equifax Info. Servs., L.L.C.*, 510 F.3d 495, 507 (4th Cir. 2007); *Fischl v. GMAC*, 708 F.2d 143 (5th Cir. 1983); *Thompson v. San Antonio Retail Merchants Ass'n*, 682 F.2d 509 (5th Cir. 1982); *Lawrence v. TransUnion*, L.L.C., 296 F. Supp. 2d 582 (E.D. Pa. 2003); *Sheffer v. Experian Info. Sols., Inc.*, 2003 WL 21710573 (E.D. Pa. July 24, 2003).

Plaintiffs have presented undisputed, detailed and corroborated testimony that they both suffered exactly these types of emotional distress.

Nissan's violations tormented Plaintiffs for four mouths while Nissan battled with itself internally to fix an obvious mistake to Plaintiffs' credit. Plaintiffs (father and son) together worked tirelessly for those four months to remove Nissan's mistake from their credit files. They called Nissan repeatedly. They submitted fourteen disputes to the CRAs. They complained to the CFPB. Plaintiffs did everything they could do to stop Nissan.

Plaintiffs testified in detail and under oath about all of these efforts and about the emotional distress Nissan's actions caused. Plaintiffs' testimony is too voluminous to repeat here but their entire story of distress and all the efforts they made to correct Nissan's inaccurate reporting are explained in detail with each Plaintiff corroborating the other in their responses to Nissan's interrogatories. (Cento Cert., **Exhibit 26**, at Response to Interrogatory No. 11; **Exhibit 27**, at Response to Interrogatory No. 11; **Exhibit 29**, at 22:23-24:10; 25:11-27:02; 28:03-19; 31:12-19; 32:06-37:22; and **Exhibit 30**, at 21:18-22:18; 24:01-25:13). Ultimately, on their testimony a reasonable jury could easily find that Plaintiffs suffered emotional damages as a result of Nissan's reporting.

|  | Respectfully submitted, |
|  | /s/Jacob M. Polakoff |
|  | Jacob M. Polakoff, Bar No. 035832006 |
|  | BERGER MONTAGUE PC |
|  | 1818 Market Street, Suite 3600 |
|  | Philadelphia, PA 19103 |
|  | Tel.: (215) 875-3000 |
|  | Fax: (215) 875-4604 |
|  | Email: jpolakoff@bm.net |
|  |  |
|  | /s/Guerino Cento |
|  | Guerino Cento |
|  | CENTO LAW |
|  | 5666 Carrollton Avenue |
|  | Indianapolis, Indiana 46220 |
|  | (317) 908-0678 |
|  | cento@centolaw.com |
|  |  |
|  | *Counsel for Plaintiffs Andrew Ritz and Michael Ritz* |

## Certificate of Service

I hereby certify that the foregoing was served to all parties and counsel of record via ECF on September 30, 2022.

*/s/Jacob M. Polakoff*
Jacob M. Polakoff