**LINDABURY, McCORMICK, ESTABROOK & COOPER**
**53 Cardinal Drive**
**P.O. Box 2369**
**Westfield, N.J. 07091**
**(908) 233-6800**
**Attorneys For Defendant Nissan Motor Acceptance Corporation**
**SLF-0274**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **ANDREW RITZ AND MICHAEL RITZ,** : | **Case No. 3:20-cv-13509** |
| **Plaintiffs,** : | |
| : | |
| **v.** : | |
| : | |
| **NISSAN-INFINITI LT; TRANS UNION, LLC;** : | |
| **EQUIFAX INFORMATION SERVICES. LLC;** : | |
| and **EXPERIAN INFORMATION SOLUTIONS,**: | |
| **INC.** : | |
| : | |
| **Defendants** : | |

<u>**Defendant Nissan Motor Acceptance Corporation (improperly pled as Nissan-Infiniti LT)'s**</u>

<u>**Responses to Plaintiffs' Supplemental Statement of Disputed Material Facts**</u>

Nissan Motor Acceptance Corporation (hereinafter referred to as "**NMAC**") submits the following responses to Plaintiffs' Supplemental Statement of Disputed Material Facts and reply to Plaintiffs' opposition to NMAC's motion for summary judgment as follows:

1.    After leaving the dealership on August 9, 2019, at 11:35 AM Plaintiffs submitted a chat message to Nissan's Complaints Management Department.  (Cento, <u>Exhibit 5</u>).

**Response:**  NMAC agrees with this statement to the extent a chat message was submitted. NMAC also references that the chat message reflects that Plaintiffs' "…tried to return the 2017 Nissan Sentra today…".  The chat further indicates that Plaintiff alleges he had tried

to make an appointment about a month before his visit to Freehold Nissan on August 9, 2019. The chat further indicates that Plaintiffs told Freehold Nissan that he would leave the car with the dealership "and come back for the appointment whenever." (Cento Cert., Exhibit 5).

2.      In that message, the full text of which is in Nissan's account notes, Plaintiffs' informed Nissan that they had returned the leased vehicle that day to the Freehold Nissan dealership. (*Id.*)

        **Response:** NMAC disagrees with this statement. The statement is taken out of context. The message indicates that the car was being returned; that Plaintiffs had tried to return the vehicle; Plaintiff advised the dealership that he was leaving the car with the dealership to come back for an appointment whenever; Plaintiffs were told by the dealership that it could not be returned that day because an appointment was not made; and that the federal odometer statement could not be completed. (Cento Cert., Exhibit 5).

3.      Based on these account notes, the head of Nissan's Complaints Management Department, Tanya Messmer, testified as follows: "Q. Do you have any reason to think that what the Ritzes told Nissan at 11:35 was untrue? A. No." (Cento, Cert., Exhibit 6, at 33:07-09).

        **Response:** NMAC disagrees with this statement insofar as it is not the complete content of the chat notes reflected on Exhibit 5 attached to Cento Certification. NMAC admits that the deposition transcript speaks for itself. (Cento Cert., Exhibit 5).

4.      After Plaintiffs received the invoice by which Nissan billed the charges at issue in this case, Plaintiffs' again contacted Nissan's Complaints Management Department on September

3478751v1

20, 2019, this time by phone at 8:26 AM and 8:54 AM. (Cento Cert., Exhibit 7.)

**Response:** NMAC agrees that the document reflects that on September 20, 2019, Andrew Ritz called about a bill received and was advised to contact the dealership to ground the vehicle and was advised that the account cannot be closed out. Furthermore, at 8:54 am Ritz admitted he never signed the odometer statement. (Cento Cert., Exhibit 7, 8:54 am).

5. During these calls, Plaintiffs again informed Nissan that the leased vehicle had been returned to the Freehold Nissan dealership on August 9th (*Id.*) After concluding the second call with Plaintiffs, Nissan's agent called the Freehold Nissan dealership (*Id.*)

**Response:** NMAC agrees that Plaintiffs called informing NMAC that Plaintiffs believed they had "returned" the vehicle to Freehold Nissan. Andrew Ritz also advised that the dealer did not want to accept the vehicle. Plaintiffs were advised that the dealer never grounded the vehicle and Plaintiffs needed to contact the dealership. Plaintiffs acknowledged that he never signed the odometer statement at the dealership and acknowledged that he was advised an appointment was needed to turn in the vehicle. (*Id.*) Admit Nissan's agent called Freehold Nissan dealership.

6. A dealership representative returned that agent's call the same day at 10:56 AM. (Cento Cert, Exhibit 8).

**Response:** NMAC agrees with this statement and further states that the statement provides that the customer [Plaintiff] was cursing and threw the keys at a representative at the dealership and walked out of the office. Ritz was advised that there was no odometer statement signed and that the vehicle would not be grounded until the customer signs the

3

3478751v1

odometer statement.  The dealer stated that Ritz was very rude.  NMAC advised dealer that the unit needed to be grounded and that NMAC would reach out to the customer to go to the dealership to sign the odometer statement. (Cento Cert., Exhibit 8, 10:56 am.)

7.    By this call, Nissan received another confirmation that Plaintiffs returned the leased vehicle on August 9th.  (*Id*).

      **Response:**  NMAC disagrees with this statement.  While the notes reflect that Plaintiffs indicate the vehicle was "returned", the vehicle was not returned in accordance with the terms of the Lease Agreement, the lease was not terminated, the vehicle was not accepted, the odometer statement was not signed by Plaintiffs and Plaintffs simply left the vehicle at the dealership. (*Id.*)

8.    A short time later that same day, Nissan then received another call from Freehold Nissan's manager during which Freehold Nissan confirmed again that Plaintiffs had returned the vehicle on August 9th. (Cento Cert., Exhibit 9.)

      **Response:**  NMAC agrees another call from Freehold Nissan was received but disagrees that the subject vehicle was returned so as to terminate the Lease Agreement and obligations which flow from the agreement such as section 12. (See Plaintiffs' responses to NMAC's Statement of Material Facts, ECF 67-1, paragraph number 17 in which Plaintiffs agree that Plaintiffs' contractual obligation to sign the odometer statement is expressly stated in the lease agreement which Ritz signed).  (See also ECF 66-9, section 12.)

9.    This final call on September 20th also informed Nissan that Freehold Nissan's manager

4

refused to "backdate" the vehicle return because Plaintiffs were "RUDE". (*Id.*)

**Response:** NMAC agrees that the dealership's manager indicated he refused to "backdate" the odometer statement, the customer is rude. (Cento Cert., Exhibit 9.)  However, there is no causal relationship between refusal to backdate and the customer being "rude".

10.   Regarding September 20th, the head of Nissan's Complaints Management Department, Ms. Messmer, testified as follows: "Q. Would you agree that as of September 20th, 2019, it seemed likely that the Ritzes returned the car to the dealership on August 9th?  A. Yes." (*See* Exhibit 6, at 82:15-18).

**Response:** NMAC agrees insofar as the transcript speaks for itself and the question posed was couched as "likely".  However, physically returning the vehicle does not contractually terminate the lease in accordance with section 12 of the Lease Agreement which Ritz signed. (See ECF 66-9, section 12.)  Furthermore, the testimony cited does not include the context as to the manner in which the term "return" was being used and whether it related to the return obligation contained in section 12 of the Lease Agreement. (*Id.*)

11.   On September 24, 2019, the Freehold Nissan dealership sent a letter to Nissan which stated in pertinent part: "This vehicle was dropped off to our dealership on 8.9.19.  The Customer wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the Vehicle at 4041 RT 9 in Freehold NJ.  The odometer was 32,500 miles at the time the car was left." (Cento, Exhibit 10 (the "**September 24th Letter**")).

**Response:** NMAC agrees that Freehold Nissan dealership sent a letter dated September 24, 2019, the letter speaks for itself.

5

12.     The September 24th Letter also referenced the vehicle identification number (the "VIN")

as 'X9XXXXXXXXXXXXXXX' which was VIN number for Plaintiffs' vehicle except

that it contained a typographical error in the second digit of the number which was written

as a "9" but was in fact an "N". (*See* Exhibit 10 and Cento Cert, <u>Exhibit 11</u>).

**Response:**  NMAC agrees the VIN number contained in the letter dated September 24,

2019 from Freehold Nissan does not contain Plaintiffs' correct VIN number for the leased

vehicle.

13.     On September 26, 2019, at 7:39 AM, submitted another chat message to Nissan's

Complaints Management Department. (Cento Cert., <u>Exhibit 12</u>).

**Response:**  NMAC agrees that on September 26, 2019, at 7:39am, there exists another chat

message, that chat message and the chat messages at 8:02am and 8:03am read together

speak for themselves. (Cento Cert., Exhibit 12).

14.     Again Plaintiffs informed Nissan that the leased vehicle had been returned on August 9th

and expressed concern about how Nissan's reporting of the auto loan was negatively

impacting their credit. (*Id.*)

**Response:**  NMAC agrees that Plaintiffs took the position during the chat that the car was

physically returned to the dealership on August 9, 2019, however, Plaintiffs failed to

"return" the vehicle in  accordance with the terms of the Lease Agreement, specifically,

section 12 of the Lease Agreement.  (See ECF 66-9, section 12.)

15.     On that same day, September 26th, at 9:13 AM, Nissan's customer service department

submitted a "Service Request" to Nissan's Credit Bureau Management Team, the

6

department responsible for Nissan's credit reporting (the "**CBM Team**").  (Cento Cert.,

Exhibit 13) (the "**First Service Request**")).

**Response:**  NMAC agrees with this statement.

16.   By this First Service Request, customer service department informed the CBM Team that
Plaintiffs' leased vehicle was returned on August 9th and that the "dealer grounded late",
provided the CBM Team with a copy of the September 24th Letter and instructed the CBM
Team to remove the "August delinquency" from Plaintiffs' credit files.  (*Id.*)

**Response:**  NMAC neither agrees nor disagrees with this statement as the document speaks
for itself.  Notwithstanding, the customer service department was not interpreting the
contract (Lease Agreement).

17.   However, Nissan's CBM Team cancelled, i.e., did not process, the First Service Request
"because there was a typo in the second digit of the VIN number." (Cento Cert., Exhibit
14, at 85:25-86:02 and 93:07-94:20; and Exhibit 28, at 48:03-52:05).

**Response:**   NMAC agrees with this statement that the first service request was not
processed because of an incorrect VIN number.

18.   Regarding the Plaintiffs' account at this time, Ms. Messmer testified as follows regarding
the vehicle return and Nissan's reporting of Plaintiffs' account as delinquent: "Q. As likely,
as we just agreed, that the car was returned on August 9th, it is unlikely that the charge
Nissan placed on the accountant was correct; right? A. Yes. Q. It is unlikely that the charge
was correct, it's unlikely that the late payment reported was correct; right? A. Yes." (*See*
Exhibit 6, at 84:11-19).

7

**Response:** NMAC agrees the deposition transcript speaks for itself but disagrees that the testimony supports that Plaintiffs properly returned the vehicle according to the Lease Agreement thereby terminating their contractual obligations under section 12 of the Lease Agreement. (See ECF 66-9, section 12.)

19. Between September 28, 2019 (a few days after the CBM Team cancelled the First Service Request instructing them to stop furnishing Plaintiffs' auto loan as delinquent) and October 4, 2019, the CBM Team received and processed seven Automated Consumer Dispute Verifications ("ACDVs") it had received from Experian, Equifax and Trans Union by which Plaintiffs were disputing Plaintiffs' account information, including the account status, payment rating and account history of Plaintiffs' auto loan account and informing Nissan that the leased vehicle had been returned on August 9th, the last day of the leased term. (Cento Cert., Exhibit 15; and Exhibit 16, at Nissan 000136-Nissan 000149).

**Response:** NMAC admits that it received and processed seven automated consumer dispute verifications ("ACDVs") in which Plaintiffs disputed their account information with NMAC. While Plaintiffs may have disputed their account information since the subject vehicle was abandoned at the dealership on August 9, 2019, the lease was not terminated in accordance with the express language contained in section 12 of the lease agreement and did not return the vehicle in accordance with the lease agreement. (See ECF 66-9, paragraph 12.)

20. At the time these ACDVs were processed Nissan was inaccurately furnishing the account as 30-days late with an incorrect balance (which should have been zero) and a derogatory payment rating and account status. (*Id*.)

8

3478751v1

**Response:**    NMAC states that this statement is a legal conclusion not a statement of fact insofar as Plaintiffs did not sign the odometer statement as required by federal law to terminate the lease and as contractually obligated to do so in accordance with sectoin 12 of the Lease Agreement.  Notwithstanding, NMAC disagrees with this statement.  NMAC was accurately furnishing the account.  Plaintiffs did not properly return the vehicle thereby terminating the lease as expressly provided for in section 12 of the Lease Agreement by signing the federally required odometer statement, in addition to following the procedures necessary to terminate the lease. (See ECF 66-9, section 12.)

21.    On October 8, 2019, Plaintiffs again called Nissan's customer service department and disputed the derogatory credit reporting (Cento Cert., Exhibit 17).

**Response:**    NMAC disagrees with this statement insofar as the October 8, 2019, notes do not utilize the term "derogatory credit reporting."  Notwithstanding, NMAC agrees that there are notes reflected for an October 8, 2019, telephone call with Plaintiffs and NMAC which speak for themselves. (Cento Cert., Exhibit 17).

22.    As a result of this call, Nissan's Complaints Management Department sent a second service request directing the CBM Team to delete and stop reporting the derogatory payment history, status and rating and again providing the dealership's September 24th Letter along with other relevant documents.  (Cento Cert., Exhibit 17 ("submitted SR, with letter attach from dlrs"); and Exhibit 18 (the "**Second Service Request**").

**Response:**    NMAC disagrees with the description contained in this paragraph but agrees a second service request was generated, the contents speak for themselves.

23.     Specifically, the CBM Team was told: "Please remove August delinquency. Vehicle was returned 8/9/2019 but dealer grounded late. Please see attachments for letter from dealer. Thank you. [sic]customer is stating that Experian shows x 30 days as of 8-29-19." (*See* Exhibit 18 (*emphasis added*)).

**Response:**     NMAC agrees a second service request was generated but disagrees to the extent this paragraph is taken out of content. For example, in Second Service Request includes reference to, and a copy of, section 12 of the Lease Agreement addressing "Vehicle Return"; terminating the lease and the requirement of the lessee [Plaintiffs] to sign an odometer statement.

24.     However, Nissan's CBM Team cancelled the Second Service Request "because there was a typo in the second digit of the VIN number." (See Exhibit 14, at 85:25-86:02; 87:19-88:22; and 93:07-94:20).

**Response:**  NMAC agrees with this statement insofar as the deposition transcript speaks for itself and the VIN number was incorrect.

25.     As Ms. Messmer testified regarding the First Service Request and the Second Service Request: "It doesn't make sense to me why he denied it." (Exhibit 14, at 97:10-98:17).

**Response:**  NMAC disagrees with this statement to the extent the deposition testimony was requiring Ms. Messmer to testify as to notes and comments contained in the First Service Request and the Second Service Request entered and completed by others. Ms. Messmer had no personal knowledge regarding the reason for the entries and decisions contained in the First Service Request and the Second Service Request. Notwithstanding

3478751v1

the above, NMAC relies upon Ms. Messmer's entire testimony regarding this issue. (Cento Cert., Exhibit 14).

26.    Between October 8, 2019, and November 4, 2019, Nissan received and processed seven more ACDVs it received from Experian, Equifax and Trans Union by which Plaintiffs were disputing Plaintiffs' account information, including the account status, payment rating and account history of Plaintiffs' auto loan account and informing Nissan that the leased vehicle had been returned on August 9th, the last day of the leased term. (Cento Cert., Exhibit 19; and Exhibit 16, at Nissan 000150-Nissan 000163).

**Response:**  NMAC disagrees with this statement.  First, the time period is October 18, 2019, and November 14, 2019, not October 8, 2019, to November 14, 2019.  Second, NMAC admits that it received and processed seven automated consumer dispute verifications ("ACDVs") in which Plaintiffs disputed their account information with NMAC.  While Plaintiffs may have disputed their account information since the subject vehicle was left at the dealership on August 9, 2019, the lease was not terminated in accordance with the express language contained in section 12 of the Lease Agreement as Plaintiffs did not follow the termination procedure, did not fulfill their contractual obligations and specifically did not sign the odometer statement. (See ECF 66-9, paragraph 12.)

27.    At the time these ACDVs were processed Nissan continued to furnish the Plaintiffs' auto loan as 30-days late with a balance, and a derogatory payment rating and account status. (*Id.*)

**Response:**  NMAC disagrees with this statement.  NMAC continued to furnish Plaintiffs'

11

auto loan with a balance and status as a result of Plaintiffs' failure to sign the legally required odometer statement and complete its contractual obligations under section 12 of the Lease Agreement.  (See ECF 66-9, paragraph 12.)

28.    Plaintiff again disputed the derogatory reporting on December 19, 2019; this time through the Consumer Financial Protection Bureau (the "**CFPB**").  (Cento Cert., Exhibit 20).

**Response:**  NMAC disagrees with this statement. Exhibit 20, entry of December 19, 2019, does not reflect Plaintiffs' dispute through the Consumer Financial Protection Bureau ("**CFPB**").  NMAC agrees that an entry for December 19, 2019, exists which speaks for itself.

29.    On January 2, 2020, at 11:05 AM, Ms. Messmer submitted a third service request to Nissan's CBM Team instructing the CBR Team as follows: "I approve removal of 1x30 delinquency due to the previous Service Request shows letter from dealer…tm" (*See* Exhibit 20; Exhibit 21 (the "**Third Service Request**"); Exhibit 14, at 85:06-102:17).

**Response:**  NMAC agrees with this statement.

30.    On January 3, 2020, at 7:43 AM, Nissan's CBM Team attempted to cancel this Third Service Request (*See* Exhibit 20).

**Response:**  NMAC disagrees with this statement.  The January 3, 2020, entry noted the incorrect VIN number and requested a correct letter.  The entry does not indicate that the CBM team attempted to cancel the Third Service Request. (Cento Cert., Exhibit 20).

31.    Ms. Messmer then overrode the CBM Team's attempted cancellation of the Third Service

Request forcing the CBM Team to issue an Automated Universal Data ("**UDF**") form to Experian, Trans Union and Equifax removing the derogatory credit data from Plaintiffs' credit files. (Exhibit 16, at Nissan 000164-000165).

**Response:** NMAC disagrees with this statement. See response to number 30 above. Additionally, NMAC agrees that Ms. Messmer approved the adjustment of Plaintiffs' credit data and removing any delinquency notation from Plaintiffs' credit files. (Cento Cert., Exhibit 16, Nissan 000164-000165).

32.   On January 6, 2020, the same day the CBM Team transmitted the UDF to the consumer reporting agencies, Nissan responded to Plaintiffs' CFPB complaint by letter. (Cento Cert., Exhibit 22).

**Response:** NMAC agrees with this statement.

33.   By that letter, Nissan told the CFPB that: "NMAC's records show that it received a letter from Freehold Nissan stating that the vehicle was returned on August 9, 2019, and they were late in grounding the vehicle" and "On January 6, 2019, NMAC submitted an update to the credit bureaus to remove the 1x30 for the September 2019 payment." (*Id.*) (*emphasis added*).

**Response:** NMAC agrees with this statement to the extent the letter of January 26, 2020, speaks for itself. (*Id.*)

34.   Nissan received and processed one additional ADCV after sending the AUD correction. (*See* Exhibit 20).

13

**Response:** NMAC agrees with this statement that the document speaks for itself.

35. On January 17, 2022, Nissan responded to the ACDV it received from Trans Union and in that response removed the negative account status, payment rating, balance and late payment history. (*See* Exhibit 16, at Nissan 000166-000167).

   **Response:** NMAC disagrees with this statement. The date is January 17, 2020.

36. Before the CBM responded to any ACDVs it had in its possession all of the following information: (1) account records showing that Plaintiffs returned the car on time on August 9th, including confirmation from the Freehold Nissan dealership (See e.g., Exhibits 5, 6, 7, 8 and 9); and (2) the First Service Request, which included a copy of the September 24th Letter which, according to the head of Nissan's Complaints Management Department, contained an "obvious typo on the VIN number." (Cento Cert., Exhibit 23).

   **Response:** NMAC disagrees with this statement. First, the subject vehicle was not returned on time in accordance with the Lease Agreement. Plaintiffs failed to follow the procedure required and more importantly did not contractually fulfill its obligation under section 12 of the Lease Agreement to sign the federally required odometer statement. This legal issue and Plaintiffs' actions and/or inactions began the ball rolling regarding the notations in Plaintiffs' credit reports. Second, what may be obvious to Plaintiffs' counsel in submitting questions at the deposition referenced in support of this paragraph may not be obvious to the individuals processing and responding to any ACDVs. (Cento Cert., Exhibit 23). Thirdly, NMAC is and was entitled to rely upon the Federal Regulations requiring lessees such as Plaintiffs to sign an odometer statement upon terminating a leased vehicle.

14

37.    The Motor Vehicle Lease Agreement (the "Lease") contains only two provisions which grant Nissan the contractual right to continue to charge monthly payments beyond the expiration of the Lease term, including any extended term. (*See generally*, Cento Cert., Exhibit 24; and Exhibit 28, at 56:08-72:14).

**Response:**  If Plaintiffs failed to follow the proper grounding procedure (terminating the lease) NMAC has the contractual right to charge Plaintiffs after August 9, 2019. (*See* Cento Cert., Exhibit 28, page 65, lines 5 to 16). Finally, Cento Cert., Exhibit 28, omits page 56 through 59. (*See also* See ECF 66-9, section 12.)

38.    Section 12 of the Lease (captioned "Vehicle Return") provides in pertinent part that: "If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments." (Exhibit 24, at Nissan 000036).

**Response:**  Objection to the extent the first page of Exhibit 24 is not part of the subject lease agreement.  Upon information and belief, it was prepared by Plaintiffs' counsel. Without waiving said objection, the motor vehicle lease agreement contains multiple terms and conditions, and the contract as a whole speaks for itself.  NMAC disagrees with this statement.  Section 12 of the lease captioned "vehicle return", additionally provides in pertinent part ***"[w]hen your lease terminates, whether early or as scheduled, you will return the Vehicle to a Nissan dealer or other location to be specified.  You will complete a statement of this Vehicle's mileage at termination as required by federal law."*** *[emphasis added] (*Cento Cert., Exhibit 24, Nissan 000036, Section 12; ECF 66-9, section 12.)

39.    Section 12 of the Lease further states that:

3478751v1

> You will pay us for any damage we suffer because you failed to return this Vehicle to a Nissan dealer…or because you failed to return this Vehicle at the end of the lease term. We may determine our damages in one of the following two ways…by charging you the Total Monthly Payment for each month the Vehicle is not returned…

(Exhibit 24, at Nissan 000036).

**Response:** NMAC agrees with this statement but also references in pertinent part that section 12 further provides *"[w]hen your lease terminates, whether early or as scheduled, you will return the Vehicle to a Nissan dealer or other location to be specified. You will complete a statement of this Vehicle's mileage at termination as required by federal law."* *[emphasis added] (*See ECF 66-9, section 12; Cento Cert., Exhibit 24, Nissan 000036, section 12.)

40.    The Lease does not provide Nissan with the contractual right to charge Plaintiffs for additional monthly payments for not signing an odometer statement. (See generally, Cento Cert., Exhibit 24).

**Response:** NMAC states that this statement is a legal conclusion and not a statement of fact. The failure to sign the odometer statement regarding the vehicle's mileage at termination as required by federal law and under the Lease Agreement is a condition of the Lease Agreement. Plaintiffs' failure to do so is a breach of the lease. The vehicle is not properly returned, and the lease is not therefore properly terminated.

41.    The Lease does not provide Nissan with the contractual right to charge Plaintiffs for

3478751v1

additional monthly payments for not grounding the vehicle. (*See generally*, Exhibit 24; and Exhibit 28, at 65:13-68:14; and 85:02-86:13).

**Response:**   NMAC states that this statement is a legal conclusion and not a statement of fact.  The failure to sign the odometer statement regarding the vehicle's mileage at termination as required by federal law and under the Lease Agreement is a condition of the Lease Agreement.  To the extent not signing the odometer statement is not proper return of the vehicle, not proper termination of the lease and not proper grounding, the lease is not terminated, and Plaintiffs' may be charged under the lease.  Plaintiffs action herein are similar to leaving the vehicle in a parking lot.

42.   The Lease provides that: "When your lease terminates…you will return the Vehicle to a Nissan dealer…" (Exhibit 24, Lease at Section 12).

**Response:**   NMAC agrees to the extent the complete relevant provision provides *"[w]hen your lease terminates, whether early or as scheduled, you will return the Vehicle to a Nissan dealer or other location to be specified.  You will complete a statement of this Vehicle's mileage at termination as required by federal law."  [emphasis added]* (See ECF 66-9, section 12; Cento Cert., Exhibit 24, Nissan 000036, Section 12.)

43.   The Lease extension agreement provides that: "You may return your vehicle any time during the extension period" (Exhibit 24, Lease extension agreement, at Nissan 000040).

**Response:**  NMAC agrees to this statement as only one of many terms and conditions of the lease extension agreement and lease.

44.   There is nothing in the Lease or the Lease extension agreement which required Plaintiffs

17

to make an appointment to return the vehicle. (*See generally*, Exhibit 24; and Exhibit 28, at 90:18-94:16).

**Response:** NMAC agrees with this statement, however, Plaintiffs testified that they received notification from NMAC that an appointment was necessary to terminate the lease. (See NMAC's Statement of Undisputed Material Facts, EFC 66-1. paragraphs 9-10 and citations therein.)

45.    There is nothing in the Lease or the Lease extension agreement which gives Nissan the contractual right to charge Plaintiffs for additional monthly payments for not making an appointment. (*See generally*, Exhibit 24; and Exhibit 28, at 90:18-94:16).

**Response:** NMAC states that this statement is a legal conclusion not a statement of fact with respect to contractual rights and, so stating, disagree with the statement. Notwithstanding, NMAC references the Lease provision which provides ***"[w]hen your lease terminates, whether early or as scheduled, you will return the Vehicle to a Nissan dealer or other location to be specified. You will complete a statement of this Vehicle's mileage at termination as required by federal law."*** [emphasis added] (See ECF 66-9, section 12; Cento Cert., Exhibit 24, Nissan 000036, Section 12.)

Respectfully submitted,

**LINDABURY, MCCORMICK, ESTABROOK & COOPER, P.C.**

By:_____

STEVEN L. FOX, ESQ.
Partner

Dated:  October 17, 2022

3478751v1