# Exhibit F

Case 3:20-cv-13509-GC-DEA  Document 71-8  Filed 10/17/22  Page 2 of 17 PageID: 1079

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

2022 WL 5240547 (C.A.11) (Appellate Brief)
United States Court of Appeals, Eleventh Circuit.

Shelly MILGRAM, Plaintiff-Appellant,

v.

CHASE BANK USA, N.A., Defendant-Appellee.

No. 22-10250.
August 9, 2022.

On Appeal from the United States District Court
for the Southern District of Florida
(No. 0:19-cv-60929) (The Hon. Aileen M. Cannon)

**Brief for the Chamber of Commerce of the United States of America, American Bankers Association, National Association of Federally-Insured Credit Unions, Independent Community Bankers of America, American Financial Services Association, Credit Union National Association, Mortgage Bankers Association, and Consumer Bankers Association as Amici Curiae in Support of Defendant-Appellee**

Tara S. Morrissey, Janet Galeria, U.S. Chamber Litigation Center, 1615 H Street NW, Washington, DC 20062, (202) 463-5337, Thomas Pinder, American Bankers Association, 1120 Connecticut Avenue NW, Washington, DC 20036, (202) 663-5035, Ann C. Petros, National Association of Federally-Insured Credit Unions, 3138 10th Street N, Arlington, VA 22201, (703) 842-2212, Michael Emancipator, Independent Community, Bankers of America, 1615 L Street NW, Suite 900, Washington, DC 20036, (202) 821-4469, Jeffrey B. Wall, Morgan L. Ratner, Zoe A. Jacoby, Sullivan & Cromwell LLP, 1700 New York Avenue NW, Suite 700, Washington, DC 20006, (202) 956-7500, wallj@sullcrom.com, Philip Bohi, American Financial, Services Association, 919 18th Street NW, Suite 300, Washington, DC 20006, (202) 466-8605, Alexander Monterrubio, Credit Union National Association, 99 M Street SE, Suite 300, Washington, DC 20003, (202) 525-8558, Justin Wiseman, Mortgage Bankers Association, 1919 M Street NW, Washington, DC 20036, (202) 557-2854, David Pommerehn, Consumer Bankers Association, 1225 New York Avenue NW, Suite 1100, Washington, DC 20005, (202) 552-6368.

**\*C-1 CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT**

Amici curiae have no parent corporations, and no publicly traded companies own 10% or more of their stock.

Pursuant to Eleventh Circuit Rule 26.1, in addition to those identified in the other parties' briefs, the following persons and entities have an interest in the outcome of this appeal:

American Bankers Association

American Financial Services Association

Bohi, Philip

Chamber of Commerce of the United States of America

Consumer Bankers Association

Credit Union National Association

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 3 of 17 PageID: 1080

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

Emancipator, Michael

Galeria, Janet

Independent Community Bankers of America

Jacoby, Zoe A.

Monterrubio, Alexander

Morrissey, Tara S.

Mortgage Bankers Association

*C-2  National Association of Federally-Insured Credit Unions

Petros, Ann

Pinder, Thomas

Pommerehn, David

Ratner, Morgan L.

Sullivan & Cromwell LLP

Wall, Jeffrey B.

Wiseman, Justin

## *i TABLE OF CONTENTS

| | |
|---|---|
| CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT | C-1 |
| IDENTITY AND INTEREST OF AMICI CURIAE | 1 |
| STATEMENT OF THE ISSUE | 5 |
| INTRODUCTION AND SUMMARY OF ARGUMENT | 5 |
| ARGUMENT | 7 |
| I. THE FCRA ADDRESSES FACTUAL INACCURACIES, NOT LEGAL DISPUTES | 7 |
| A. The FCRA's Text Requires Furnishers And CRAs To Investigate Only Factual Accuracy | 8 |
| B. The FCRA's Structure, Purpose, And History Confirm The Textual Focus On Factual Accuracy | 12 |
| C. This Court And Others Have Correctly Interpreted The FCRA | 15 |
| II. THE BUREAU'S CONTRARY APPROACH IS UNWORKABLE AND INEFFICIENT | 20 |
| A. Distinguishing Between Fact And Law Is A Familiar Task For Courts | 21 |
| B. The Bureau's Approach Is Far Worse | 25 |
| CONCLUSION | 33 |

## *ii TABLE OF AUTHORITIES

Cases:

| | |
|---|---|
| *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) | 21 |
| *Batterman v. BR Carroll Glenridge, LLC*, 829 Fed. Appx. 478 (11th Cir. 2020) | *passim* |

Case 3:20-cv-13509-GC-DEA  Document 71-8  Filed 10/17/22  Page 4 of 17 PageID: 1081

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

| | |
|---|---|
| BKR Global, LLC v. FourWinds Capital Mgmt., 661 F.3d 1134 (11th Cir. 2011) | 22 |
| Bowling v. U.S. Bank Nat'l Assoc., 963 F.3d 1030 (11th Cir. 2020) | 18 |
| BP Am. Prod. Co. v. Burton, 549 U.S. 84 (2006) | 9 |
| Cahlin v. Gen. Motors Acceptance Corp, 936 F.2d 1151 (11th Cir. 1991) | 31 |
| Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876 (9th Cir. 2010) | 12, 18, 19 |
| Chiang v. Verizon New England Inc, 595 F.3d 26 (1st Cir. 2010) | 18 |
| Chuluunbat v. Experian Info. Sols., Inc., 4 F.4th 562 (7th Cir. 2021) | 23, 24, 25 |
| Cornock v. Trans Union LLC, 638 F. Supp. 2d 158 (D.N.H. 2009) | 23 |
| DeAndrade v. Trans Union LLC, 523 F.3d 61 (1st Cir. 2008) | 17, 25, 27 |
| Denan v. Trans Union LLC, 959 F.3d 290 (7th Cir. 2020) | passim |
| Dennis v. BEH-1, LLC, 520 F.3d 1066 (9th Cir. 2008) | 24 |
| Felts v. Wells Fargo Bank, N.A., 893 F.3d 1305 (11th Cir. 2018) | 7 |
| *iii Gross v. CitiMortgage, Inc., 33 F.4th 1246 (9th Cir. 2022) | 19, 27 |
| Humphrey v. Trans Union LLC, 759 Fed. Appx. 484 (7th Cir. 2019) | 26 |
| *Hunt v. JPMorgan Chase Bank, N.A., 770 Fed. Appx. 452 (11th Cir. 2019) | passim |
| •Losch v. Nationstar Mortgage LLC, 995 F.3d 937 (11th Cir. 2021) | passim |
| McIvor v. Credit Control Servs., Inc, 773 F.3d 909 (8th Cir. 2014) | 32 |
| Merck Sharp & Dohme Corp. v. Albrecht, 139 S. Ct. 1668 (2019) | 21 |
| Miller v. Fenton, 474 U.S. 104 (1985) | 22 |
| Sessa v. TransUnion, LLC, No. 22-87 (2d Cir. May 5, 2022) | 17 |
| Teva Pharm. USA, Inc. v. Sandoz, Inc., 574 U.S. 318 (2015) | 22 |
| Trans Union LLC v. FTC, 536 U.S. 915 (2002) | 30 |
| U.S. Bank N.A. v. Village at Lakeridge, 138 S. Ct. 960 (2018) | 22 |
| United States v. Oliveros, 275 F.3d 1299 (11th Cir. 2001) | 22 |
| Wright v. Experian Info. Sols., Inc., 805 F.3d 1232 (10th Cir. 2015) | 18, 30 |

**Statutes:**

15 U.S.C.

| | |
|---|---|
| § 1681(a)(1) | 12 |
| § 1681e | 17 |
| *§ 1681i | passim |
| § 1681n | 7, 30 |
| *iv § 1681o | 7, 30 |
| § 1681s-2(a) | 19 |
| *§ 1681s-2(b) | passim |
| Pub. L. No. 104-208, 110 Stat. 3009 (1996) | 15 |
| Pub. L. No. 108-159, 117 Stat. 1952 (2003) | 15 |

**Legislative Materials:**

| | |
|---|---|
| 115 Cong. Rec. 2410 (1969) | 13 |
| 142 Cong. Rec. S11869 (daily ed. Sept. 30, 1996) | 15 |
| H.R. Rep. 108-263 (2003) | 15 |

**Other Authorities:**

| | |
|---|---|
| American Heritage Dictionary of the English Language (5th ed. 2018) | 9 |
| Fair Credit Reporting Act Suits Have Soared Over Last Decade, Law 360 (Oct. 22, 2019), https://www.law360.com/articles/1210252/fair-credit-reporting-act-suits-have-soared-over-last-decade | 30 |
| Merriam-Webster's Collegiate Dictionary (10th ed. 1993) | 9, 10 |
| Merriam-Webster's Collegiate Dictionary (10th ed. 2001) | 10 |

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 5 of 17 PageID: 1082

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

*Taskforce on Federal Consumer Financial Law Report* 103 (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf ..................... 31

Pursuant to Eleventh Circuit Rule 28-1(e), asterisks identify the citations upon which amici primarily rely.

## *1 IDENTITY AND INTEREST OF AMICI CURIAE

The Chamber of Commerce of the United States of America is the world's largest business federation. The Chamber directly represents approximately 300,000 members and indirectly represents the interests of more than 3 million companies and professional organizations of every size, in every economic sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members by participating as an amicus curiae in cases, like this one, that raise issues of concern to the nation's business community.

The American Bankers Association (ABA) is the principal national trade association of the financial services industry in the United States. Founded in 1875, ABA is the voice for the nation's $23.7 trillion banking industry and its more than two million employees. ABA members provide banking services in each of the fifty States and the District of Columbia. Among them are banks, savings associations, and non-depository trust companies of all sizes. ABA frequently submits amicus curiae briefs in state and federal courts in matters that significantly affect its members and the business of banking.

*2 The National Association of Federally-Insured Credit Unions (NAFCU) advocates for all federally-insured not-for-profit credit unions that, in turn, serve over 131 million consumers with personal and small business financial service products. It provides members with representation, information, education, and assistance to meet the constant challenges that cooperative financial institutions face in today's economic environment. NAFCU proudly represents many smaller credit unions with relatively limited operations, as well as many of the largest and most sophisticated credit unions in the Nation. NAFCU represents 78 percent of total federal credit union assets and 60 percent of all federally-insured credit union assets.

The Independent Community Bankers of America (ICBA) creates and promotes an environment where community banks flourish. ICBA is dedicated exclusively to representing the interests of the community banking industry and its membership through effective advocacy, best-in-class education, and high-quality products and services. With nearly 50,000 locations nationwide, community banks constitute roughly 99 percent of all banks, employ nearly 700,000 Americans, and are the only physical banking presence in one in three U.S. counties. Holding nearly $5.9 trillion in assets, *3 over $4.9 trillion in deposits, and more than $3.5 trillion in loans to consumers, small businesses, and the agricultural community, community banks channel local deposits into the Main Streets and neighborhoods they serve, spurring job creation, fostering innovation, and fueling their customers' dreams in communities throughout America.

The American Financial Services Association (AFSA), founded in 1916, is the national trade association for the consumer credit industry, protecting access to credit and consumer choice. AFSA members provide consumers with many kinds of credit, including traditional installment loans, mortgages, direct and indirect vehicle financing, payment cards, and retail sales finance.

Credit Union National Association (CUNA) is the largest trade association serving and representing the nation's 5,000 credit unions and their 130 million members. CUNA advocates for credit unions before Congress, state and federal agencies, and the courts.

The Mortgage Bankers Association (MBA) represents more than 2,200 member companies in the real estate finance industry, including federally-chartered banks and savings associations. The MBA works to ensure the continued strength of the nation's residential and commercial real estate *4 markets; to expand homeownership; and to extend access to affordable housing for all Americans.

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 6 of 17 PageID: 1083

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

The Consumer Bankers Association (CBA) is the only national financial trade group focused exclusively on retail banking and personal financial services-- banking services geared toward consumers and small businesses. As the recognized voice on retail banking issues, CBA provides leadership, education, research, and federal representation for its members. CBA members include the nation's largest bank holding companies as well as regional and super-community banks that collectively hold two-thirds of the total assets of depository institutions.

Amici have a significant interest in this case. Their members include information furnishers and consumer reporting agencies (CRAs) covered by the Fair Credit Reporting Act (FCRA). The scope of the FCRA's command to investigate the accuracy of consumers' credit files is of immense importance to those members. As explained below, the Consumer Financial Protection Bureau's proposal to expand the FCRA's obligations and require *5 furnishers and CRAs to adjudicate legal disputes would raise operating costs for those members and lead to unpredictable and unwarranted legal liability.[1]

## STATEMENT OF THE ISSUE

Whether the Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b), requires a furnisher to investigate the factual accuracy of reported information or to assess and resolve legal disputes.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The plaintiff in this case, Shelly Milgram, is a business owner whose employee opened a Chase credit card in her name and incurred a balance of over $30,000 on that card. The $30,000 debt appeared on Milgram's credit report, and she disputed it with credit reporting agencies. Under the Fair Credit Reporting Act, consumer reporting agencies and the entities that furnish information to them--here, Chase--have a duty to investigate whether information in a credit file is "inaccurate" when there is a dispute. 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(b)(1). Chase reasonably investigated the dispute and concluded that Milgram was responsible for the charges under *6 the legal doctrine of apparent authority, because Milgram's employee used and paid for the Chase card from a deposit account controlled by Milgram for over two years without objection. Milgram disagreed and sued under the FCRA.

The Consumer Financial Protection Bureau argues as amicus that the duty to investigate whether credit information is "inaccurate" requires data furnishers and CRAs to investigate not merely factual disputes but legal disputes as well. This Court does not need to address that issue, because even assuming Chase's credit personnel had to assess Milgram's legal arguments about the validity of her debt, they did so and their assessment was reasonable. As Chase argues, a plaintiff cannot predicate the inaccuracy element of her FCRA claim on a legal dispute. That resolves this case. But if the Court considers the Bureau's argument, the Bureau is wrong: credit personnel must get to the bottom of factual *inaccuracies*, not disputed legal arguments. This Court has already held as much, and its decisions accord with the FCRA's text, structure, purpose, and history. The Bureau's contrary proposal is neither sensible nor workable.

## *7 ARGUMENT

### I. THE FCRA ADDRESSES FACTUAL INACCURACIES, NOT LEGAL DISPUTES

The FCRA provides that a furnisher who receives notice "of a dispute with regard to the completeness or accuracy of any information provided . . . to a consumer reporting agency" shall "conduct an investigation with respect to the disputed information." 15 U.S.C. § 1681s-2(b). If a consumer believes that the furnisher has not made a reasonable investigation, she may sue for damages-- including punitive damages for willful violations--and attorney's fees. 15 U.S.C. §§ 1681n(a), 1681o(a). To prevail on that FCRA claim, a plaintiff must establish that if the defendant had "conducted a reasonable

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 7 of 17 PageID: 1084

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

investigation, the result would have been different; *i e*, that the furnisher would have discovered that the information it reported was inaccurate or incomplete." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018).

The text, structure, history, and purpose of the FCRA all demonstrate that the statute requires furnishers and CRAs to investigate and verify factual accuracy, not assess or resolve legal disputes. This Court has already reached that conclusion under the provision outlining the investigation obligations of CRAs. 15 U.S.C. § 1681i(a). *See Losch v. Nationstar Mortgage* *8 *LLC*, 995 F.3d 937, 946 (11th Cir. 2021); *Batterman v. BR Carroll Glenridge, LLC*, 829 Fed. Appx. 478, 481-482 (11th Cir. 2020). And it has reached the same conclusion for the similarly worded provision at issue here for data furnishers, 15 U.S.C. § 1681s-2(b). *See Hunt v. JPMorgan Chase Bank, N.A.*, 770 Fed. Appx. 452, 458 (11th Cir. 2019). As the Court put it in *Hunt*, a "plaintiff must show a *factual inaccuracy* rather than the existence of *disputed legal questions* to bring suit against a furnisher under § 1681s-2(b)." *Id.* (emphases added).

### A. The FCRA's Text Requires Furnishers And CRAs To Investigate Only Factual Accuracy

The Bureau contends that "the text of the statute does not distinguish between legal and factual disputes." Br. 16. That is incorrect. A careful examination of the FCRA's text demonstrates that Congress required furnishers and CRAs to investigate factual inaccuracies, not legal disputes.

1. Section 1681s-2(b)(1) requires furnishers to investigate information whose "completeness or accuracy" is disputed, and to modify or delete any "item of information" "found to be *inaccurate or incomplete*" (emphasis added). The key textual question is what it means for an "item of information" in a consumer's file to be "inaccurate or incomplete." Because the statute does not define those terms, they take their ordinary meaning. *9 *BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 91 (2006). "Inaccurate," means, of course, "not accurate." And "accurate" means "[c]onforming exactly to fact, errorless." *American Heritage Dictionary of the English Language* 12 (5th ed. 2018). [2] Similarly, "incomplete" means "not complete," and "complete" means "[h]aving all necessary or normal parts, components, or steps." *Id.* at 377.

Asking whether credit information conforms exactly to fact or truth, or has no errors, or contains all necessary parts, applies most naturally to matters of *fact*. Here, Chase furnished factual information that $30,000 was owing on a Chase credit card in Milgram's name. If in fact the outstanding balance was $20,000, or if Chase had attributed a debt to "Shelly Milgram" that was owed by "Sheila Milgram," it would be natural to say that Chase had reported "inaccurate" or "incomplete" information. But it would not be natural to say that Chase reported inaccurate or incomplete information because Milgram contests whether, under the doctrine of apparent authority, she is legally responsible for the debt. Terms like validity or legality fit *10 better for legal disputes than accuracy and completeness. Accuracy and completeness ordinarily concern whether information reflects correct and full facts--not whether the consumer has a potential legal defense to the debt.

2. Even if "inaccuracy" can sometimes be construed to cover both factual and legal error, in the context of the FCRA it should be limited to its ordinary meaning of "conforming to fact." The surrounding statutory language repeatedly speaks in terms that apply most naturally to factual disputes. For example, the FCRA requires furnishers and CRAs to "investigat[e]" and "reinvestigat[e]" disputed information. 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(b)(1)(A). To "investigate" is "to observe or study by close examination and systematic inquiry," *Merriam-Webster's Collegiate Dictionary* 615 (10th ed. 1993). Facts can be "observe[d]" or "inquir[ed]" into, but we do not normally refer to laws that way.

The FCRA also directs furnishers and CRAs to conduct an investigation so that they can determine whether the disputed information can "be verified." 15 U.S.C. §§ 1681i(a)(5)(A), 1681s-2(b)(1)(E). Like the word "investigate," the word "verify" connotes an inquiry into knowable facts or objective truth. *See Merriam-Webster's Collegiate Dictionary* 1308 (10th

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 8 of 17 PageID: 1085

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

\*11 ed. 2001) (defining "verify" as "to establish the truth, accuracy, or reality of") Here, it would be strange to suggest that Chase's credit personnel could objectively "verif[y]" whether Milgram was legally responsible for the debt. Chase personnel believe the doctrine of apparent authority applies; Milgram disagrees. Whoever is right, the question turns on interpretation and judgment--not on "verif[ying]" some objective fact in the world.

Other surrounding terms provide further evidence that the statute requires furnishers and CRAs to look for factual inaccuracies, not assess or resolve legal disputes. For example, the statute requires CRAs to "determine whether" disputed information is inaccurate, and it contemplates that furnishers may "find[] that" disputed information is inaccurate. §§ 1681i(a)(1)(A), 1681s-2(b)(1)(D). CRAs and furnishers can readily "determine" and "find" whether disputed information is *factually* error-free. But only courts of law have the capacity to conclusively "determine" or "find" that information in a credit file is legally valid. *See Denan v. Trans Union LLC*, 959 F.3d 290, 295 (7th Cir. 2020) ("Only a court can fully and finally resolve the legal question of a loan's validity."). At every turn, the statutory language supports a duty to investigate factual inaccuracies, not to resolve legal disputes.

### \*12 B. The FCRA's Structure, Purpose, And History Confirm The Textual Focus On Factual Accuracy

1. The FCRA's structure and purpose reinforce the natural reading of the statutory text. Congress explained that the statute was designed to ensure "fair and accurate credit reporting," because "[i]naccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine . . . public confidence." 15 U.S.C. § 1681(a)(1). Accordingly, the FCRA's provisions work together to ensure that the information in a consumer's credit report accurately represents her creditworthiness. Furnishers have a circumscribed role under that scheme: they must reasonably investigate disputed information to guard against mistakes in a consumer's report, and they must omit certain information from reports following a consumer's direct dispute. 15 U.S.C. § 1681s-2. The Bureau's proposed regime would turn Congress's careful credit-reporting scheme into a debt-adjudication system, under which consumers may mount impermissible "collateral attacks on the legal validity of their debts in the guise of FCRA" claims. *Carvalho v. Equifax Info Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010).

Suppose a consumer complains about the mortgage balance on her credit report. Furnishers and CRAs reasonably could (and are required to) \*13 investigate whether the amount is accurate, whether it is still owed by the consumer, and the like. But now suppose the consumer's complaint is that her debt is unenforceable under state law because of a state usury statute. The consumer's proper course of action would be to sue the company, asking a court to issue a declaratory judgment or to enjoin the mortgage obligation. But under the Bureau's regime, the consumer could frame her legal challenge as an "inaccuracy" under the FCRA, and sue the furnisher and reporting agency for failing to reasonably investigate the "inaccuracy." And in the Bureau's view, furnishers and CRAs would apparently need to substitute for courts and make a judgment about the debt's permissibility under the state statute, on pain of damages and attorney's fees. None of that can be fairly derived from a statute meant to prevent and correct factual reporting mistakes.

2. The FCRA's legislative history further confirms Congress's focus on factual inaccuracy, not legal disputes. The original Fair Credit Reporting Act of 1970 was introduced in the Senate by a bipartisan group of Senators, to "protect consumers against arbitrary, erroneous, and malicious credit information." 115 Cong. Rec. 2410 (1969) (statement of Senator Proxmire). Sponsoring Senator William Proxmire outlined the five types of \*14 inaccuracy that the bill was designed to target: confusion over individuals with similar names; biased information; malicious gossip; computer errors; and incomplete information. *Id.* at 2411. Each of those categories was intended to be factual in nature. Identity confusion, malicious gossip, and computer errors, for example, are plainly factual inaccuracies.

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 9 of 17 PageID: 1086

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

The final two categories of "biased information" and "incomplete information" also meant that the credit report gave a slanted or misleading view of the facts. For example, in the category of "biased information," Senator Proxmire explained that a consumer should have the opportunity to tell his "side of the story" to explain his nonpayment; Senator Proxmire did not suggest that a CRA or furnisher would engage in legal analysis but rather that the customer's version of events should "find its way . . . into the files of the credit bureau." *Id.* And when discussing "incomplete information," Senator Proxmire mentioned credit reports that omitted delayed-payment agreements reached between consumers and their creditors, dropped charges, or favorable court judgments. *Id.* at 2411-2412.

The discussion around later FCRA amendments was similar. In 1996, Congress passed the Consumer Credit Reporting Reform Act, which created obligations for furnishers and added the provision at issue in this case, *15 Section 1681s-2(b). Pub. L. No. 104-208, § 2413, 110 Stat. 3009-448 (1996). The motivating factor behind that amendment and the statute's other reforms was concern with "human error or computer error." 142 Cong. Rec. S11869 (daily ed. Sept. 30, 1996) (statement of Senator Bryan). Members of Congress heard extensive testimony about distinctly factual errors, like the story of Mary Lou Mobley, whose credit report reflected that she was married to a financially troubled man from Arizona, even though she had never been married or been to Arizona. *Id.* In later amendments, too, Congress's discussion focused on "[e]nhancing the accuracy of consumer report information." Pub. L. No. 108-159, tit. III, 117 Stat. 1952 (2003), including by "reconciling" inconsistent addresses in a consumer file--yet another prevalent factual inaccuracy. H.R. Rep. 108-263, at 46 (2003). In sum, the legislative history confirms that the text focuses on factual accuracy.

### C. This Court And Others Have Correctly Interpreted The FCRA

Consistent with the FCRA's text, structure, purpose, and history, this Court and many of its sister circuits have recognized that the FCRA focuses on factual inaccuracies.

*16 1. In interpreting the same provision of the FCRA at issue here, this Court has recognized that "a plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit against a furnisher under § 1681s-2(b)." *Hunt*, 770 Fed. Appx. at 458. In *Hunt*, the plaintiff challenged a furnisher's reporting of his late monthly mortgage payments by arguing that, under Florida law, he no longer had to make those payments after the bank filed a foreclosure action. In a well-reasoned but unpublished opinion, issued after briefing on this question, the Court concluded that the plaintiff's FCRA claim failed because his challenge amounted to "a currently unresolved legal, not a factual, question." *Id.*

The Court has drawn the same fact-law distinction in interpreting similarly worded provisions of the FCRA that govern CRAs. In *Batterman*, the Court rejected a plaintiff's FCRA claim premised on the argument that he was not legally liable for the liquidated damages included in his credit report. 829 Fed. Appx. at 481-482. And then in *Losch*, the Court reaffirmed in a published opinion that a plaintiff must show "factually inaccurate information," and that "a reasonable reinvestigation . . . does not require [CRAs] to resolve legal disputes about the validity of the underlying debts they report." 995 F.3d at 945-946. Although the Court ultimately found that *17 the credit information was factually inaccurate, the relevant point is that it distinguished between factual inaccuracy and legal invalidity.

The Bureau recently acknowledged in a similar amicus brief to the Second Circuit that *Batterman* distinguishes between factual inaccuracies and legal disputes. *See* CFPB Br. 15, *Sessa v. TransUnion LLC*, No. 22-87 (2d Cir. May 5, 2022). Before this Court, however, the Bureau merely alludes in a parenthetical (at 19) to "cases of this Court that were not selected for publication," but does not cite *Batterman* or *Hunt* by name. And the Bureau buries *Losch* in footnotes (at 18 n.15, 23 n.18), emphasizing that the CRA there failed to reasonably investigate a factual inaccuracy, but downplaying the relevant reasoning that factual inaccuracy is required.

2. In suits against CRAs under Sections 1681e (another provision that addresses "accuracy") and 1681i, the four other courts of appeals to consider the question--the First, Seventh, Ninth, and Tenth Circuits--have held that a CRA's obligations extend

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 10 of 17 PageID: 1087

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 6240547...

only to "factually inaccurate information, as consumer reporting agencies are neither qualified nor obligated to resolve legal issues." *Denan*, 959 F.3d at 296-297; *see DeAndrade v Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008) (distinguishing between "a factual inaccuracy" and "a legal issue that a credit *18 agency" "is neither qualified nor obligated to resolve under the FCRA"); *Carvalho*, 629 F.3d at 892 (holding that CRAs need not "provide a legal opinion on the merits"); *Wright v. Experian Info. Sols., Inc.*, 805 F.3d 1232, 1242 (10th Cir. 2015) (explaining that CRAs are not required to "resolve legal disputes about the validity of the underlying debts they report"). As discussed above, this Court joined its unanimous sister circuits in *Batterman* and *Losch*.

The issue has also been litigated in suits against furnishers under Section 1681s-2(b). The First Circuit has held that in that context, "just as in suits against CRAs, a plaintiff's required showing is *factual* inaccuracy, rather than the existence of disputed legal questions." *Chiang v Verizon New England Inc.*, 595 F.3d 26, 38 (1st Cir. 2010). And of course this Court reached the same conclusion in *Hunt*, relying in part on *Chiang*. That conclusion makes sense: Section 1681s-2(b), which governs furnishers, uses the same "inaccurate" language as Section 1681i. And "identical words and phrases within the same statute should normally be given the same meaning." *Bowling v U S Bank Nat'l Assoc*, 963 F.3d 1030, 1038 (11th Cir. 2020). The Bureau suggests that this Court can distinguish between Sections 1681i and 1681s-2(b). *See* Br. 19-21. But it provides no textual basis for that *19 distinction except that furnishers conduct "investigations" and CRAs conduct "reinvestigations." *Id.* As discussed above, the term "investigation" suggests an exploration of objective facts, *see* p. 10, *supra*, and the addition of the prefix "re" does not affect that meaning.[3]

The Ninth Circuit is the sole outlier among courts of appeals. It recently accepted the Bureau's argument that the "FCRA will sometimes require furnishers to investigate, and even to highlight or resolve, questions of legal significance." *Gross v CitiMortgage, Inc.*, 33 F.4th 1246, 1253 (9th Cir. 2022). But the Ninth Circuit previously adopted the distinction between factual inaccuracies and legal disputes in *Carvalho*, and *Gross* offers no textual justification for the different results. This Court should reject the Bureau's invitation to abandon *Hunt, Losch*, and *Batterman* in favor of *Gross*'s atextual and anomalous rule.

*20 * * *

The Bureau repeatedly urges this Court to "clarify there is no exemption in the FCRA's reasonable investigation requirement for legal questions." Br. 24. It is right, in a sense. This Court need not craft an atextual "exemption" from the FCRA for legal disputes. Instead, the statute's text, structure, purpose, and history all confirm that the reasonable-investigation provisions, including Section 1681s-2(b)(1), address only disputes about inaccurate facts. As a result, and as this Court and others have recognized, a "plaintiff must show a factual inaccuracy rather than the existence of disputed legal questions to bring suit" under the statute. *Hunt*, 770 Fed. Appx. at 458.

## II. THE BUREAU'S CONTRARY APPROACH IS UNWORKABLE AND INEFFICIENT

The Bureau also urges the Court to abandon its distinction between factual inaccuracies and legal disputes on the ground that it will be unworkable. The Bureau is wrong. This Court's existing rule is administrable and is already operating well in courts around the country. On the contrary, it is *the Bureau'* s reading that is unworkable, expensive, and inefficient. It would have damaging economic consequences for furnishers, CRAs, and consumers alike.

### *21 A. Distinguishing Between Fact And Law Is A Familiar Task For Courts

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 11 of 17 PageID: 1088

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

The Bureau contends that it will be "difficult" for courts deciding FCRA cases to determine whether a plaintiff has asserted a factual inaccuracy or a legal dispute. See Br. 22-24. But courts routinely distinguish between factual and legal matters in a variety of contexts. It is a familiar judicial task, even if hard questions occasionally arise at the margins. And with respect to the FCRA specifically, courts across the country already distinguish between factual and legal issues without the chaos that the Bureau imagines.

1. Distinguishing between fact and law is a common task for federal courts. District courts, for example, distinguish between fact and law whenever they determine which issues they must decide and which must be reserved for a jury. See Merck Sharp & Dohme Corp. v. Albrecht, 139 S. Ct. 1668, 1679 (2019). When reviewing the sufficiency of a complaint, a district court must decide legal issues for itself but accept factual allegations as true. That task includes the nuanced assessment whether a plaintiff has asserted a legal conclusion "couched" as a factual allegation. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). And when deciding whether triable issues exist at summary judgment, a district court must determine whether the *22 disputed questions are factual in nature. See BKR Global, LLC v. FourWinds Capital Mgmt., 661 F.3d 1134, 1136-1137 (11th Cir. 2011). Once the case proceeds to trial, a district court must instruct the jury on relevant issues of law and permit juries to decide questions of fact. See United States v. Oliveros, 275 F.3d 1299, 1306-1307 (11th Cir. 2001).

Distinguishing between fact and law is also a routine task for courts of appeals. See Teva Pharm. USA, Inc. v. Sandoz, Inc., 574 U.S. 318, 328 (2015) ("Courts of appeals have long found it possible to separate factual from legal matters."). Not only do appellate courts regularly review district courts' distinctions of fact and law, but they also distinguish between factual and legal matters for themselves when deciding what standard of review to apply (clear error or de novo). To be sure, there are hard cases at the margins. But even in cases involving mixed questions of law and fact, the principles for distinguishing legal and factual matters "are by now well established," Miller v. Fenton, 474 U.S. 104, 113 (1985), and generally involve the determination whether a case "entails primarily legal or factual work," U.S. Bank N.A. v. Village at Lakeridge, 138 S. Ct. 960, 967 (2018). Compared to the complex questions that the Bureau's alternative theory would raise, see pp. 25-29, infra, the fact-law distinction in the FCRA places courts on familiar footing.

*23 2. The Bureau's warnings are especially unwarranted because courts around the country have already distinguished between fact and law for years in the FCRA context. See pp. 15-19, supra. The Bureau points (at 22-23) to two cases that supposedly show courts are struggling, but a closer look reveals how much it is the Bureau that is straining. For example, the Bureau observes that more than a decade ago in Cornock v. Trans Union LLC, 638 F. Supp. 2d 158 (D.N.H. 2009), the district court expressed some frustration with the exercise of distinguishing between fact and law. But Cornock was not a hard case: the plaintiff could not show "any inaccuracy" because at the time of the CRA's investigation an arbitrator had already affirmed the plaintiff's debt. Id. at 166. The court's apparent frustration was thus not even borne out in the case before it.

The Bureau's reliance on Chuluunbat v. Experian Information Solutions, Inc., 4 F.4th 562 (7th Cir. 2021), is even more puzzling, because the Seventh Circuit there accepted the very fact-law distinction that the Bureau rejects, id. at 567. The Bureau nevertheless says (at 22-23) that Chuluunbat demonstrates the difficulty of distinguishing between fact and law, because the decision was a consolidated appeal and the district courts below supposedly diverged in how they viewed the underlying disputes. On *24 the contrary, the district courts all reached consistent conclusions, even if their explanations varied in immaterial ways: they all found that CRAs were not required to adjudicate the dispute, whether because it was strictly legal, was more legal than factual, or fell outside the competency of CRAs to resolve. Chuluunbat, 4 F.4th at 566. The Seventh Circuit affirmed across the board. Id. at 569.

3. Importantly, the existing regime does not "categorically exempt" furnishers and CRAs from investigating all disputes that touch on legal issues, as the Bureau suggests (at 18, 23-24). Rather, the key question will usually be whether a court has already

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 12 of 17 PageID: 1089

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

authoritatively adjudicated the dispute. Once a court has ruled that a consumer's debt is legally invalid, including information about that debt in a consumer's report may render the report "inaccurate" as a matter of objective fact. Thus, when a plaintiff points to a legal dispute that has already been adjudicated, furnishers and CRAs may be required to investigate "the status of the information contained in the public records." *Dennis v. BEH-1, LLC*, 520 F.3d 1066, 1069 (9th Cir. 2008) (citation omitted).

This Court's decision in *Losch* is illustrative. In that case, this Court explained that where the plaintiff could point to a court's judgment that left *25 "no doubt that [the consumer's] mortgage was discharged," the dispute was not a legal one about "the validity of the underlying debt," but rather a factual inaccuracy: the report indicated that the consumer had an outstanding mortgage balance, but he no longer did. 995 F.3d at 946. In that scenario, a furnisher or CRA need not "make any legal determinations about the underlying claim." *Chuluunbat*, 4 F.4th at 568.

\* \* \*

The point is not that the analysis of fact and law is easy in every case. There will no doubt be some hard questions. The point instead is that this distinction is firmly embedded in the American legal tradition and is familiar to every federal court in the country. It is not, as the Bureau suggests (at 24), "an unworkable standard" ginned up to "encourage evasion" of the FCRA.

### B. The Bureau's Approach Is Far Worse

The Bureau's proposed elimination of the accepted fact-law distinction would prove unworkable, expensive, and inefficient in practice.

1. As a threshold matter, the regime that the Bureau envisions will be unadministrable. Furnishers and CRAs are "neither qualified nor obligated to resolve" legal disputes. *DeAndrade*, 523 F.3d at 68. Personnel *26 responsible for responding to disputed information in credit reports are not typically lawyers, let alone judges. Yet the Bureau would demand that they resolve a host of extraordinarily complex legal questions.

Consider, for example, the *Denan* case in the Seventh Circuit. There, the legal validity of the plaintiffs' loans turned on three complex legal issues: (1) the enforceability of choice-of-law provisions in the plaintiffs' loan agreements; (2) whether, under the applicable state law, plaintiffs' loans were void; and (3) whether, even if state law would otherwise void the loans, tribal sovereign immunity applied. 959 F.3d at 295. Those are difficult questions even for courts. Expecting credit personnel-- especially those with no legal training--to resolve them borders on the absurd. Moreover, credit personnel would have to resolve those legal issues within a 30-day time frame. *See* 15 U.S.C. §§ 1681i(a)(1)(A), 1681s-2(b)(2). As the Seventh Circuit recognized, addressing complex legal questions "exceeds the competences of consumer reporting agencies." *Denan*, 959 F.3d at 295. The same goes for furnishers.

Nor was *Denan* an outlier. In *Humphrey v. Trans Union LLC*, 759 Fed. Appx. 484, 485 (7th Cir. 2019), for example, the plaintiff argued that a certain debt in his file was invalid under federal regulations because of a *27 pending application for a disability discharge. *DeAndrade* concerned whether mortgage documents with an allegedly forged signature were nevertheless valid under the doctrine of ratification. 523 F.3d at 63. *Gross* involved the application of Arizona's Anti-Deficiency Statute, and an Arizona Supreme Court decision interpreting that statute, to the plaintiff's debt. 33 F.4th at 1251-1252. And even cases that turn only on the meaning of the underlying contracts may involve complex issues of contract law subject to legitimate debate. *See, e.g., Batterman*, 829 Fed. Appx. at 481 (whether a landlord was entitled to liquidated damages under the terms of a lease agreement).

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 13 of 17 PageID: 1090

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

In this case, the legal validity of Milgram's debt involves competing interpretations of judicial precedent. Milgram denies responsibility for the debt because it was incurred by a rogue employee who acted without Milgram's authorization. Chase contends that Milgram is responsible for the employee's charges under the doctrine of "apparent authority." Chase relies on decisions holding that a cardholder may vest a fraudulent user with the apparent authority to use a credit card if the fraudulent charges are continuously paid over time (here, two years). Chase Br. 35-37. Milgram asserts that those cases are distinguishable on several grounds, including the *28 duration of the fraud and the fact that Milgram did not pay her credit card bill by written check. Milgram Br. 57-58.

The Bureau never explains exactly what else Chase was supposed to do with those competing legal arguments, or how Chase's assessment fell short. It hedges and says (at 21) that a furnisher "does not have to conclusively adjudicate a legal dispute; it just needs to conduct a reasonable investigation of it" or take some "lesser steps." That concession gives away the game. Set aside that the Bureau hardly explains what "lesser steps" would suffice, beyond vague allusions to obtaining "guidance" or having a "policy" on the issue, or why those steps should be different for legal disputes than factual ones. More importantly, the Bureau does not explain why furnishers and CRAs should investigate legal disputes but not actually resolve them. The FCRA does not impose investigation for its own sake. Investigation is required so that inaccurate information in a credit report can be modified or deleted as necessary. *See* 15 U.S.C. § 1681s-2(b)(1)(C)-(E). It is a purely box-checking exercise if furnishers and CRAs have to merely inquire into legal arguments, with no effect on the credit report itself.

Moreover, if, as the Bureau proposes, a furnisher or CRA need do less than actually reach the "correct" legal answer that a court later adopts, then *29 what *is* enough? The Bureau suggests that it may be enough to "obtain guidance about the issue" or "develop[] a policy about how to handle the situation," Br. 21, but does that mean that credit personnel are required to consult legal counsel, or may their own research suffice? And when may a CRA or a furnisher throw up its hands with a contested legal issue and determine--in the Bureau's awkward reading of the FCRA's text--that the answer "cannot be verified"? *See* 15 U.S.C. §§ 1681i(a)(5)(A), 1681s-2(b)(1)(E). The Bureau does not say, so the only certainty is a new wave of litigation over when enough is enough.

2. The regime that the Bureau proposes also would be quite expensive. To avoid liability, furnishers and CRAs might feel obligated to expand their in-house legal teams to ensure that legal disputes in credit reports are all reviewed by a qualified lawyer. And the lawyers reviewing those reports would need to be trained in a host of disparate subject areas, so that they could spot and analyze legal issues. If the existing FCRA cases are any indication, furnishers' and CRAs' lawyers would need to be trained in federal disability law, state statutory law, contract law, tax law, and even tribal sovereign immunity. Imposing such requirement on furnishers and CRAs would, of course, "substantially increase the cost of their services." *30 *Wright*, 805 F.3d at 1241 (rejecting interpretation of the FCRA that would require CRAs to employ tax law experts). Furnishers and CRAs would also need to spend significant resources addressing frivolous claims, which are a distraction from legitimate disputes. Those increased costs would "outweigh[] the potential of harm to consumers" of leaving legal disputes to courts. *Id.*

Converting the FCRA into a vehicle to dispute the legal validity of underlying debts would also result in massive increases in litigation. FCRA suits already have "more than doubled in the last decade." Ben Kochman, *Fair Credit Reporting Act Suits Have Soared Over Last Decade*, Law 360 (Oct. 22, 2019), https://www.law360.com/articles/1210252/fair-credit-reporting-act-suits-have-soared-over-last-decade. FCRA suits not only are costly to litigate, but they also carry significant potential liability, because the statute permits plaintiffs to recover statutory damages, costs and attorney's fees, and even perhaps punitive damages. 15 U.S.C. §§ 1681n(a), 1681o(a). When plaintiffs proceed as a class, a FCRA defendant's liability may be astronomical. *See Trans Union LLC v FTC*, 536 U.S. 915, 917 (2002) (Kennedy, J., dissenting from denial of cert.) ("Because the FCRA provides *31 for statutory damages of between $100 and $1,000 for each willful violation, petitioner faces potential liability approaching $190 billion.").

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 14 of 17 PageID: 1091

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

To avoid that exposure, furnishers and CRAs might err on the side of omitting information from a consumer's file if it is subject to any possible legal debate, including negative information that is factually accurate. That approach would have sweeping economic consequences as well. After all, "the very economic purpose for credit reporting companies would be significantly vitiated if they shaded every credit history in their files in the best possible light for the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1158 (11th Cir. 1991). The reliability of the national credit-reporting industry has enabled modern creditors to extend far more credit to consumers, including to consumers with whom they have no prior experience. *See* Consumer Financial Protection Bureau, 1 *Taskforce on Federal Consumer Financial Law Report* 103 (Jan. 2021), https://files.consumerfinance.gov/f/documents/cfpb_taskforce-federal-consumer-financial-law_report-volume-1_2022-01_amended.pdf. This "democratiz[ation]" of consumer lending, *id.* at 24, has greatly benefited consumers and the American economy. If credit reports became categorically less reliable because they omit subjects of legal dispute, that would have **\*32** repercussions for CRAs, for furnishers, and for the wide variety of lenders and other businesses that rely on them--and ultimately for consumers.

3. Finally, the Bureau's proposed rule would be inefficient. As discussed above, "[o]nly a court can fully and finally resolve the legal question of a loan's validity." *Denan*, 959 F.3d at 295. Yet the Bureau's theory would put furnishers and CRAs in the position of defending the legal validity of a consumer's debts when the creditor that actually has a financial stake might be absent. CRAs are not creditors. And although furnishers are often the creditors, that is not always true. Debt collectors, for example, are furnishers too. *See McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 915 (8th Cir. 2014). It makes little sense to treat the credit-reporting scheme under the FCRA as a mechanism for collateral attacks on the legality of certain debts, with an entity who may not be the creditor acting as the defendant in subsequent FCRA litigation.

The correct path for handling legally contested debts is far more straightforward: if a consumer wants a debt deemed unenforceable, she should go to court and ask the court to say so. If the court agrees, the legal question is resolved, the debt is no good, and a furnisher or CRA who fails to conduct a reasonable investigation to catch the adjudication and lists it as **\*33** outstanding commits a factual error for which it may be penalized under the FCRA.

## CONCLUSION

For the foregoing reasons, the judgment of the district court should be affirmed.

Respectfully submitted,

*s/ Jeffrey B. Wall*

Jeffrey B. Wall

Morgan L. Ratner

Zoe A. Jacoby

Sullivan & Cromwell LLP

1700 New York Avenue NW, Suite 700

Washington, DC 20006-5215

(202) 956-7500

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 15 of 17 PageID: 1092

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

wallj@sullcrom.com

Tara S. Morrissey

Janet Galeria

U.S. Chamber Litigation Center

1615 H Street NW

Washington, DC 20062

(202) 463-5337

Thomas Pinder

American Bankers Association

1120 Connecticut Avenue NW

Washington, DC 20036

(202) 663-5035

Ann C. Petros

National Association of Federally-Insured Credit Unions

**\*34** 3138 10th Street N

Arlington, VA 22201

(703) 842-2212

Michael Emancipator

Independent Community Bankers of America

1615 L Street NW, Suite 900

Washington, DC 20036

(202) 821-4469

Philip Bohi

American Financial Services Association

919 18th Street NW, Suite 300

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 16 of 17 PageID: 1093

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

Washington, DC 20006

(202) 466-8605

Alexander Monterrubio

Credit Union National Association

99 M Street SE, Suite 300

Washington, DC 20003

(202) 525-8558

Justin Wiseman

Mortgage Bankers Association

1919 M Street NW

Washington, DC 20036

(202) 557-2854

David Pommerehn

Consumer Bankers Association

1225 New York Avenue NW, Suite 1100

Washington, DC 20005

(202) 552-6368

August 9, 2022

### Footnotes

1    No party's counsel authored this brief in whole or in part; no party or party's counsel contributed money intended to fund the preparation or submission of this brief; and no person other than the amici, their members, or their counsel contributed money that was intended to fund preparing or submitting the brief.

Case 3:20-cv-13509-GC-DEA   Document 71-8   Filed 10/17/22   Page 17 of 17 PageID: 1094

Shelly MILGRAM, Plaintiff-Appellant, v. CHASE BANK USA,..., 2022 WL 5240547...

2   Accuracy meant the same thing in 1996 when the FCRA was amended to add Section 1681s-2 to the statute. *See Merriam-Webster's Collegiate Dictionary* 8 (10th ed. 1993) (defining "accurate" as "free from error esp. as the result of care; conforming exactly to truth or to a standard").

3   In a footnote, the Bureau contends that one of its own regulations implementing a different statutory provision, Section 1681s-2(a), requires furnishers to analyze certain legal disputes. Br. 16 n.13. But as the Bureau concedes, Section 1681s-2(a) is not at issue here. *Id.* The Bureau cannot assume that its regulations construing an inapplicable statutory provision are reasonable, and parlay those inapplicable (and thus unchallenged) regulations into the appropriate construction of the statutory provision that governs here.

End of Document                                                                 © 2022 Thomson Reuters. No claim to original U.S. Government Works.