**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| ANDREW RITZ and MICHAEL RITZ,<br><br>Plaintiffs,<br><br>v.<br><br>NISSAN-INFINITI LT; TRANS UNION, LLC; EQUIFAX INFORMATION SERVICES, LLC; and EXPERIAN INFORMATION SOLUTIONS, INC,<br><br>Defendants. | Civil Action No. 20-13509-GC-DEA<br><br>**MEMORANDUM OPINION** |

**CASTNER, District Judge**

This matter comes before the Court on Defendant Nissan Motor Acceptance Corporation's[1] ("NMAC") Motion for Summary Judgment, pursuant to Federal Rule of Civil Procedure ("Rule") 56, on the only claim against NMAC. (ECF No. 66.) Plaintiffs Andrew Ritz and Michael Ritz opposed (ECF No. 67), and NMAC replied (ECF No. 71). The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Rule 78 and Local Civil Rule 78.1. For the reasons set forth below, and other good cause shown, NMAC's Motion is **GRANTED**.

---

[1]     Purportedly improperly pled as "Nissan-Infinity LT."

I.      **BACKGROUND**[2]

A. **Procedural History**

On or abound September 29, 2020, Plaintiffs[3] filed this action against NMAC; TransUnion, LLC; Equifax Information Services, LLC; and Experian Information Solutions, Inc. (*See* ECF No. 1.) Plaintiffs later voluntarily dismissed their claims against TransUnion, LLC; Equifax Information Services, LLC; and Experian Information Solutions, Inc. (ECF Nos. 43, 44, 45.) Plaintiffs claim that NMAC willfully or negligently violated the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §§ 1681s-2(b), 1681n, and 1681o, by reporting inaccurate or incomplete information to credit reporting agencies ("CRAs") related to an automobile lease, failing to investigate Plaintiffs' request for reinvestigations, and failing to respond to Plaintiffs' requests for reinvestigation. (*See generally* ECF No. 1; *see also* RSMF ¶ 4.)

B. **Facts Undisputed, or Substantiated by Record Evidence**[4]

Nearly all of the material facts are based on documentary evidence and, as such, are generally undisputed. Plaintiffs' lease of a Nissan vehicle was set to end on August 9, 2019. (RSMF ¶ 6.) The lease included the following terms concerning the vehicle's return:

> **12.** *Vehicle Return*
> When your Lease terminates . . . you will return the Vehicle to a
> Nissan dealer or other location we specify.  You will complete a

---

[2]     On a motion for summary judgment, the Court "draw[s] all reasonable inferences from the underlying facts in the light most favorable to the nonmoving party." *Jaffal v. Dir. Newark New Jersey Field Off. Immigr. & Customs Enf't*, 23 F.4th 275, 281 (3d Cir. 2022) (quoting *Bryan v. United States*, 913 F.3d 356, 361 n.10 (3d Cir. 2019)).

[3]     In line with the parties' briefing, the Court refers to Plaintiffs collectively regardless of whether a particular fact involved only Andrew Ritz or Michael Ritz.

[4]     NMAC's Rule 56.1 Statement of Material Facts ("SMF") is at ECF No. 66-1; Plaintiffs' Responsive Statement of Material Facts ("RSMF") is at ECF No. 67-1; Plaintiffs' Supplemental Statement of Material Facts ("SSMF") is at ECF No. 67-2; and NMAC's Response to Plaintiffs' Supplemental Statement of Material Facts ("RSSMF") is at ECF No. 71-1.

> statement of this Vehicle's mileage at termination as required by federal law. If you keep possession of this Vehicle past the end of the lease term, you will continue to pay the monthly payments . . . . You will pay us for any damages we suffer because you failed to return this Vehicle to a Nissan dealer . . . or because you failed to return this Vehicle at the end of the lease term. We may determine our damages in one of the following two ways at our election and in our sole discretion: a) by charging you the Total Monthly Payment for each month the Vehicle is not returned as required . . . .

[(*Id.* ¶ 7; ECF No. 66-9 at 4 ¶ 12.[5])]

Leading up to the lease-end date, NMAC (who acts as a servicer for the lessor, Nissan-Infiniti LT) emailed Plaintiffs information about the procedure for returning the vehicle and terminating the lease. (RSMF ¶¶ 5, 9.) The email detailed "steps to help you complete your lease return," such as "[s]chedul[ing] your complimentary, but required, vehicle inspection," and "[m]ak[ing] a vehicle-return appointment with your Nissan Dealership," and advised that "you are required to complete a Federal Odometer/Lease Termination Statement." (ECF No. 66-11 at 3-4 (emphasis omitted).) Plaintiffs contest that the lease documents required Plaintiffs to schedule an appointment. (*See* RSMF ¶ 9.)

On August 9, 2019, the final day of the term, Plaintiffs went to the dealership to return the vehicle, without scheduling an appointment or inspection. (*Id.* ¶ 12.) Dealership representatives refused to accept the vehicle's return, claiming that they could not meet with Plaintiffs without an appointment to inspect the vehicle; complete lease-return paperwork, including the contractually required odometer statement; and terminate (or "ground") the vehicle. (*Id.* ¶¶ 13, 19.) After a contentious encounter with the dealership's representatives, Plaintiffs tossed the vehicle's keys on a desk and abruptly walked out, leaving the vehicle at the dealership, not having signed the

---

[5] Page numbers for record cites (*i.e.*, "ECF Nos.") refer to the page numbers stamped by the Court's e-filing system and not the internal pagination of the parties.

odometer statement. (*Id.* ¶¶ 19-20.) That day, Plaintiffs sent a chat message to Nissan's Complaints Management Department ("Complaints Department"), describing the incident and noting, among other things, that they had left the vehicle at the dealership. (RSSMF ¶ 1; *see also* ECF No. 67-8.)

Because the vehicle was not marked as "grounded" on the last day of the lease, Plaintiffs were charged an additional monthly payment of $181.51, due on August 9, 2019. (RSMF ¶¶ 27-28.) The parties dispute who is to blame for the vehicle's untimely grounding. (*See id.* ¶ 28.) In any event, Plaintiffs did not pay the additional charge, and so on August 19, 2019, NMAC notified Plaintiffs that $181.51 was past due and that another $181.51 would be due on September 9, 2019. (*Id.* ¶ 29; *see also* ECF No. 66-28 at 3.)

On September 20, 2019, after receiving NMAC's notice of the additional charges, Plaintiffs called the Complaints Department and again advised that they had returned the vehicle on August 9. (RSSMF ¶ 4; *see also* ECF No. 67-10.) NMAC's notes from its calls that day show that NMAC tried to understand what had happened and how to resolve the grounding issue. (*See* ECF Nos. 67-10, 67-11, 67-12.) That same day, September 20, Plaintiffs returned to the dealership and signed the odometer statement. (RSMF ¶ 25.)

By letter dated September 24, 2019, the dealership advised NMAC that Plaintiffs' "vehicle was dropped off to our dealership on 8.9.19," and that Plaintiffs "wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the Vehicle." (ECF No. 67-13.) The subject line included the vehicle's VIN with a typographical error. (RSSMF ¶ 12.)

Two days later, Plaintiffs sent another chat message to the Complaints Department, reiterating that they had returned the vehicle on August 9 and expressing concern about the impact of NMAC's reporting on their credit. (*Id.* ¶¶ 13-14; *see also* ECF No. 67-14.) NMAC's customer

4

service department then submitted a "service request" asking NMAC's credit bureau management team (the "CBM Team") to remove the "August delinquency" from Plaintiffs' files, noting that the "[v]ehicle was returned 8/9/2019 but dealer grounded late," and attaching a copy of the dealership's September 24 letter.[6] (RSSMF ¶¶ 15-16; *see also* ECF No. 74-1 at 2.) However, due to the VIN-number typo, the CBM Team did not process this request, and the delinquency remained on Plaintiffs' account. (RSSMF ¶ 17.)

Between September 28 and October 4, 2019, NMAC processed seven automated consumer dispute verifications ("ACDVs") that it received from the CRAs Experian, Equifax, and Trans Union, in which Plaintiffs disputed their account information, namely the thirty-day payment delinquency that NMAC was reporting. (RSSMF ¶¶ 19-20; *see also* ECF No. 67-19 at 2-15.)

On October 8, 2019, Plaintiffs called NMAC's customer service department and disputed again NMAC's reporting. (RSSMF ¶ 21; *see also* ECF No. 67-20.) The department then sent the CBM Team a second service request asking to "remove August delinquency," again noting that the "[v]ehicle was returned 8/9/2019 but dealer grounded late," and attaching the dealership's September 24 letter, among other documents. (RSSMF ¶¶ 22-23; *see also* ECF No. 74-2 at 2, 23.) But, again due to the VIN-number typo, the CBM Team did not process this request, and the delinquency remained. (RSSMF ¶ 24; *see also* ECF No. 74-2 at 25.)

Between October 18 and November 4, 2019, NMAC processed seven more ACDVs that it received from the CRAs, in which Plaintiffs disputed payment delinquency on their account information with NMAC. (RSSMF ¶¶ 26-27; *see also* ECF No. 67-19 at 16-29; ECF No. 67-22.)

---

[6]   A separate note states: "rcvd sr dispute reason delinquency pay/history inquiry . . . reviewed trans history . . . found delinquency 1x30 (08/09/19) completed grounding 09/20/19 . . . dealer did not admit fault for delq . . . account reporting accurate." (ECF No. 74-1 at 10 (all-capitalizations revised).)

By letter dated October 23, 2019, in response to Plaintiffs' September 26 call, NMAC advised Plaintiffs that its investigation indicated that its reporting on Plaintiffs' account was accurate. (ECF No. 66-28 at 8.) By letter dated November 25, 2019, Plaintiffs responded to NMAC's October 23 letter, pleading for NMAC to correct its reporting on Plaintiffs' account. (*Id.* at 6-7.) In response, by letter dated December 19, 2019, NMAC advised Plaintiffs that its prior determination was unchanged. (*Id.* at 6-7, 9.)

On December 19, 2019, NMAC received a complaint from the Consumer Financial Protection Bureau (CFBP) concerning Plaintiffs' dispute. (RSSMF ¶ 28; *see also* ECF No. 67-23.) The Complaints Department then sent the CBM Team a third service request to remove the delinquency. (RSSMF ¶ 29; *see also* ECF No. 67-23; ECF No. 74-3.) On January 6, 2020, after communications exchanged between the departments, the CBM Team issued the CRAs an automated universal data ("AUD") form to remove the late payment entry from Plaintiffs' credit reports. (RSSMF ¶¶ 30-31; RSMF ¶ 34; *see also* ECF No. 67-19 at 30-31; ECF No. 67-23.)

That same day, January 6, NMAC responded to Plaintiffs' CFPB complaint, advising that "[o]n September 27, 2019, NMAC received notice that the vehicle arrived at [the dealership] on September 20, 2019"; that "NMAC's records show that it received a letter from [the dealership] stating that the vehicle was returned on August 9, 2019, and they were late in grounding the vehicle"; and that "[o]n January 6, 2019 NMAC submitted an update to the credit bureaus to remove the 1x30 for the September 2019 payment." (RSSMF ¶¶ 32-33; *see also* ECF No. 67-25.)

## II.  LEGAL STANDARD

Pursuant to Rule 56, "[s]ummary judgment is proper when, viewing the evidence in the light most favorable to the nonmoving party and drawing all inferences in favor of that party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of

law." *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 402 (3d Cir. 2016) (citing Fed. R. Civ. P. 56(a)). "A fact is material if—taken as true—it would affect the outcome of the case under governing law." *M.S. v. Susquehanna Twp. Sch. Dist.*, 969 F.3d 120, 125 (3d Cir. 2020) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "And a factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.*

### III. DISCUSSION

NMAC moves for summary judgment on Plaintiffs' FCRA claim for four reasons. First, NMAC's reporting was accurate as a matter of law. Second, even if the reporting was inaccurate, Plaintiffs' dispute concerns a legal issue, not a factual inaccuracy needed to sustain an FCRA claim. Third, because NMAC did not willfully violate the FCRA, this precludes an award of statutory and punitive damages under Section 1681n. Fourth, and finally, Plaintiffs have not suffered damages. (*See* ECF No. 66-5 at 16-26.)

The FCRA "was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Seamans v. Temple Univ.*, 744 F.3d 853, 860 (3d Cir. 2014) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010)). Although many of the FCRA's provisions may only be enforced by federal and state officials, *see id.* at 864, a private cause of action against furnishers[7] of information to CRAs is available for violations of Section 1681s-2(b), which requires a furnisher to investigate disputes

---

[7] A "furnisher" is "[a]ny person with relevant data about a consumer's financial activity may voluntarily provide it to a CRA, but '[t]he most common . . . furnishers of information are credit card issuers, auto dealers, department and grocery stores, lenders, utilities, insurers, collection agencies, and government agencies.'" *Chiang v. Verizon New England Inc.*, 595 F.3d 26, 35 n.7 (1st Cir. 2010) (quoting H.R. Rep. 108-263, at 24 (2003)).

received from a CRA. Under Section 1681s-2(b), once a CRA notifies a credit furnisher of a dispute, the furnisher must "1) conduct an investigation with respect to the disputed information; 2) review all relevant information received from the CRA; 3) report the results of the investigation to the CRA; and 4) if the information is found to be inaccurate or incomplete, report the results to all CRAs to which it originally provided the erroneous information." *Esperance v. Diamond Resorts*, Civ. No. 18-10237, 2022 WL 1718039, at *5 (D.N.J. May 27, 2022) (quoting *Van Veen v. Equifax Info.*, 844 F. Supp. 2d 599, 604 (E.D. Pa. 2012)).

As a threshold matter, "courts have explicitly held that a showing of inaccuracy is essential to a [Section] 1681s-2(b) claim." *Gatanas v. Am. Honda Fin. Corp.*, Civ. No. 20-07788, 2020 WL 7137854, at *3 n.3 (D.N.J. Dec. 7, 2020) (citing *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 629 (6th Cir. 2018) (collecting cases)); *see Holland v. Trans Union LLC*, 574 F. Supp. 3d 292, 302 (E.D. Pa. 2021) (ruling that the "construction of [Section] 1681s-2" dictates that "there must be some threshold showing of inaccuracy to make a claim against a furnisher"). Even reported information that is "technically correct" may still "be inaccurate if, through omission, it 'create[s] a materially misleading impression.'" *Seamans*, 744 F.3d at 865 (quoting *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 148 (4th Cir. 2008)). "Whether technically accurate information was 'misleading in such a way and to such an extent that [it] can be expected to have an adverse effect' is generally a question to be submitted to the jury." *Id.* at 865 (quoting *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1163 (9th Cir. 2009)).

Here, Plaintiffs argue that NMAC's furnishing of information concerning their nonpayment of additional monthly lease charges after August 9 was inaccurate because NMAC had no "contractual or legal right," in the lease or otherwise, to assess those charges. (*See generally* ECF No. 67.) This is because, Plaintiffs assert, Plaintiffs did exactly what the lease required of

them: to return and relinquish possession of the vehicle by the lease-end date. (ECF No. 67 at 21.) On the other hand, NMAC argues that its reporting was, in fact, accurate. (*See generally* ECF Nos. 66-5, 71.) NMAC asserts that Plaintiffs' failure to follow certain lease-termination procedures made their alleged return of the vehicle ineffective, which triggered the lease provision that, "[i]f [Plaintiffs] keep possession of this Vehicle past the end of the lease term, [Plaintiffs] will continue to pay the monthly payments . . . ." (ECF No. 66-5 at 18; *see* ECF No. 66-9 at 4 ¶ 12.) As a result, NMAC contends, the lease permitted NMAC to assess additional charges, which Plaintiffs never paid. (ECF No. 71 at 8.) And still, according to NMAC, Plaintiffs' claim turns on a legal question, not a factual inaccuracy, because at issue is "whether Nissan's charge was valid." (ECF No. 66-5 at 22.) NMAC argues that such a legal question cannot support a claim under Section 1681s-2. (*Id.* at 19.) The Court agrees.

The United States Court of Appeals for the Third Circuit has not addressed whether a legal dispute as to the validity or enforceability of a debt renders that debt a "factual inaccuracy" for purposes of a Section 1681s-2(b) claim against a furnisher. Other courts across the country that have addressed this question, including district courts in the Third Circuit, agree that such a legal dispute alone is insufficient to maintain a Section 1681s-2(b) claim. *See Chiang*, 595 F.3d at 38 ("[J]ust as in suits against CRAs, a plaintiff's required showing is *factual* inaccuracy, rather than the existence of disputed legal questions." (citing *DeAndrade v. Trans Union LLC*, 523 F.3d 61, 68 (1st Cir. 2008)) (emphasis in original)); *Hunt v. JPMorgan Chase Bank, Nat'l Ass'n*, 770 F. App'x 452, 458 (11th Cir. 2019) (dismissing a Section 1681s-2(b) claim and reasoning that "[w]hether [plaintiff] was obligated to make payments on the mortgage after the Foreclosure Action was filed is a currently unresolved legal, not a factual, question," and that "even assuming [defendant] furnished information that turned out to be legally incorrect under some future ruling,

[defendant]'s purported legal error was an insufficient basis for a claim under the FCRA" (applying *Chiang*)); *Holland v. Chase Bank USA, N.A.*, 475 F. Supp. 3d 272, 276 (S.D.N.Y. 2020) ("'[Plaintiff]'s claim of 'factual inaccuracy' relies entirely on his legal conclusion that his debts had been discharged due to the purported running of the relevant state's statute of limitations," and "[s]uch a dispute is a legal, not factual, challenge, and . . . plainly insufficient to support [plaintiff]'s FCRA claim"); *Esperance*, 2022 WL 1718039, at *5 ("[C]ourts have held that 'a plaintiff's required showing [under Section 1681s-2(b)] is factual inaccuracy rather than the existence of disputed legal questions,' such as whether a plaintiff was legally billed for the services disputed." (quoting *Chiang*, 595 F.3d at 38)); *Farrington v. Freedom Mortg. Corp.*, Civ. No. 20-4432, 2022 WL 16552779, at *10 (D.N.J. Oct. 31, 2022) (following *Esperance*); *Alston v. Wells Fargo Home Mortg.*, Civ. No. 13-3147, 2016 WL 816733, at *10 (D. Md. Feb. 26, 2016) (ruling that defendant's determination on "the legal question whether" a cashier's check "was a legally valid payment . . . cannot be deemed patently incorrect because it is not a factual question, but a legal one"); *Okocha v. Trans Union LLC*, Civ. No. 08-3107, 2011 WL 2837594, at *5 (E.D.N.Y. Mar. 31, 2011) ("Plaintiff's argument that he did not agree to the terms of the overdraft line of credit is a collateral legal attack on the validity of the debt, . . . not a factual inaccuracy, and, thus, is insufficient to withstand summary judgment."), *aff'd*, 488 F. App'x 535, 536 (2d Cir. 2012) (affirming "for the reasons articulated by the district court in its well-reasoned order").

Here, the subject information is Plaintiffs' failure to pay additional monthly charges assessed beyond the lease term. There is no dispute that Plaintiffs did not pay these charges and that they left the vehicle at the dealership without executing the lease-end documents. (RSMF ¶ 29.) At issue, as Plaintiffs put it, is "whether or not Plaintiffs returned the vehicle on August 9" and whether the return of the vehicle was consistent with the terms of the lease. (ECF No. 67 at

28.) The resolution of that issue will dictate whether NMAC had a right to assess the additional charges under the lease and related lease-return documents.

The challenge for Plaintiffs is that their dispute turns on interpretations of "possession" and "return" under the lease. (*See* ECF No. 71 at 9.) In Plaintiffs' own words, "[i]f Plaintiffs **did not** return the vehicle, they could be charged. If Plaintiffs **did** return the vehicle, they cannot be charged." (ECF No. 67 at 26 (emphasis in original).) NMAC assessed the additional monthly charge against Plaintiffs based on the notion — well-founded or not — that Plaintiffs had not returned the vehicle in accordance with the lease or Nissan's protocols. Plaintiffs insist that they had. Regardless of whether the conditions in the lease were met for assessing additional monthly charges, Plaintiffs' dispute concerns not "patently incorrect" information,[8] but rather the legal validity of an additional monthly charge. And that dispute can only be resolved by a court of law. *See Chiang*, 595 F.3d at 38 ("Like CRAs, furnishers are 'neither qualified nor obligated to resolve' matters that 'turn[ ] on questions that can only be resolved by a court of law.'" (quoting *DeAndrade*, 523 F.3d at 68)). Thus, even if NMAC furnished information that turned out to be legally incorrect under some future ruling, NMAC's alleged legal error is an insufficient basis for a claim under the FCRA.

Plaintiffs' strict reliance on the lease terms and witnesses' interpretation of them, in contesting NMAC's right to assess additional monthly charges, only underscores the dispute's legal nature. Indeed, Plaintiffs' briefing is replete with arguments that oft appear in breach-of-contract actions. For example, Plaintiffs maintain that "neither the Lease nor the Lease extension

---

[8] *See, e.g., Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 568-69 (7th Cir. 2021) ("[E]xamples of factual inaccuracies include the amount a consumer owes, and what day a consumer opened an account or incurred a payment," or where "the furnisher has factually misidentified [a consumer]—say with the wrong social security number" (citing *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 891 (9th Cir. 2010))).

agreement make return or possession subject . . . to whether the dealership . . . 'did not accept' or 'refused to take' possession" (ECF No. 67 at 21); that "there is nothing in the Lease or the Lease extension agreement which required Plaintiffs to make an appointment to return the vehicle" (*id.* at 22); that "there is simply nothing in the Lease or the Lease extension agreement that gives Nissan the contractual right to charge Plaintiffs an additional monthly payment for failing to sign an odometer statement" (*id.* at 22-23); and that because "the term 'grounding' is not in the Lease at all . . . it cannot be that Nissan could charge Plaintiffs an additional monthly payment because the dealership did not ground the vehicle" (*id.* at 24). Plaintiffs also claim that the odometer statement is dated September 20, yet the official "grounding date" is August 9, indicating that Plaintiffs returned the vehicle on time. (*Id.* at 23.) Plaintiffs further argue that NMAC's right to assess additional monthly charges under the lease should start and stop with the lease's terms and ignore NMAC's notice leading up to the lease end. (*See id.* at 29 n.2 ("Nissan's reliance on Exhibit F, the end of lease email, is pointless. That email is not part of the Lease or the Lease extension agreement . . . .") (internal citations omitted).) Finally, Plaintiffs assert that "[n]othing in those [Code of Federal Regulations] or [Odometer Disclosure Requirements] give Nissan the contractual right to charge an additional monthly payment. That is all that matters here." (*Id.* at 28.[9])

Boiled down, these arguments concern a contract dispute, not a factual inaccuracy. Indeed, Plaintiffs' claim is truly that NMAC failed to accept Plaintiffs' interpretation of what the lease required of Plaintiffs to surrender possession of the vehicle properly and terminate the lease. But "[f]urnishers are neither qualified nor obligated to resolve matters that turn on questions that can only be resolved by a court of law." *Esperance*, 2022 WL 1718039, at *5 (quoting *Chiang*, 595

---

[9] Plaintiffs argue this is in opposition to NMAC's contention that federal law requires an odometer statement to be executed when a lease terminates. (*See* RSMF ¶ 18; ECF No. 66-5 at 22; *see also* 49 CFR § 580.7.)

F.3d at 35)); *see Cohen v. Mercantile Adjustment Bureau, LLC*, Civ. No. 21-16977, 2022 WL 1567798, at *5 (D.N.J. May 18, 2022) ("The question of whether a person is indebted to another is ultimately one of law, concerning the legal obligation of one party to another." (citing *Rosenberg v. Frontline Asset Strategies, LLC*, 556 F. Supp. 3d 157, 161 (E.D.N.Y. 2021); *see also Brusco v. WIP Moonachie LLC*, Civ. No., 2020 WL 5201379, at *4 (D.N.J. Sept. 1, 2020) ("[D]isputes involving the interpretation of unambiguous contracts are resolvable as a matter of law, and are, therefore, appropriate cases for summary judgment." (quoting *Tamarind Resort Assocs. v. Gov't of Virgin Islands*, 138 F.3d 107, 110 (3d Cir. 1998))).

Plaintiffs place too much weight on NMAC ultimately submitting an AUD to the CRAs to remove the late payment entry from Plaintiffs' credit reports. (*See generally* ECF No. 67.) NMAC's decision, even when viewed in a light most favorable to Plaintiffs, does not change the dispute's legal nature. Plaintiffs also point to NMAC's internal notes that allegedly show NMAC's customer-service representatives affirming that the additional charges should be removed because the dealership grounded the vehicle late. However, the dealership's September 24 letter states that Plaintiffs "wanted it to be grounded and turned in but didn't want to follow procedure and abandoned the Vehicle" (ECF No. 67-13), not that the dealership grounded the vehicle late. This squares with another of NMAC's internal notes that it "reviewed trans history . . . found delinquency 1x30 (08/09/19) completed grounding 09/20/19 . . . dealer did not admit fault for delq . . . account reporting accurate." (ECF No. 74-1 at 10 (all-capitalizations revised).) Indeed, NMAC consistently maintained that its reporting was accurate. NMAC reiterated such in its December 19 letter to Plaintiffs, despite its customer service department having by that point generated at least two service requests to remove the payment delinquency. And, as NMAC soundly asserts,

"whether customer service chooses to resolve issues favorably to a consumer does not address whether the information was inaccurate." (ECF No. 71 at 7.)

Moreover, Plaintiffs suggest that NMAC failed to resolve Plaintiffs' dispute because the dealership believed that Plaintiffs were "rude." (*See* ECF No. 67 at 21, 23, 28, 43.) Presumably, Plaintiffs seek to infer that NMAC willfully failed to comply with reporting requirements. *See* 15 U.S.C. § 1681n (imposing liability on "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter"). But Plaintiffs have proffered no evidence for a factfinder to infer that NMAC's reporting was motivated by the dealership's view of Plaintiffs rather than the consequences under the lease for failing to return the vehicle. Absent such evidence, the Court cannot draw that inference. *See Denckla v. Maes*, 313 F. Supp. 515, 524 (E.D. Pa. 1970) ("'[U]nresolved issues of fact' may not be created or manufactured by drawing inferences from general conclusions which are not factually supported.").

Plaintiffs' reliance on *Gross v. CitiMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022), is also misplaced here. Plaintiffs cite *Gross* for the proposition that not all courts have let furnishers avail themselves of the defense against FCRA claims that are truly collateral attacks on the underlying credit information. *See id.* at 1253 ("FCRA does not categorically exempt legal issues from the investigations that furnishers must conduct."). However, *Gross*'s facts are distinguishable from this case's. In *Gross*, the Court held that a furnisher's reporting of a debt was "patently incorrect" because a statute had abolished plaintiff's obligation to repay the debt. *Id.* at 1249-51. Here, of course, no statute has made NMAC's reporting inaccurate. And although not all courts have endorsed *Chiang*'s extension of the collateral-attack defense to furnishers, *Chiang*'s appears to be the prevailing approach among courts that have faced the issue directly, including district courts in this circuit, as noted above. *See Esperance*, 2022 WL 1718039, at *5; *Farrington*,

14

2022 WL 16552779, at *10 ("[A] plaintiff must show a factual inaccuracy in the furnisher's report to a CRA, not the existence of a disputed legal issue." (internal citations omitted)). This Court adopts *Chiang*'s approach too.[10]

Having determined that Plaintiffs failed to satisfy the essential requirement of showing a factual inaccuracy, the Court need not address NMAC's remaining arguments as to the reporting's accuracy as a matter of law or Plaintiffs' damages.

## IV.   CONCLUSION

For the foregoing reasons, and other good cause shown, NMAC's Motion for Summary Judgment (ECF No. 66) on Plaintiffs' FCRA claim is **GRANTED**. The FCRA claim against NMAC in Plaintiffs' Complaint (*see* ECF No. 1 ¶¶ 40-53) is **DISMISSED** with prejudice. An appropriate Order and Judgment follows.

Dated: May 30th, 2023

_____
GEORGETTE CASTNER, U.S.D.J.

---

[10]   Because the Court joins its fellow courts' adoption of *Chiang*, it need not address each of the several other cases Plaintiffs cite to oppose NMAC's collateral-attack defense. (*See* ECF No. 67 at 32-42.)